UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.1:08-cv-614 (CKK) |
| UNITED STATES POSTAL SERVICE, | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Defendant respectfully moves for summary judgment pursuant to Fed. R. Civ. P. 56 or in the alternative to dismiss the claims against it for lack of subject matter jurisdiction and failure to state a claim under Rules 12(b)(1) and (6).  In short, plaintiff's claim must be dismissed because the defendant has complied fully with the arbitration award plaintiff seeks to enforce, the claim asserted in the complaint is moot and fails to state a cognizable claim.  The arguments are set forth in more detail in the accompanying memorandum of points and authorities.

Respectfully Submitted,

_____

 JEFFREY A. TAYLOR, BAR # 498610
United States Attorney

_____

RUDOLPH  CONTRERAS, Bar # 434122
Assistant United States Attorney


_____/s_____

BENTON G. PETERSON,  Bar #1029849
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.  Civil Division
Washington, D.C.  20530
(202) 514-7238 514-8780 (Facsimile)
 Benton.Peterson@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No.1:08-cv-614 (CKK) |
| UNITED STATES POSTAL SERVICE, | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Defendant, United States Postal Service, moves for summary judgment under Rule 56 and in the alternative to dismiss the claims against it for lack of jurisdiction and failure to state a claim under Rule 12(b)(1) and (6).  As discussed below, because the Postal Service has complied fully with the arbitration award plaintiff seeks to enforce, the claim asserted in the complaint is moot. As a result, plaintiff fails to state a cognizable claim and this Court is without subject matter jurisdiction and the matter must be dismissed or in the alternative because there are no genuine issues of fact and defendant is entitled to judgment as a matter of law, defendant's Motion for Summary Judgment must be granted.

### I.    FACTUAL BACKGROUND

This is an action brought by the American Postal Workers Union ("APWU") on behalf of one of its members, Deborah Freeman.  Ms. Freeman was removed from Postal

Service employment on August 7, 2004.  (Complaint, ¶¶ 6-7; Monk decl., ¶ 3 and Ex.1).

The July 2, 2004 notice of removal advised Ms. Freeman that, if her removal was later

reversed or modified, back pay may be allowed "*only if [she has] made reasonable*

*efforts to obtain alternate employment during the potential back pay period*." (emphasis

original) (Monk decl., ¶ 3, and Ex.1).  The notice of removal was accompanied by a copy

of Part 436 of the Postal Service's Employment and Labor Relations Manual ("ELM")

which explains the Postal Service's procedures governing corrective back pay awards

and the employee's obligation to mitigate damages through outside employment.  ELM

Part 436 is incorporated into the collective bargaining agreement ("the CBA") between

the Postal Service and the APWU through Article 19 thereof.  (Monk decl., ¶ 3).  The

ELM is also formally made part of the "regulations of the Postal Service" under 39

C.F.R. § 211.2(a)(2).

    The APWU filed a grievance under Article 15 of the CBA challenging Ms.

Freeman's removal.  That grievance was not resolved under the negotiated grievance

procedures and proceeded to a hearing before Arbitrator Christopher E. Miles.

(Complaint, ¶¶ 8-9; Monk decl., ¶ 5, and Ex. 4).  On January 10, 2007, Arbitrator Miles

sustained the grievance and ordered Ms. Freeman reinstated and that she "*be made whole*

*for all lost wages as a result of the Notice of Removal dated July 2, 2004*." (Complaint,

¶¶ 10-11; Monk decl., ¶ 5, and Ex. 4) (emphasis added).

    Ms. Freeman subsequently was paid back pay for the period from August 7, 2004,

to January 19, 2007, in compliance with the Miles award.  (Monk decl., ¶ 6).  The

payment was calculated in accordance with the procedures and policy outlined in ELM,

Part 436, by determining the amount Ms. Freeman would have been paid by the Postal

Service during that period and deducting the amount Ms. Freeman actually earned in

outside employment during the same period.  (*Id.*).  Ms. Freeman also was paid interest

on her back pay award in accordance with ELM, Part 436. (Monk decl., ¶ 7).

This method of calculating back pay awards under ELM, Part 436, is consistent

with all other back pay awards paid by the Postal Service, and is consistent with rulings

in other arbitration awards on this point.  (Monk decl., ¶ 8, and Ex. 5).

## II.    ARGUMENT

### A.    MOTION TO DISMISS

A motion under Rule 12(b)(1) or 12(b)(6) "tests the legal sufficiency of the

complaint."  *ACLU Foundation of Southern Calif.  v. Barr*, 952 F.2d 457, 472 (D.C. Cir.

1991).  When reviewing such motions, the Court must take the allegations in the

non-movant's pleading as true.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957);

*Sinclair v. Keindienst*, 711 F.2d 291, 293 (D.C. Cir.  1983).  However, "a court must

accept only well-pleaded allegations of fact, it need not accept legal conclusions."  *Taiwo*

*Okusami v. Psychiatric Institute of Washington, Inc.*, 959 F.2d 1062, 1069 (D.C. Cir.

1992) (Sentelle, J., concurring in part and dissenting in part) (quoting 5A Wright &

Miller, Federal Practice and Procedure, § 1357 at 315) (internal quotes omitted).

A court may consider evidence beyond the pleadings in ruling on a 12(b)(1)

motion challenging jurisdiction, though it is not required to do so.  *See Herbert v.*

*National Academy of Science*, 974 F.2d 192, 197 (D.C. Cir. 1992). Under Rule 12(b)(1),

the plaintiff bears the burden of establishing by a preponderance of the evidence that the

Court possesses subject matter jurisdiction.  *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp.

2d 59, 63 (D.D.C. 2002); *Pitney Bowes v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19

(D.D.C. 1998). In deciding a motion to dismiss for lack of subject matter jurisdiction, a

court is not limited to the allegations set forth in the complaint, "but may also consider

material outside the pleadings in its efforts to determine whether the court has

jurisdiction in the case." *Alliance for Democracy v. Fed. Election Comm'n*, 362 F. Supp

2d 138, 142 (D.D.C. 2005); *see Lockamy v. Truesdale*, 182 F.Supp. 2d 26, 30-31 (D.D.C.

2002). Because mootness is a jurisdictional defect, an action that has been rendered

moot should be dismissed under Rule 12(b)(1). *Abu v. Gonzales*, 378 F. Supp. 2d 16, 17

(D.D.C. 2005). "Federal courts lack jurisdiction to decide moot cases because their

constitutional authority extends only to actual cases and controversies." *City of Houston

v. Dep't of Housing and Urban Dev.*, 24 F. 3d 1421, 1426 (D.C. Cir. 1994). A case is

rendered moot when the relief sought by the plaintiff has already been provided. *Jean v.

Dept. of Labor*, D.C. Civil Action No. 89-0611, 1990 WL 51563 at *4, (D.D.C. Jan. 9,

1990) (dismissing complaint as moot where "defendants have already afforded [plaintiffs

the] relief [they seek]"). In ruling on a 12(b)(6) motion, a court is limited to the

allegations in the complaint and "other matters of public record including court files,

records and letters of official actions or decisions of government agencies and

administrative bodies, documents referenced and incorporated in the complaint and

documents referenced in the complaint or essential to a plaintiff's claim which are

attached to a defendant's motion." *See Arizmendi v. Lawson, 914 F. Supp. 1157, 1160-61

(E.D. Pa. 1996)*.

**B.     SUMMARY JUDGMENT**

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). In determining whether a genuine issue of material fact exists, the Court must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587. The mere existence of a factual dispute, however, will not defeat summary judgment. The non-moving party must show that the dispute is genuine and material to the case. That is, the factual dispute must be capable of affecting the substantive outcome of the case and supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party. *Anderson*, 477 U.S. at 247-48; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987). If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. (*citing Anderson*, 477 U.S. at 249-50. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

### C.    PLAINTIFF FAILS TO PRESENT AN ACTIONABLE CLAIM

The Postal Service has now paid Ms. Freeman the full amount she would have been paid by the Postal Service but for her removal, offset by the amount of her actual outside earnings for the relevant period.  (Monk decl., ¶ 6).  As explained below, this payment constitutes full compliance with Arbitrator Miles' directive that Ms. Freeman be "made whole" for her lost wages.  The plaintiff has received all relief that can be afforded and this action is thus rendered moot and fails state a claim.

The sole issue in this case is whether an award of back pay directing that the employee be "made whole" bars the employer from offsetting the employee's outside earnings in calculating the payment.  The APWU has framed its complaint in this action as seeking to "enforce" the arbitrator's directive in a manner that is both contrary to the terms of the CBA and contrary to the plain meaning of the language in the award.  This transparent attempt to reform the award by judicial interpretation must be rejected.  It is well settled that judicial review of an arbitration award is extremely limited.  *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1473 (D.C. Cir. 1997) (*citing United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567-68 (1960)).  Once the parties have exhausted the grievance procedures under a collective bargaining agreement and obtained a final award from an arbitrator, a court "ha[s] nothing left to do but enforce the award." *Int'l Bhd. of Elec. Workers, Local 429 v. Toshiba Am., Inc.*, 879 F.2d 208, 209 (6th Cir. 1989).

The arbitrator's directive in this case that the grievant be "made whole" is not ambiguous because that term has specific meaning both in the contract at issue here and in general legal precepts.  The CBA contains an integration clause, at Article 19, which incorporates all Postal Service handbooks, manuals, and published regulations that

directly relate to wages, hours and working conditions.  (Monk decl., ¶ 3).  The ELM is one of the manuals incorporated into the collective bargaining agreement by Article 19. Section 436.2(a) of the ELM.  Section 436.2(a) of the ELM imposes a strict limitation on corrective back pay awards by requiring that the amount earned by the employee through outside employment during the back pay period be "offset against the amount of reimbursement" that the employee would otherwise receive.  (Monk decl., ¶ 3 and Ex. 2).  The award in this case was issued under the authority of the CBA and must therefore be presumed to comply with the unambiguous terms of that agreement, including the provisions of section 436 of the ELM which are incorporated therein.

This conclusion is further supported by numerous back pay claims that have been arbitrated by various postal unions,[1] a sampling of which are attached to the declaration of Appalachian District Human Resources Manager Wendy P. Monk. (Monk decl., ¶ 7, and Ex. 5 consisting of five awards: *Woods* (Thomas, 2004); *Rigel* (Loeb, 2006); *Toles* (Fletcher, 2005); *Austin* (Bahakel, 2005); *Khong* (Helburn, 2005)).  These arbitration awards have uniformly upheld the contractual mitigation requirement set forth in Section 436 of the ELM.  Ms. Monk also states that it is the regular practice of the Postal Service to offset mitigation earnings in all corrective back pay awards.  (Monk decl., 7).

The duty to mitigate damages is rooted in an ancient principle of law.  The "general rule" has been summarized as follows:

> Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages. The person wronged cannot recover for any item of damages which could thus have been avoided.

---

[1]   The relevant sections of the ELM governing back pay claims apply across the board to all of the unions representing employees within the Postal Service.

C. McCormick, *Law of Damages* at 127 (1935).  This principle also has found its way

into analogous areas of employment and labor law.  Thus, in connection with the

remedial provisions of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.,* the

Supreme Court has stated:

> Making the workers whole for losses suffered on account of an unfair
> labor practice is part of the vindication of public policy which the
> [National Labor Relations] Board enforces.  Since only actual losses
> should be made good, it seems fair that deductions should be made not
> only for actual earnings by the worker but also for losses which he
> willfully incurred.

*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197-98 (1941).   The concept of offsetting

mitigation earnings is also embodied in the back pay provisions of Title VII of the Civil

Rights Act of 1964[2] which provides, in relevant part, that: "[i]nterim earnings or amounts

earnable with reasonable diligence by the person or persons discriminated against shall

operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1).

As explained above, this hallowed principle has been enacted in the Postal

Service's ELM, which has been incorporated into the collective bargaining agreement

between the APWU and the Postal Service.  Ms. Freeman was explicitly advised of this

requirement in the Notice of Removal.  The award issued by Arbitrator Miles, which the

plaintiff purportedly seeks to enforce, must therefore be found to incorporate this

principle into its unambiguous directive that Ms. Freemen be "made whole for all lost

wages" resulting from her removal.  It is undisputed that the Postal Service has paid Ms.

Freeman all back pay due, after deducting her actual outside earnings.  This constitutes

---

[2]    In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975), the Supreme Court noted that "[t]he [Title VII] back pay provision was expressly modeled on the back pay provision of the National Labor Relations Act."

full compliance with the award and there is no further relief that can be granted in this case.

D) ALTERNATIVELY, SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANT SHOULD BE ENTERED

Notwithstanding the foregoing argument, should the Court find plaintiff has asserted an actionable claim that is within the Court's jurisdiction, then summary judgment in favor of the Postal Service should be entered pursuant to FRCP 56(b).  As explained above and demonstrated by the Statement of Material Facts as to Which There is No Genuine Issue, there is no dispute as to any material facts and those undisputed facts compel the legal conclusion that the Postal Service has complied fully with the arbitration award at issue.  The Postal Service is therefore entitled to judgment in its favor as a matter of law.

### III.    CONCLUSION

For the reasons stated above, this complaint should be summarily dismissed pursuant to FRCP 12(b)(1) or 12(b)(6).  Alternatively, summary judgment pursuant to FRCP 56(b) should be entered in favor of the Postal Service.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, Bar # 498610
United States Attorney

_____
RUDOLPH CONTRERAS, Bar # 434122
Assistant United States Attorney

_____/s_____
BENTON  PETERSON, Bar # 1029849
Assistant United States Attorney
555 Fourth Street, NW,
Washington, DC 20530
202-514-7238

Of Counsel:
DENNIS E. SZYBALA
United States Postal Service
475 L'Enfant Plaza, S.W., Room 6534
Washington, D.C.  20260-1150
202-268-6529

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.1:08-cv-614 |
| | ) (CKK) |
| UNITED STATES POSTAL SERVICE, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Upon consideration of Defendant's Motion to Dismiss or in the Alternative Motion for

Summary Judgment, and the opposition, if any, it is

ORDERED that  Defendant's Motion is GRANTED, and it is

FURTHER ORDERED that this case is dismissed with prejudice.

Dated this _____ day of _____, 2008.

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No.1:08-cv-614 ) (CKK) |
| UNITED STATES POSTAL SERVICE, | ) ) |
| Defendant. | ) |

**STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE**

_____Pursuant to Local Rule 7 (h), the defendant hereby submits the following material facts as

to which there is no genuine dispute :

1)  This is an action brought by the American Postal Workers Union ("APWU") on behalf of one

of its members, Deborah Freeman. Ms. Freeman was removed from Postal Service employment

on August 7, 2004.   (Complaint, ¶¶ 6-7; Monk decl., ¶ 2 and Ex.1).

2) The July 2, 2004 notice of removal advised Ms. Freeman that, if her removal was later

reversed or modified, back pay may be allowed "*only if [she has] made reasonable efforts to

obtain alternate employment during the potential back pay period*." (emphasis original) (Monk

decl., ¶3, and Ex.1).

3) The notice of removal was accompanied by a copy of Part 436 of the Postal Service's Employment and Labor Relations Manual ("ELM") which explains the Postal Service's procedures governing corrective back pay awards and the employee's obligation to mitigate damages through outside employment. (Monk decl., ¶ 3, and Ex. 2).

4) ELM Part 436 is incorporated into the collective bargaining agreement ("the CBA") between the Postal Service and the APWU through Article 19 thereof.  Monk decl., ¶ 3.

5) The ELM is also formally made part of the "regulations of the Postal Service."  39 C.F.R. § 211.2(a)(2).

6) The APWU filed a grievance under Article 15 of the CBA challenging Ms. Freeman's removal.   (Complaint, ¶¶ 8-9; Monk decl., ¶ 5, and Ex. 4).

7) The APWU grievance was not resolved under the negotiated grievance procedures and proceeded to a hearing before Arbitrator Christopher E. Miles.  Id.

8) On January 10, 2007, Arbitrator Miles sustained the grievance and ordered Ms. Freeman reinstated and that she "be made whole for all lost wages as a result of the Notice of Removal dated July 2, 2004." (Complaint, ¶¶ 10-11; Monk decl., ¶ 5, and Ex. 4.)

9) Ms. Freeman was subsequently paid back pay for the period from August 7, 2004, to January 19, 2007, in compliance with the Miles award.  (Monk decl., ¶ 6).

10) The payment was calculated in accordance with the procedures and policy outlined in ELM, Part 436, by determining the amount Ms. Freeman would have been paid by the Postal Service during that period and deducting the amount Ms. Freeman actually earned in outside employment during the same period.  Id.

11) Ms. Freeman was also paid interest on her back pay award in accordance with ELM, Part 436. (Monk decl., ¶ 7).

12) This method of calculating back pay awards under ELM, Part 436, is consistent with all other back pay awards paid by the Postal Service, and is also consistent with rulings in other arbitration awards on this point.  (Monk decl., ¶ 8, and Ex. 5).

Respectfully Submitted,

_____
 JEFFREY A. TAYLOR, BAR # 498610
United States Attorney


_____
RUDOLPH  CONTRERAS, Bar # 434122
Assistant United States Attorney


_____/s_____
BENTON G. PETERSON,  Bar #1029849
Assistant United States Attorney
Judiciary Center Building
555 4th Street, N.W.  Civil Division
Washington, D.C.  20530

(202) 514-7238 514-8780 (Facsimile)
 Benton.Peterson@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN POSTAL WORKERS UNION,    )
    AFL-CIO,    )
    )
        Plaintiff,    )
    )
    v.    )    Civil Action No. 1:08-cv-0614
    )    Judge Kollar-Kotelly
UNITED STATES POSTAL SERVICE,    )
    )
Defendant.    )

### Declaration of Wendy P. Monk

I, Wendy P. Monk, hereby declare as follows:

1.    I am presently employed by the United States Postal Service ("Postal Service") as Manager, Human Resources, for the Appalachian District. I have held this position since December 2006. I make this declaration based upon my own personal knowledge and upon information contained in official Postal Service records.

2.    Deborah B. Freeman has been employed by the Postal Service since 1988. On February 1, 2000, Ms. Freeman filed an action in the United States District Court for the Western District of Virginia alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964 arising from her employment at the Roanoke, Virginia, Processing and Distribution Center. *Freeman v. Henderson*, W.D.Va. Civil Action No. 7:00-CV-0071. That action was settled by agreement dated July, 19, 2000. The settlement agreement provided, among other things, that Ms. Freeman would be transferred "as soon as practicable to a full time window clerk position in the Hollins Branch of the Roanoke Post Office" and that she "shall be placed on administrative leave until such time as she is placed in such position."

3.    A dispute subsequently arose regarding whether Ms. Freeman had been placed in the position designated in the settlement agreement. In March, 2004 and thereafter, Ms. Freeman failed to report to duty following being excessed to a different postal facility in accordance with Article 12 the collective bargaining agreement between the APWU and the Postal Service. ("CBA") Based on her failure to report for duty as ordered, Ms. Freemen was subsequently removed from Postal Service employment on August 7, 2004. A copy of the July 2, 2004 Notice of Removal is attached hereto as Exhibit 1. The final paragraph of that letter states:

> If this action is reversed or modified on appeal, back pay may be allowed unless the appropriate award or decision specifies otherwise, ONLY IF YOU HAVE MADE REASONABLE EFFORTS TO OBTAIN ALTERNATE EMPLOMENT DURING THE POTENTIAL BACK PAY PERIOD. The documentation which you must maintain and present to support [a] back pay claim is described in Part 436 of the Employee and Labor Relations Manual (copy attached).

(emphasis original). A copy of Part 436 of the Employee and Labor Relations Manual ("ELM") is hereto attached as Exhibit 2. The ELM is incorporated into the CBA by virtue of Article 19 which incorporates into the CBA all handbooks, manuals, and published regulations of the Postal Service that directly relate to wages hours or working conditions.

4.    Ms. Freeman thereafter filed a second action in the United States District Court for the Western District of Virginia alleging that the Postal Service breached the terms of the settlement agreement in her prior action. *Freeman v. Potter*, W.D.Va. Civil Action No. 7:04-CV-0276. On June 7, 2006, United States District Judge William L. Osteen issued an opinion finding that the Postal Service had breached the settlement agreement and, among other things, awarding Ms. Freeman $14,000.00 in lost wages through August 7, 2004. Judge Osteen specifically declined to order Ms. Freeman reinstated. A copy of Judge Osteen's June 6, 2006

2

opinion is attached hereto as Exhibit 3.

5.     The American Postal Workers Union ("APWU") thereafter filed a grievance under Article 15 of the CBA challenging Ms. Freeman's removal. That grievance was not resolved under the negotiated grievance procedure and proceeded to an arbitration hearing before Arbitrator Christopher E. Miles. On January 10, 2007, Arbitrator Miles sustained the grievance and ordered Ms. Freeman "reinstated to her position with the Postal Service and she shall be made whole for all lost wages as a result of the Notice of Removal dated July 2, 2004." A copy of Arbitrator Miles' award is hereto attached as Exhibit 4.

6.     Ms. Freeman was thereafter reinstated on January 20, 2007. Pursuant to Arbitrator Miles' directive that Ms. Freeman be "made whole" for her lost wages, and in accordance with the procedure and policy outlined in ELM, Part 436, Ms. Freeman subsequently received back pay for the period from August 7, 2004 to January 19, 2007. The back pay was calculated by determining the amount Ms. Freeman would have been paid by the Postal Service during that period and deducting the amount Ms. Freeman actually earned in outside employment during the same period. The net difference of $44,720.98 (after all appropriate deductions were taken) was received by Ms. Freeman on December 10, 2007.

7.     As further provided in ELM, Part 436, Ms. Freeman also received interest on the back pay she received. That interest payment in the amount of $7,475.08 was received by Ms. Freeman on December 17, 2007.

8.     The Postal Service policy stated in ELM, Part 436 - that back pay awards shall be offset by the amount of outside earnings during the back pay period - applies to all corrective back pay awards made by the Postal Service. The application of this policy has been upheld in

3

numerous arbitration awards.  Attached hereto as Ex. 5 are five representative arbitration awards

applying this policy:[1] Woods (Thomas, 2004); Rigel (Loeb, 2006); Toles (Fletcher, 2005); Austin

(Bahakel, 2005); Khong (Helburn, 2005)


I declare under penalty of perjury that the foregoing is true and correct to the best of my

information and belief.

June 12, 2008

*Wendy P. Monk*

Wendy P. Monk

---

[1] The awards are identified in the following format: "*grievant name* (arbitrator name, year award issued)."

4


**UNITED STATES**
**POSTAL SERVICE**

                                    **Certified No. 7099 3400 0006 0090 1110**
                                    **Return Receipt**

**DATE:**      July 2, 2004

**OUR:**       RKASSEBAUM: wsh-9401
                                                        ┌─────────────────────────┐
**SUBJECT:**   Notice of Removal                         │      RECEIVED           │
                                                        │                         │
              Deborah Freeman                           │      AUG 2 3 2004        │
              Clerk                                      │                         │
              SSN: 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                           │ E.S.O. DISPUTE RESOLUTION │
                                                        │   APPALACHIAN DISTRICT   │
                                                        └─────────────────────────┘

This is advance written notice that you will be removed from the Postal Service
effective Saturday, August 7, 2004.

This action is based on the following reason(s):

## CHARGE 1 – IMPROPER CONDUCT

*Failure to Follow Instructions*

Specifically, on May 17, 2004, James Cox sent you a letter[1], which you received on
May 18, 2004, reminding you of your responsibility as a Postal employee to report
for duty as scheduled. You were also directed in this letter to either report to work or
provide documentation that was acceptable to substantiate your continued absence
from duty. Mr. Cox informed you on the second page of this letter that failure to
return to work or provide acceptable documentation to support your continued
absence may result in your being charged as Absent Without Leave (AWOL) and
corrective action up to and including removal from the Postal Service would be
considered. You failed to abide by these instructions even after being notified of the
potential penalty that could result from your non-compliance with the instructions
contained in the May 17, 2004 letter. As of this date, you have failed to report for
work or provide acceptable documentation to substantiate your continued absence
from duty. Furthermore, you were instructed to provide PS Form 3971 every 14 days
requesting appropriate leave. Once again, you failed to follow these instructions.

On June 3, 2004, I sent you a certified letter (7002 3150 0004 3885 9883) instructing
you to report to my office for a Pre-Disciplinary Interview (PDI) on Wednesday, June
9, 2004 at 11:00am. You reported for the PDI with your Union Representative John
Feazelle present. You stated that you had not corresponded with your supervisor
since requesting administrative leave on April 14, 2004. When you were asked if you
provided a PS Form 3971 every 14 days requesting appropriate leave you stated

[1] The May 17, 2004 letter from HR Manager James Cox was signed by Labor Relations Specialist
Robert Young *for* James Cox.

ROANOKE POST OFFICE
PO BOX 9998
ROANOKE, VA 24022
(540) 985-8751


GOVERNMENT
EXHIBIT

1

- 2 -

RECEIVED

AUG 2 3 2004

E.E.O. DISPUTE RESOLUTION

that you are not required to. All employees are required to submit PS Form 3971 when requesting/taking any type of leave pursuant to Section 511.23 of the Employee and Labor Relations Manual (ELM). I find your answers to be insufficient to relieve you of your responsibility to follow instructions.

Furthermore, section 666.51 of the Employee and Labor Relations Manual (ELM) states in part "Employees must obey the instructions of their supervisors." Your failure to follow my instructions cannot and will not be tolerated by the Postal Service.

## CHARGE 2 - ABSENT WITHOUT OFFICIAL LEAVE (AWOL)

Specifically, on March 8, 2004, you requested administrative leave on PS Form 3971 and under "Number of Hours Requested" you wrote in "Effective Immediately". In the "Remarks" section you wrote: "Per Civil Action No: 7:00-CV-00071 referring to an EEO settlement you signed on July 19, 2000. During the PDI on June 9, 2004, you kept referring to "Article 5" of the settlement agreement which states in part:

*"Defendant agrees to transfer plaintiff as soon as practicable to a full time window clerk position in the Hollins Branch of the Roanoke Post Office. Plaintiff shall be placed on administrative leave until such time as she is placed in such position."*

Since there was no such position available at time the settlement agreement was signed, you chose to work at the Hollins Station from August 26, 2000 through December 27, 2002. You were then excessed from the Hollins Station and moved to the Carrier Annex where you were assigned from December 28, 2002 through March 5, 2004. You were assigned to the Cave Spring Station effective March 6, 2004. Your request for administrative leave was denied by Roanoke, VA Postmaster Anne Murray on March 9, 2004; however, you failed to report for duty or request another type of leave.

James Cox, Manager, Human Resources sent you a letter dated March 15, 2004, supporting Postmaster Murray's denial of your March 8, 2004 request for Administrative Leave. Mr. Cox strongly encouraged you to reconsider your decision to be absent from work without approval and reminded you that if your absence was due to an unplanned emergency, illness, or injury that you should utilize normal leave requesting procedures. Finally, Mr. Cox offered you a 30-day "shadowing" assignment as per your July 19, 2000 EEO settlement and you were given 20 days to respond; however, you failed to respond to this offer. As such you were carried in an AWOL status from March 8, 2004 through March 19, 2004.

RECEIVED

AUG 2 3 2004

E.E.O. DISPUTE RESOLUTION
APPALACHIAN DISTRICT

- 3 -

On March 23, 2004, you began requesting annual leave for March 22, 2004 through April 9, 2004, which was approved by (A) Station Manager Richard Kassebaum. You submitted a PS Form 3971 dated April 14, 2004, again requesting administrative leave and under "Number of Hours Requested" you wrote "Until Window Clerk @Hollins is available". You also cited the July 19, 2000 EEO settlement, Article 5 as your justification for requesting the administrative leave. Your request was denied by Postmaster Murray on April 14, 2004.

On May 17, 2004, James Cox sent you a letter, which you received on May 18, 2004, reminding you of your responsibility as a Postal employee to report to duty as scheduled. You were also directed in this letter to either report to work or provide documentation that was acceptable to substantiate your continued absence from duty. As of this date, you have failed to report for work or provide acceptable documentation to substantiate your continued absence from duty. Furthermore, you were instructed to provide PS Form 3971 every 14 days requesting the appropriate leave. Once again, you failed to follow these instructions.

Mr. Cox informed you on the second page of this letter that failure to return to work or provide acceptable documentation to support your continued absence may result in your being charged as Absent Without Leave (AWOL) and corrective action up to and including removal from the Postal Service would be considered. You failed to abide by these instructions even after being notified of the potential penalty that could result from your non-compliance with the instructions contained in the May 17, 2004 letter. As of the date of this letter, you have yet to provide me with acceptable documentation to support your continued absence from work. As such, you have been carried in an AWOL status from April 12, 2004 through the present.

Section 666.82 of the Employee and Labor Relations Manual (ELM) states "Employees failing to report for duty on scheduled days, including Saturdays, Sundays, and holidays, will be considered absent without leave except in actual emergencies which prevent obtaining permission in advance. In emergencies, the supervisor or proper official will be notified as soon as the inability to report for duty becomes apparent. Satisfactory evidence of the emergency must be furnished later. An employee who is absent without permission or fails to provide satisfactory evidence that an emergency existed will be placed in a nonpay status for the period of such absence. The absence will be reported to the appropriate authority."

Section 666.81 of the Employee and Labor Relations Manual (ELM) states "Employees are required to be regular in attendance".

Furthermore, section 511.43 states in part "Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences."

RECEIVED

AUG 2 3 2004

E.E.O. DISPUTE RESOLUTION
APPALACHIAN DISTRICT

- 4 -

Therefore, it is my decision to remove you from the Postal Service effective August 7, 2004.

You have the right to file a grievance under the grievance/arbitration procedure set forth in Article 15 of the National Agreement within 14 days of your receipt of this notice.

If this action is reversed or modified on appeal, back pay may be allowed unless the appropriate award or decision specifies otherwise, ONLY IF YOU HAVE MADE REASONABLE EFFORTS TO OBTAIN ALTERNATE EMPLOYMENT DURING THE POTENTIAL BACK PAY PERIOD. The documentation which you must maintain and present to support back pay claim is described in Part 436 of the Employee and Labor Relations Manual (copy attached).

Edward LWood
FOR
Richard Kassebaum
_____
Printed Name of Proposing Official

Edward L Wood  7-2-04
for Richard Kassebaum
_____
Richard Kassebaum          Date
Station Manager
Roanoke, VA

Higher Level Review & Concurrence

Anne M. Murray  7-2-04
_____
Anne Murray          Date
Postmaster
Roanoke, VA

This letter is being sent to you both regular and certified mail.

I have received the original of this letter on ___7.3.04___

Signature _____          Time: _____

Attachment:  ELM 436

cc:  Inspection Service
     Labor Relations
     Personnel (OPF)

Pay Administration
Basic and Special Pay Provisions

436 **Back Pay**

> **Reference Note:**
> For additional material concerning the subject matter found in 436, refer to:
> - Management Instruction EL-430-90-8 or its replacement.

436.1 **Corrective Entitlement**

An employee or former employee is entitled to receive back pay for the period during which an unjustified or unwarranted personnel action was in effect that terminated or reduced the basic compensation, allowances, differentials, and employment benefits that the employee normally would have earned during the period.

For purposes of entitlement to employment benefits, the employee is considered as having rendered service for the period during which the unjustified or unwarranted personnel action was in effect.

436.2 **Limitations**

Limitations to corrective entitlement are as follows:

a. Any amount that the employee earned in a new employment or in an enlarged part-time employment to replace Postal Service employment must be determined and offset against the amount of the reimbursement to which he or she would be entitled.

b. Back pay is allowed, unless otherwise specified in the appropriate award or decision, provided the employee has made reasonable efforts to obtain other employment, as follows (see also 436.42g).

   (1) Job applicants not hired by the Postal Service must immediately make reasonable efforts to obtain other employment.

   (2) Separated employees, or employees on indefinite suspension, are allowed 45 days before they must make reasonable efforts to obtain other employment.

   **Exception:** Postal Service employees eligible for veterans' preference are not required to make reasonable efforts to obtain other employment while pursuing an administrative appeal with the Merit Systems Protection Board (MSPB).

c. No back pay is allowed for any period during which the person was not ready, willing, and able to perform the duties of the postal position.

d. Leave that is recredited as a result of the corrective action may not exceed the maximum amount of leave to which the employee was eligible (see 512.321).

   **Exception:** Postal Service employees eligible for veterans' preference are entitled to uncapped annual leave restoration if a removal is reversed or modified by the Merit Systems Protection Board (MSPB).

GOVERNMENT
EXHIBIT
2

e.   The employee is not entitled to (1) increases in pay resulting from deferment of step increases due to unsatisfactory service or (2) salary increases resulting from ranking action.

f.   Any claim made by a postal employee or his or her authorized agent or attorney for back pay must be submitted to the appropriate office within 6 full years after the date the claim first accrued.

### 436.3 Corrective Action

The installation head or other appropriate authority determining that a previous decision was unjustified or unwarranted initiates and directs the corrective action to be taken to ensure appropriate earnings to the employee for the period affected.

### 436.4 Documents in Support of Claim

### 436.41 Statements by Local Official

The following must be provided:

a.   The local official must provide a tabulation of the number and type of pay hours with which the employee should have been credited during the back pay period, including any annual or holiday leave taken as follows:

   (1)   Overtime hours and/or night differential, as applicable, are determined by averaging the number of hours that other employees of the office with the same employment status were assigned during the back pay period.

   (2)   If the claim is for a part-time flexible employee, a tabulation must be provided that shows the number and type of pay hours the employee experienced for a full 13 pay periods prior to the separation or suspension. If the back pay period is less than 1 full pay period, only a 6-pay-period tabulation is required.

b.   The local official must provide a statement indicating whether the employee is entitled to the following during the back pay period:

   (1)   Premium pay (see 434).

   (2)   Change in pay rate or salary schedule.

   (3)   Step increase and date effective.

   (4)   Change in leave category and date effective.

   (5)   Other changes in pay of a general application.

c.   The local official must provide a statement indicating that had the employee not been suspended or removed he or she would have worked the hours as reported.

d.   The local official must provide a statement showing that monies earned by the employee for other employment during the period covered by the corrected action must be deducted, provided the earnings were from work that replaced the lost postal employment (see 436.2a).

436.42    **Statements by Employee**

The following must be provided:

a.    The employee must provide a statement signed by the employee agreeing or disagreeing to the hours shown in 436.41b. If the employee does not agree, the basis for the disagreement should be explained.

b.    Where the original action resulted in separation or suspension, the employee must furnish the following:

   (1)    The employee must provide a statement on whether or not any income was earned during the back pay period. If any outside earnings were received, provide information on whether the earnings were from a part-time job held at the time of removal, in a new employment, or in an enlarged part-time employment obtained to replace the postal employment. In either case, a statement from the employer showing the record of hours worked and gross earnings during the back pay period is necessary.

   (2)    If the employee was already working in a part-time job at the time of removal or suspension, the employer should include the employee's record of employment for the 6-month period prior to the removal or suspension.

   (3)    If outside earnings were from self-employment, the claimant must provide an affidavit stating the amount earned during the back pay period. If such employment existed before the back pay period, the earnings must also be stated for 13 pay periods prior to the back pay period.

c.    The employee must provide a statement on whether or not the employee received any unemployment compensation, and if so, state the amount received and the state that made the payments.

d.    The employee must provide a statement that the employee was ready and able to perform his or her job during the back pay period. If not, state inclusive dates not ready and able, and the cause by which incapacitated or unavailable. The employee may request payment of sick or annual leave as appropriate and to his or her credit, for the period of incapacity or unavailability during the back pay period.

e.    Where the original action resulted in separation or indefinite suspension and no outside employment was obtained for all or any part of the back pay period, the employee must furnish the following:

   (1)    If the back pay period is 45 days or less, the employee is not required to certify or to provide documentation in support of efforts to secure other employment during this period.

   (2)    If the back pay period is more than 45 days and does not exceed 6 months, the employee must provide a statement certifying the reasons why outside employment was not obtained for all parts of the back pay period that exceed the first 45 days.

    (3)    If the back pay period is more than 6 months, the employee must provide documentation in support of efforts to secure other employment for all parts of the back pay period that exceed the first 45 days.

f.    On health benefit coverage, the employee should state whether he or she desires (a) to enroll in any plan, the same as a new employee, or (b) to have the prior enrollment reinstated retroactive to the date it was terminated.

g.    Where the original action resulted in denial of employment with the Postal Service, the individual must provide documentation in support of his or her efforts to secure other employment for all parts of the back pay period. The individual must also provide a statement of earnings during the back pay period as required by 436.42.

## 436.5 Life Insurance Coverage

If an individual is restored to duty in a pay status, or hired through a settlement or decision, life insurance coverage is dealt with according to Federal Employees' Group Life Insurance (FEGLI) Program regulations, depending on the circumstances encountered during the back pay period, as follows:

a.    *Employee is on the rolls but in nonpay status.* While the employee is in nonpay status, basic and optional coverage continue without cost for up to 12 months. After 12 months, coverage ceases, subject to a 31-day extension. (This 12-month period in nonpay status may be broken by periods of less than 4 consecutive months in pay status. If the employee returns to pay status for a period of 4 consecutive months or more, a new 12-month period of continued coverage begins.) When the employee returns to duty in a pay status, if coverage has ceased, on the first day of his or her return, basic and optional insurance are restored automatically, according to the last election on file (see 534.1, LWOP). Until coverage ceases, optional insurance may be elected, or increased, if the employee submits SF 2817, *Life Insurance Election (FEGLI),* within 60 days of experiencing a qualifying life event (e.g., marriage, divorce, death of spouse, birth or adoption of child).

b.    *Employee is separated from the Postal Service for less than 180 days.* On the last day in pay status, basic and optional coverage cease, subject to a 31-day extension (see 535.6, Termination). The employee may also convert FEGLI coverage to an individual policy. When the employee is reinstated, the employee automatically receives the FEGLI coverage according to his or her last election on file. The FEGLI regulations allow changes to this election under any one of the following three circumstances:

    (1)    *FEGLI Open Season.* A new election form may be submitted during a FEGLI Open Season.

    (2)    *Satisfactory medical information.* An employee who waived life insurance before the separation may acquire Basic Life Insurance and Option A — Standard and/or Option B — Additional (up to a total of five multiples) insurance by providing satisfactory medical

information to the Office of Federal Employees' Group Life Insurance (OFEGLI) by using SF 2822, *Request for Insurance (FEGLI).* If the request is approved, the employee is automatically signed up for Basic Life Insurance. He or she is given 31 days to elect Option A and/or Option B by submitting SF 2817. An employee who already has Basic Life Insurance may elect Option A and/or Option B or increase Option B multiples by providing satisfactory medical information through the same procedure. The employee must meet pay and duty status requirements to have the coverage become effective.

(3)   *Qualifying life event.* An employee who has Basic Life Insurance coverage may elect Option B or Option C or increase multiples of Option B or C (up to a total of five multiples) if there is a qualifying life event during the separation or during the 60-day period immediately before the separation. The employee is given 31 days from the date of reinstatement, or 60 days from the date of the event, whichever gives the employee more time, to elect optional insurance by submitting SF 2817. An employee who experiences a qualifying life event after returning to service has 60 days from the qualifying life event to increase FEGLI coverage. The amount of coverage that can be elected can vary depending on the life event and eligible family members. (See the chart under Life Event in FE 76-20, *FEGLI Program Booklet for Postal Service Employees.)*

c.   *Employee is separated from the Postal Service for 180 days or more.* On the last day in pay status, basic and optional coverage cease, subject to a 31-day extension (see 535.6, Termination). When the employee is reinstated, any waiver of insurance previously on file is cancelled. Basic Life Insurance becomes effective on the first day the employee returns to duty in a pay status. The employee may file a new waiver of coverage or elect optional insurance within 31 days of returning to duty by submitting SF 2817. If the employee files no election, he or she is given the optional insurance on file immediately before the break in service.

d.   *Individual hired as a new employee of the Postal Service.* As a new employee, the individual is eligible for basic and optional insurance according to 531.2, Eligible Employees, subject to 531.3, Exclusions. Basic Life Insurance coverage begins for an eligible employee on the first day of duty in a pay status, and he or she has 31 days to elect optional insurance by submitting SF 2817.

e.   *Individual dies during the back pay period.* According to 5 U.S.C. 8706(d), if the insurance of an employee stops because of separation from the service or suspension without pay, and the separation or suspension is thereafter officially found to have been erroneous, the employee is deemed to have been insured during the period of erroneous separation or suspension. Deductions otherwise required by 5 U.S.C. 8707 are not withheld from any back pay awarded for the period of separation or suspension unless death or accidental dismemberment of the employee occurs during such period.

Deductions must be made from the back pay awarded in these two situations because an insurance claim is paid.

## 436.6 Erroneous Separation for Retirement

### 436.61 Explanation

An individual who separates under optional (voluntary) retirement before meeting both age and service requirements is considered erroneously separated. In such cases, the Office of Personnel Management (OPM) usually disallows the retirement application and requests the Postal Service to retroactively restore the employee to the active rolls as of the date of the erroneous separation. If the date on which the applicant would attain the age and/or service requirements has already passed and the time span for attaining eligibility is rather short, e.g., 30 days or less, OPM may administratively place the employee in a LWOP status from the date of the erroneous separation to the date on which the minimum service or age requirement is attained.

### 436.62 Corrective Action

OPM's letter requesting the Postal Service to restore the employee to the rolls will indicate that the employee "may be entitled to back pay covering the period from the date of the erroneous separation to the date the employee is restored to the rolls." Before any action is taken on OPM's letter, the employee's service record must be verified. If the reason for the erroneous separation is based on age, records must be verified to ascertain the employee's correct birth date. After the retirement separation is established as erroneous, the employee must be contacted promptly and action taken to restore him or her to the rolls.

In these erroneous optional retirement cases, the back pay is calculated so that employees are compensated as if they had worked during the period of erroneous separation.

## 436.7 Interest on Back Pay

### 436.71 Purpose

This section establishes procedures for paying interest that the Postal Service is obligated to pay pursuant to the law, court order, arbitration or federal agency decision, national labor agreement, or Postal Service settlement agreement. This section does not create any Postal Service obligation to pay interest on back pay claims.

### 436.72 Availability of Interest

Interest is paid on back pay only under the following circumstances:

a.  *Decisions* — awards resulting from legally binding determinations by courts of law, administrative agencies, or the grievance and arbitration process. They are handled as follows:

   (1)  *Merit Systems Protection Board (MSPB).* Interest is paid automatically by the Accounting Service Center (ASC).

(2) *Equal Employment Opportunity Commission (EEOC).* Interest is paid automatically by the ASC.

(3) *National Labor Relations Board (NLRB).* Interest is paid automatically by the ASC.

(4) *Court Decisions.* Interest is not paid unless specifically awarded in the decision.

(5) *Arbitration Decisions.* Interest is paid automatically for arbitration decisions that award back pay for a disciplinary suspension or removal for employees represented by the National Postal Mail Handlers' Union (NPMHU) for cases heard after February 20, 1991, and for employees represented by the National Association of Letter Carriers (NALC) and the American Postal Workers' Union (APWU) for cases heard after June 12, 1991.

> **Note:** For arbitration decisions that are unrelated to a disciplinary suspension or removal, interest is not paid unless it is specifically required by the award.

b. *Settlements* — awards resulting from agreements between a representative of the Postal Service and an authorized employee representative that are reached through negotiation. Interest is not paid unless it is specifically required by the settlement agreement.

### 436.73 Determination of Rate of Interest

When interest is paid on back pay, the interest rate is determined as follows:

a. *Decisions* (see Exhibit 436.73a):

(1) *Merit Systems Protection Board (MSPB).* The rate of interest is based on the veterans' preference eligibility of the employee.

(a) For veterans' preference eligible employees, the rate of interest is calculated using the Internal Revenue Code Overpayment Rate (see 26 U.S.C. 6621(a)(1)). Computation methods for applying the rate of interest are as found in 5 CFR 550.806.

(b) For non-veterans' preference eligible employees, the rate of interest is calculated using the Federal Judgment Rate (see 28 U.S.C. 1961).

(2) *Equal Employment Opportunity Commission (EEOC).* Interest is paid at the Internal Revenue Code Overpayment Rate (see 26 U.S.C. 6621(a)(1)). Computation methods for applying the rate of interest are as found in 5 CFR 550.806.

(3) *National Labor Relations Board (NLRB).* Interest is paid at the Federal Judgment Rate (see 28 U.S.C. 1961).

(4) *Court Decisions.* Interest is paid at the Federal Judgment Rate (see 28 U.S.C. 1961).

(5) *Arbitration Decisions.* For arbitration decisions that award back pay for disciplinary suspension or removal, interest is paid at the Federal Judgment Rate (see 28 U.S.C. 1961).

**Note:** For arbitration decisions unrelated to disciplinary suspension or removal, interest is not paid unless specifically required by the award.

b.    *Settlements* (see Exhibit 436.73b):

(1)    *Merit Systems Protection Board (MSPB).* The rate of interest for MSPB causes is based on the veterans' preference eligibility of the employee.

(a)    For veterans' preference eligible employees, the rate of interest is calculated using the Internal Revenue Code Overpayment Rate (see 26 U.S.C. 6621(a)(1)). Computation methods for applying the rate of interest are found in 5 CFR 550.806.

(b)    For non-veteran's preference eligible employees, the rate of interest is calculated using the Federal Judgment Rate (see 28 U.S.C. 1961).

(2)    *Equal Employment Opportunity Commission (EEOC).* Interest is paid at the Internal Revenue Code Overpayment Rate (see 26 U.S.C. 6621(a)(1)). Computation methods for applying the rate of interest are found in 5 CFR 550.806.

(3)    *National Labor Relations Board (NLRB).* Interest is paid at the Federal Judgment Rate (see 28 U.S.C. 1961).

(4)    *Court Settlements.* Interest is paid at the Federal Judgment Rate (see 28 U.S.C. 1961).

(5)    *Grievance Settlements.* Interest is paid at the Federal Judgment Rate (see 28 U.S.C. 1961).

Exhibit 436.73a
**Interest on Back Pay Decisions**

| Type of Decision | Merit Systems Protection Board (MSPB) Decisions | | Equal Employment Opportunity Commission (EEOC) Decisions | National Labor Relations Board (NLRB) Decisions | Court Decisions | Arbitration Decisions |
|---|---|---|---|---|---|---|
| Application | Veterans' Preference Eligible Recipients | Non-Veterans' Preference Eligible Recipients | All Recipients | All Recipients | All Recipients | All Recipients |
| Whether Interest Is Paid | Yes, paid automatically by ASC | Yes, paid automatically by ASC | Yes, paid automatically by ASC | Yes, paid automatically by ASC | No, unless specifically stated in the decision | Refer to Note[1] |
| Rate of Interest | IRS Overpayment Rate[2] | Federal Judgment Rate[3] | IRS Overpayment Rate[2] | Federal Judgment Rate[3] | Federal Judgment Rate[3] | Federal Judgment Rate[3] |

Notes:

[1]    Interest is paid automatically for arbitration decisions related to disciplinary suspension or removal for employees represented by the National Postal Mail Handlers' Union (NPMHU) for cases heard after February 20, 1991, and for employees represented by the National Association of Letter Carriers (NALC) and the American Postal Workers Union (APWU) for cases heard after June 12, 1991. If an arbitration award is unrelated to disciplinary suspension or removal, interest is not paid unless specifically required by the award.

[2]    See 26 U.S.C. 6621(a)(1) and 5 CFR 550.806.

[3]    28 U.S.C. 1961. The rate used is the rate in effect seven days prior to the date of the award.

ELM 18 Contents    Index

Pay Administration
Basic and Special Pay Provisions
437.2

Exhibit 436.73b
**Interest on Back Pay Settlements**

| Type of Settlement | Merit Systems Protection Board (MSPB) Settlements | | Equal Employment Opportunity Commission (EEOC) Settlements | National Labor Relations Board (NLRB) Settlements | Court Settlements | Grievance Settlements |
|---|---|---|---|---|---|---|
| Application | Veterans' Preference Eligible Recipients | Non-Veterans' Preference Eligible Recipients | All Recipients | All Recipients | All Recipients | All Recipients |
| Whether Interest Is Paid | No, unless specifically stated in the settlement | No, unless specifically stated in the settlement | No, unless specifically stated in the settlement | No, unless specifically stated in the settlement | No, unless specifically stated in the settlement | No, unless specifically stated in the settlement |
| Rate of Interest | IRS Overpayment Rate[1] | Federal Judgment Rate[2] | IRS Overpayment Rate[1] | Federal Judgment Rate[2] | Federal Judgment Rate[2] | Federal Judgment Rate[2] |

Notes:
[1] See 26 U.S.C. 6621(a)(1) and 5 CFR 550.806.
[2] 28 U.S.C. 1961. The rate used is the rate in effect seven days prior to the date of the award.

436.74 **Responsibility**

The Eagan ASC is responsible for calculating the amount of interest payable.

437 **Waiver of Claims for Erroneous Payment of Pay**

437.1 **Purpose**

This part establishes procedures for (a) requesting a waiver of a claim made by the Postal Service against a current or former employee for the recovery of pay that was erroneously paid and (b) applying for a refund of money paid by or deducted from a current or former employee as a result of such a claim.

437.2 **Definitions**

Definitions relevant to waiver of claims for erroneous payment of pay include the following:

a.  *Pay* — salary, wages, or compensation for services including all forms of premium pay, holiday pay, or shift differentials; payment for leave, whether accumulated, accrued, or advanced; and severance pay. Pay does not include rental allowances or payment for travel, transportation, or relocation expenses.

b.  *Employee* — throughout 437, a *former* employee as well as a *current* employee.

c.  *Applicant* — an employee (current or former) or an individual acting on behalf of the employee who applies for a waiver of a claim for overpayment of pay.

d.  *Installation head* — the postmaster, manager, or director of a field facility or the head (or designee) of a Headquarters field unit where the employee is employed or was last employed.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DEBORAH B. FREEMAN,                 )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        7:04CV276
                                    )
JOHN E. POTTER, POSTMASTER          )
GENERAL, UNITED STATES POSTAL       )
SERVICE,                            )
                                    )
        Defendant.                  )

OSTEEN, District Judge[1]

     This matter came for bench trial on November 21, 2005,
between Plaintiff Deborah Freeman ("Plaintiff") and Defendant
John Potter, Postmaster General ("Defendant").  Pursuant to that
trial and other materials that the parties have submitted, the
court makes the following findings of fact, conclusions of law,
and order.

**I.   FINDINGS OF FACT**

     1.   Background

     Plaintiff worked for Defendant from March 1988 until
Defendant fired her.  Plaintiff suffered embarrassing racial
discrimination from fellow white employees during a period prior
to February 1, 2000.  Those acts substantiated Plaintiff's Title
VII action that she filed on February 1, 2000.

     Plaintiff's Title VII action resulted in a settlement

_____

     [1] Middle District of North Carolina, sitting by designation.



GOVERNMENT
EXHIBIT

3

agreement formed on July 19, 2000, before Magistrate Judge Glen E. Conrad.  Under the settlement agreement, Plaintiff was to receive, among other things, (1) window clerk training, (2) a "window clerk" position "as soon as practicable," and (3) administrative leave until she received the window clerk position.

    2.   The Settlement Agreement's Meaning

"Window clerk" is not ambiguous and means that Plaintiff would physically work some amount of time at a window.  No defined meaning of "window clerk" exists in the settlement agreement or in Defendant's job description documents.  Under the settlement agreement, Plaintiff is entitled to administrative leave if she is not a window clerk.  The settlement agreement also has no language restricting imposition of attorney's fees in actions to enforce the agreement.

    3.   The Settlement Agreement's Execution

Plaintiff worked for more than four years without complaint in the position Defendant placed her.  Employees whose title included "window clerk" performed some tasks that Plaintiff performed.  Plaintiff, however, never physically worked at a window during that period.  Thus, Plaintiff never worked as a window clerk because she never worked at a window.  Only at the end of the over-four-year span could Plaintiff reasonably realize that Defendant would not place her at a window because the contract did not define the specifics of window time.

2

Plaintiff also never received her administrative leave, which she requested throughout 2000 to 2004 and which was due under the settlement agreement's terms since she was not a window clerk. Defendant terminated Plaintiff on August 7, 2004, for various reasons, including failure to abide by the Postal Service's rules when Plaintiff, having received neither a window clerk position nor administrative leave, stopped coming to work.

    4.   <u>Damages</u>

Once Defendant actually fired Plaintiff on August 7, 2004, even if that act were wrong and Defendant rehired Plaintiff as part of this contract's specific enforcement, the fact finder cannot determine, with certainty, when Defendant could have again fired Plaintiff rightfully. Without such information, the fact finder cannot determine how far past August 7, 2004, Plaintiff's damages extend. Defendant's act shows the relationship between Plaintiff and Defendant was destroyed, suggesting Defendant would again fire Plaintiff when it rightfully could. The actual value of working as a true "window clerk" is also speculative. Furthermore, defining how much "window" time a "window clerk" gets is difficult and would reasonably present difficulties in ordering Defendant to re-employ Plaintiff.

Plaintiff, when employed with Defendant, received $27,941.75 per year. Plaintiff seeks only damages from 2004 until the present. When fired on August 7, 2004, Plaintiff had worked approximately 60% of the year. As Plaintiff never worked in the window clerk position as promised in the settlement agreement,

3

Plaintiff was entitled to administrative leave, which means Plaintiff had the right to stay at home, do nothing until given a true window clerk position, and continue to receive her salary. Since Plaintiff had the right to do nothing, her income was in addition to what she should have earned on administrative leave. Plaintiff's compensation for the lost administrative leave for January 1, 2004, until August 7, 2004, is worth 60% of Plaintiff's yearly salary. That administrative leave is, thus, worth $14,000.00. Plaintiff is not overcompensated in receiving an award for lost administrative leave because Plaintiff could have worked elsewhere while on administrative leave.

    5.   <u>Defenses to the Settlement Agreement's Performance</u>

    Defendant never filed an answer in this case. Defendant may have suggested various defenses in discovery, a Rule 12(b)(6) motion, and in other discussions. Defendant's defenses are apparently (1) impracticability, (2) failure to mitigate, (3) estoppel, and (4) first-breach doctrine.

## II.  CONCLUSIONS OF LAW

    1.   <u>Governing Law</u>

    Federal common law governs the interpretation of Plaintiff's Title VII settlement. <u>Pinchback v. Armistead Homes Corp.</u>, 907 F.2d 1447, 1453 (4th Cir. 1990) ("The effect of the release o[f] [a plaintiff's] federal claims against [a defendant] is a question of federal law."). Federal common law uses various sources of law to provide the rule of decision. <u>Gamewell Mfg., Inc. v. HVAC Supply, Inc.</u>, 715 F.2d 112, 116 (4th Cir. 1983) ("We

4

seek the appropriate federal rule [for contract-based actions] in the usual sources—the best-reasoned decisions in the general common law development of the subject."). "The Restatement (Second) of Contracts is . . . a proper source for common law principles . . . ." Silicon Image, Inc. v. Genesis Microchip, Inc., 271 F. Supp. 2d 840, 852 (E.D. Va. 2003).

    2.   Breach of the Settlement Agreement

Defendant breached the settlement agreement. "When performance of a duty under a contract is due[,] any non-performance is a breach." Restatement (Second) of Contracts § 235(2) (1981). By neither giving Plaintiff her administrative leave nor placing her in a true window clerk position, Defendant failed to fulfill its contractual duties.

    3.   Damages

Defendant's breach caused Plaintiff damages by not giving her (1) the benefits of working a window and (2) the administrative leave she was due.

Specific performance is not appropriate. "A promise to render personal service will not be specifically enforced." Restatement (Second) of Contracts § 367(1). "The refusal is based in part upon the undesirability of compelling the continuance of personal association after disputes have arisen and confidence and loyalty are gone . . . ." Id. § 367 cmt. a. Section 367's illustrations are particularly relevant. They provide as follows: "A, a noted opera singer, contracts with B to sing exclusively at B's opera house during the coming season."

Id. § 367 illus. 1.  "B discharges A[,] and A sues for specific performance.  Even though singing at B's opera house would have greatly enhanced A's reputation and earning power in an amount that A cannot prove with reasonable certainty, specific performance will be refused."  Id. § 367 illus. 2.

Similar to A, Plaintiff seeks reinstatement to the "window clerk" position, and the benefits Plaintiff receives from working in the position cannot be rendered into a damages award because any money award on that point is too speculative.  However, as noted in the illustration, specific performance is still not appropriate.  Furthermore, the court would have to monitor Defendant's placement of Plaintiff in an actual "window clerk" position, which "would impose on the court burdens in enforcement or supervision that are disproportionate to the advantages to be gained from enforcement and to the harm to be suffered from its denial."  Id. § 366.  For these reasons, specific performance is not available.

Other money damages are appropriate.  "The injured party has a right to damages for any breach by a party against whom the contract is enforceable . . . ."  Id. § 346(1).  "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."  Id. § 352. Plaintiff's nonspeculative damages are the value of her lost administrative leave from January 1, 2004, through August 7, 2004, which is worth $14,000.00.

  4.  Defenses

6

No defenses are applicable to this case.  The court sees no reason to decide if the government waived defenses by failing to file at least an answer.  Nevertheless, the court cannot condone the practice of never filing an answer in a case and then arguing at trial that a motion to dismiss is an answer, as Defendant vigorously did at trial.

"Impracticability" does not apply because the contract states Defendant would place Plaintiff in a window clerk position as soon as practicable.  Until then, Plaintiff was on administrative leave.  If placing Plaintiff in a window clerk position were not "practicable," then Defendant must put her on administrative leave.  Defendant presents no evidence to show that it was not practicable to put Plaintiff on administrative leave.

Plaintiff is not estopped from asserting breach by waiting four years to bring this case.  She, as the reasonable person would be, was unsure when she was actually working as a window clerk because Defendant gave Plaintiff some duties that persons with "window clerk" in their titles performed.  Plaintiff, furthermore, did attempt to get her administrative leave throughout that period, which Defendant consistently and wrongfully denied.

Defendant is not relieved from performance because Plaintiff breached first.  Defendant breached first by wrongfully withholding administrative leave when Plaintiff was not working as a window clerk.

Plaintiff could not mitigate the damages incurred because of the nature of administrative leave. She was entitled to (1) not work while on administrative leave, (2) wait for a true window clerk position, and (3) receive salary while waiting. Plaintiff cannot mitigate that loss except by seeking administrative leave in another position, which is an unreasonable concept. Thus, Plaintiff is entitled to $14,000.00.

    5.   <u>Attorney's Fees</u>

Attorney's fees are appropriate in this action. Actions to enforce Title VII settlement agreements are Title VII actions. See <u>E.E.O.C. v. Henry Beck Co.</u>, 729 F.2d 301, 305 (4th Cir. 1984) ("We hold that where an employer allegedly breaches a pre-determination settlement agreement after voluntarily entering into it, and [the adverse party] . . . seeks enforcement of that agreement only, without attempting to litigate the underlying unfair employment practice charge, the suit is brought directly under Title VII . . . ."). As actions to enforce a settlement agreement are Title VII actions, attorney's fees may be awarded under Title VII's fee provision. See <u>Eatmon v. Bristol Steel & Iron Works, Inc.</u>, 769 F.2d 1503, 1519 (11th Cir. 1985) ("Given that conciliation agreements . . . serve the conciliation goals of Title VII, . . . it is appropriate to award attorney's fees pursuant to section 706(k) in such actions."); <u>Smith v. La Cote Basque</u>, 519 F. Supp. 663, 667 (S.D.N.Y. 1981) ("The [c]ourt . . . holds that attorneys' fees may be awarded under section 706(k) [of Title VII] to a party who prevails in an arbitration

proceeding brought to enforce a settlement decree in a Title VII action."). Under section 706(k), a court, "[i]n any action or proceeding under this subchapter . . ., in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e-5(k). As Plaintiff has prevailed, and the court finds that Defendant strung Plaintiff along for several years, improperly denying Plaintiff administrative leave or window time, the court holds that attorney's fees are appropriate. This type of litigation, following a court-mediated settlement, is wasteful and must be discouraged. The court, however, will require, as described below, further submissions as to only the attorney's fees amount.

**III. ORDER**

Plaintiff has 30 days from the filing date of this award to file a position on the amount of attorney's fees. Defendant has 20 days thereafter to file a response solely on the amount of attorney's fees. Once the court decides the amount of fees, judgment will be entered in accordance with both this opinion and the decision on attorney's fees.

This the 7th day of June 2006.

United States District Judge

9

**Regular Arbitration Panel**

| | |
|---|---|
| IN THE MATTER OF THE ARBITRATION | ) |
| | ) **GRIEVANT:** Deborah Freeman |
| **BETWEEN** | ) |
| | ) **POST OFFICE:** Roanoke, Virginia |
| UNITED STATES POSTAL SERVICE | ) |
| | ) **CASE NO.:** C00C-4C-D 04167713 |
| **AND** | ) |
| | ) **UNION NO.:** CS04031 |
| AMERICAN POSTAL WORKERS UNION, | ) |
| AFL-CIO | ) |
| | ) |

BEFORE: **CHRISTOPHER E. MILES, ARBITRATOR**

APPEARANCES:

|  |  |
|---|---|
| For the U.S. Postal Service: | Jeffrey A. Meadows, |
| | Labor Relations Specialist |
| For the Union: | Lamont Brooks, |
| | National Business Agent |
| Place of Hearing: | Roanoke, Virginia |
| Date of Hearing: | November 14, 2006 |
| Date of Award: | January 10, 2007 |
| Relevant Contract Provisions: | Article 16 |
| Contract Year: | 2000-2003 |
| Type of Grievance: | Discipline |

### AWARD SUMMARY

The grievance filed on behalf of **Ms. Deborah Freeman** is sustained.  Based upon the uniquely specific circumstances surrounding this case, it is found that the Grievant provided documentation for her absence in the form of the settlement agreement entered into between her and the Postal Service, as well as her request for administrative leave. According to the Settlement Agreement she was to be placed on administrative leave until such time that she was placed in a full time window clerk position at the Hollins Branch of the Roanoke Post Office.  In addition, it is found that she cannot be charged AWOL for the dates cited in the removal notice because she was entitled to receive administrative leave if not working in accordance with the settlement agreement. Furthermore, the Postal Service has paid the Grievant for administrative for the dates cited in the Notice of Removal and charged as AWOL. Consequently, it is found that the Postal Service did not prove that it had just cause in accordance with Article 16, Section 1 of the Agreement to remove **Ms. Freeman** from her employment.  The Grievant is therefore reinstated to her position with the Postal Service and she shall be made whole for all lost wages as a result of the **Notice of Removal dated July 2, 2004.**

Christopher E. Miles, Esquire
Labor Arbitrator

GOVERNMENT EXHIBIT
4

I.    **BACKGROUND**

The Grievant in this case, Ms. Deborah Freeman, is employed by the United States Postal Service (hereinafter referred to as the "Postal Service") as a Clerk at the Post Office in Roanoke, Virginia. By Notice of Removal dated July 2, 2004, Ms. Freeman was informed that she was being removed from her Postal employment effective August 7, 2004 for the following reasons:

CHARGE 1 – IMPROPER CONDUCT
Failure to Follow Instructions

Specifically, on May 17, 2004, James Cox sent you a letter, which you received on May 18, 2004, reminding you of your responsibility as a Postal employee to report for duty as scheduled. You were also directed in this letter to either report to work or provide documentation that was acceptable to substantiate your continued absence from duty. Mr. Cox informed you on the second page of this letter that failure to return to work or provide acceptable documentation to support your continued absence may result in your being charged as Absent Without Leave (AWOL) and corrective action up to and including removal from the Postal Service would be considered. You failed to abide by these instructions even after being notified of the potential penalty that could result from your non-compliance with the instructions contained in the May 17, 2004 letter. As of this date, you have failed to report for work or provide acceptable documentation to substantiate your continued absence from duty. Furthermore, you were instructed to provide PS Form 3971 every 14 days requesting appropriate leave. Once again, you failed to follow these instructions.

On June 3, 2004, I sent you a certified letter (7002 3150 0004 3885 9883) instructing you to report to my office for a Pre-Disciplinary Interview (PDI) on Wednesday, June 9, 2004 at 11:00 am. You reported for the PDI with your Union Representative John Feazelle present. You stated that you had not corresponded with your supervisor since requesting administrative leave on April 14, 2004. When you were asked if you provided a PS Form 3971 every 14 days requesting appropriate leave you stated that you are not required to. All employees are required to submit PS Form 3971 when requesting/taking any type of leave pursuant to Section 511.23 of the Employee and Labor Relations Manual (ELM). I find your answers to be insufficient to relieve you of your responsibility to follow instructions.

CHARGE 2 – ABSENT WITHOUT OFFICIAL LEAVE (AWOL)

Specifically, on March 8, 2004, you requested administrative leave on PS Form 3971 and under "Number of Hours Requested" you wrote in "Effective Immediately". In the "Remarks" section you wrote: "Per Civil Action No: 7-00-CV-00071 referring to an EEO settlement you signed on July 19, 2000. During the PDI on June 9, 2004, you kept referring to "Article 5" of the settlement agreement which states in part "Defendant agrees to transfer plaintiff as soon as practicable to a full time window

clerk position in the Hollins Branch of the Roanoke Post Office. Plaintiff shall be placed on administrative leave until such time as she is placed in such position."

Since there was no such position available at time the settlement agreement was signed, you chose to work at the Hollins Station from August 26, 2000 through December 27, 2002. You were then excessed from the Hollins Station and moved to the Carrier Annex where you were assigned from December 28, 2002 through March 5, 2004. You were assigned to the Cave Spring Station effective March 6, 2004. Your request for administrative leave was denied by Roanoke, VA Postmaster Anne Murray on March 9, 2004; however, you failed to report for duty or request another type of leave.

James Cox, Manager, Human Resources sent you a letter dated March 15, 2004, supporting Postmaster Murray's denial of your March 8, 2004 request for Administrative Leave. Mr. Cox strongly encouraged you to reconsider your decision to be absent from work without approval and reminded you that if your absence was due to an unplanned emergency, illness, or injury that you should utilize normal leave requesting procedures. Finally, Mr. Cox offered you a 30-day "shadowing" assignment as per your July 19, 2000 EEO settlement and you were given 20 days to respond; however, you failed to respond to this offer. As such you were carried in an AWOL status from March 8, 2004 through March 19, 2004.

On March 23, 2004, you began requesting annual leave for March 22, 2004 through April 9, 2004, which was approved by (A) station Manager Richard Kassebaum. You submitted a PS Form 3971 dated April 14, 2004, again requesting administrative leave and under "Number of Hours Requested" you wrote "Until Window Clerk @ Hollins is available". You also cited the July 19, 2000 EEO settlement, Article 5 as your justification for requesting the administrative leave. Your request was denied by Postmaster Murray on April 14, 2004.

On May 17, 2004, James Cox sent you a letter, which you received on May 18, 2004, reminding you of your responsibility as a Postal employee to report to duty as scheduled. You were also directed in this letter to either report to work or provide documentation that was acceptable to substantiate your continued absence from duty. As of this date, you have failed to report for work or provide acceptable documentation to substantiate your continued absence from duty. Furthermore, you were instructed to provide PS Form 3971 every 14 days requesting the appropriate leave. Once again, you failed to follow these instructions.

Mr. Cox informed you on the second page of this letter that failure to return to work or provide acceptable documentation to support your continued absence may result in your being charged as Absent Without Leave (AWOL) and corrective action up to and including removal from the Postal Service would be considered. You failed to abide by these instructions even after being notified of the potential penalty that could result from your non-compliance with the instructions contained in the May 17, 2004 letter. As of the date of this letter, you have yet to provide me with acceptable documentation to support your continued absence

from work. As such, you have been carried in an AWOL status from April 12, 2004 through the present.

Section 666.82 of the Employee and Labor Relations Manual (ELM) states "Employees failing to report for duty on scheduled days, including Saturdays, Sundays, and holidays, will be considered absent without leave except in actual emergencies which prevent obtaining permission in advance. In emergencies, the supervisor or proper official will be notified as soon as the inability to report for duty becomes apparent. Satisfactory evidence of the emergency must be furnished later. An employee who is absent without permission or fails to provide satisfactory evidence that an emergency existed will be placed in a nonpay status for the period of such absence. The absence will be reported to the appropriate authority."

Section 666.81 of the Employee and Labor Relations Manual (ELM) states "Employees are required to be regular in attendance".

Furthermore, section 511.43 states in part "Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences."

Therefore, it is my decision to remove you from the Postal Service effective August 7, 2004.

You have the right to file a grievance under the grievance/arbitration procedure set forth in Article 15 of the National Agreement within 14 days of your receipt of this notice.

If this action is reversed or modified on appeal, back pay may be allowed unless the appropriate award or decision specifies otherwise, <u>ONLY IF YOU HAVE MADE REASOABLE EFFORTS TO OBTAIN ALTERNATE EMPLOYMENT DURING THE POTENTIAL BACK PAY PERIOD.</u> The documentation which you must maintain and present to support back pay claim is described in Part 436 of the Employee and Labor Relations Manual (copy attached).

In response to the action, a grievance was filed on behalf of Ms. Freeman by the Roanoke Local of the American Postal Workers Union (hereinafter referred to as the "Union"). The Step 2 Grievance Appeal Form, dated July 27, 2004, sets forth the following "Detailed Statement of Facts/Contentions":

On July 3, 2004, the Grievant received a Notice of Removal dated July 2, 2004.

The Grievant is charged with Improper Conduct – Failure to Following Instructions. …

The Grievant is also charged Absent Without Official Leave (AWOL). …
The removal notice letter continues to ramble on with meaningless assertions and cited violations of the Employee and Labor Relations Manual (ELM).
The letter is signed by Edward L. Wood for Richard Kassebaum.

The letter is procedurally defective because it is not signed by the Grievant's supervisor. The letter is contractually defective because it is

not progressive in discipline and it is punitive rather than corrective. Also, the letter and PDI are a violation of the contract because the settlement agreement is <u>law</u> and management must recognize it as such. The settlement agreement states "Defendant agrees to transfer plaintiff as soon as practicable to a full time window clerk position in the Hollins Branch of the Roanoke Post Office. Plaintiff shall be placed on administrative leave until such time as she is placed in such position." There is no time constraints placed on the administrative begin time nor end time and there is no limit to the amount of administrative leave that may be used.

The Grievant's willingness to work at other jobs than the Window Clerk job does not give up her right to the terms of the settlement, but shows her desire to remain a part of the Postal family. The Grievant worked from August 26, 2000 thru March 8, 2004. On March 8, 2004 the Grievant requested the administrative leave, guaranteed her in the EEO settlement. She submitted a 3971 for the administrative leave. There is no requirement in the settlement that she submit multiple 3971's or periodic 3971's because the settlement agreement guarantees the administrative leave until she is placed in the Window Clerk job at Hollins Branch.

James E. Cox, Manager Human Resources, USPS signed the EEO settlement cited herein. When James E. Cox sent the Grievant's letter dated May 17, 2004 he was aware of the terms of the settlement agreement and that his letter was in violation of the settlement agreement. Ed Wood was aware of the terms of the settlement agreement when he signed the Notice of Removal letter on July 2, 2004. Anne Murray, Postmaster, was Aware of the terms of the settlement agreement when she concurred with the letter on July 2, 2004.

The Grievant cannot be AWOL because she is complying with the terms of the aforementioned settlement agreement. The Grievant cannot be guilty of improper conduct because she submitted a 3971 for administrative leave, which is guaranteed her in the EEO settlement. The Grievant has obeyed all of management's requests and directives while complying with the settlement agreement.

As the corrective action, the Union requested that:

The Notice of Removal letter be rescinded and destroyed. Request the Postal Service comply with the terms of the EEO settlement agreement, Civil Action No. 7:00-CV-00071 dated July 19, 2000. Request the Grievant be made whole for any and all losses incurred as a result of this action and management's breach of the EEO settlement agreement. We further request, because of violations of ELM 661.24, 661.3, 661.5, the joint statement on violence and behavior in the workplace and the zero tolerance policy, August 19, 2003 from Nicholas L. Rinaldi and James A. Nemec that James E. Cox, Manager Human Resources, Anne Murray PostMaster Roanoke VA. And Edward L. Wood be removed from the U.S. Postal Service. (sic)

The parties met and discussed the grievance at Step 2 in accordance with the procedure contained in their collective bargaining agreement.[1] By letter dated August 20, 2004, Wendy P. Monk, Labor Relations Specialist, denied the grievance, by stating that:

> MANAGEMENT CONTENTIONS:   Management makes the following contentions at the Step 2 meeting:
> 1) There was no violation of the National Agreement in this matter.  The Notice of Removal was proper and for just cause.  The union's argument that it is punitive rather than corrective is flawed.   There are some infractions that are first-time removable offenses; an ongoing failure to follow a direct order or instruction and continued AWOL status are two such violations.
> 2) Just cause was met in this instant matter.  The following questions must be asked in order to determine just cause:
>
> a. "Is there a rule?" Yes.  The ELM, section 666.82 states that employees failing to report for duty on scheduled days will be considered absent without leave except in actual emergencies which prevent obtaining permission in advance.  Grievant failed to comply with this rule.  The ELM, section 666.81 states that employees are to be regular in attendance.  And, finally, ELM section 511.43 states in part, "Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences."  Grievant's continued absence is in direct violation with these rules.
>
> b. "Is the rule a reasonable rule?"  Once again, the answer is YES.  The Postal Service, as well as any other business, has the right to expect their employees to report for duty as scheduled.   Continued absence, especially in an AWOL status, is viewed as a very serious infraction.
>
> c. "Is the rule consistently and equitably enforced?"  Yes.  The Postal Service applies these rules in an equitable, consistent manner.
>
> d. "Was a thorough investigation completed?"  YES.  Grievant was provided a predisciplinary interview with her union representative present.  All of the facts of this matter were reviewed, including grievant's responses during the predisciplinary interview, and a decision was made to request removal.   The requested discipline was reviewed and concurred with in a signed and dated writing by a higher level manager.
>
> e. "Was the severity of the discipline reasonably related to the infraction itself and in line with that usually administered, as well as to the seriousness of the employee's past record?"  Most emphatically, YES.  Management takes the position that some acts are worse than others and require a higher degree of penalty.  Management considered the degree of the grievant's improper conduct when deciding the proper penalty to issue.
>
> f. "Was the disciplinary action taken in a timely manner?"  Yes.  Once the predisciplinary interview was conducted on June 9, 2004, all other

---

[1] Collective Bargaining Agreement Between American Postal Workers Union, AFL-CIO and U.S. Postal Service, November 21, 2000 – November 20, 2003 (hereinafter referred to as the "Agreement").

information gathered and reviewed, the disciplinary action was issued within approximately three weeks. (sic)

4) Because the Notice of Removal was signed by Edward Wood "for" Richard Kassebaum is not a fatal flaw. Mr. Kassebaum performed the necessary investigation and requested discipline that received higher level concurrence. Once the letter was prepared, Mr. Kassebaum was out of the office, so Mr. Wood signed the letter "for" Mr. Kassebaum. This letter was also reviewed and signed by higher level manager Anne Murray, Postmaster. There are no instructions or regulations that prohibit one manager signing for another in his or her absence.

5) With regard to the settlement agreement, Item #5 states in whole, "Defendant agrees to transfer plaintiff as soon as practicable to a full time window clerk position in the Hollins Branch of the Roanoke Post Office. Plaintiff shall be placed on administrative leave until such time as she is placed in such position. Defendant representative that the general full time window clerk position is a P.S. 5 position. If such level is found to be higher than P.S. 5, plaintiff will be given the higher level. Plaintiff shall transfer into such position at her current base salary and receive any COLA and all normal future increases. Plaintiff shall be assigned to daylight hours and shall not receive night time differential pay unless she qualifies for such pay. Plaintiff shall normally be assigned to duty on Mondays thru Fridays for a period of four years from the date of this agreement. Plaintiff shall receive not less than one working day notice prior to commencing such position." Management did comply with Item #5 of the settlement agreement; grievant was transferred to Hollins Branch in August 2000; subsequently she was excessed to the Carrier Annex. From the Carrier Annex, she was placed in Cave Springs at the beginning of March. She worked at Cave Springs for an unspecified number of days, and then, on March 8, 2004, she submitted a PS Form 3971 requesting administrative leave, "retroactive from 7-19-2000 per settlement agreement #7:00-CV-000071." This request was denied. Subsequent 3971s were submitted for administrative leave and some for annual leave; the annual leave requests were approved. On March 23, 2004, grievant submitted PS Form 3971 for 48 hours of annual leave citing "In litigation – hostile work environment" in the 'Remarks' section. It is unknown and questionable to this representative as to how grievant could work at the Hollins Branch from August 26, 2000 to December 27, 2002; be excessed to the Carrier Annex, where she was assigned from December 28, 2002 until Mach 5, 2004, with an effective date for Cave Spring being March 6, 2004. There was no explanation how working at the Cave Springs Branch created a hostile working environment for grievant. Management was not made aware of any situation or given an opportunity to correct an alleged hostile work environment. Nowhere in the Settlement Agreement does it guarantee grievant a job at Hollins Branch for the rest of her Postal career; nowhere does the settlement agreement exempt grievant from excessing per the National Agreement. To believe the grievant's and union's interpretation of Item #5, every time grievant has to work some place that she does not want to work, other than Hollins Branch, she is to be paid administrative leave. The union has proffered no reason while grievant cannot work at the Cave Springs Branch of the Roanoke Post Office. Moreover, the settlement agreement did not exempt grievant from reporting for duty as scheduled. Grievant

was not scheduled or forced to work around or for any of the individuals cited in the settlement agreement. (sic)

6) Regardless of whether Mr. Cox, Mr. Wood, and Ms. Murray were aware of the terms of the settlement agreement, the Postal Service would contend that we have complied with the settlement agreement and that it is the grievant that is in violation of Postal rules and regulations.

7) The Union failed to cite any specific issues or provisions of Articles 2,3, or 5 of the National Agreement. Therefore, any argument raised by the Union, not raised at Step 2, or that is brought up after the Step 2 process is completed should be considered new argument and be barred from future proceedings.

8) Grievant is required to submit PS Form 3971 for any absence, in accordance with Section 511.23 of the ELM, and under section 666.51, she is to obey the instructions of her supervisor or manager. As such, she was required to submit the 3971 every 14 days as required by the letter she was sent on May 17, 2004. Moreover, the PS Form 3971 only covers one pay period (two weeks), so it would be necessary for timekeeping purposes to submit a form every 14 days.

9) The requested remedy is inappropriate; the union cites the Joint Statement on Violence and the Zero Tolerance Policy as being violated because management has exercised it's rights under Article 3. (sic)

10) With regard to the Union's information request dated 7/12/2004 and addressed to James Cox, all information has been provided that is in the Agency's custody or control. There is no record of notes, emails or phone calls to be provided that relate to grievant.

11) Moreover, this grievance should be held in abeyance pending the outcome of this issue, which is currently in civil litigation. Proper disposition of this grievance cannot be had until a decision is made by the courts. If an appeal to arbitration or attempt to have this matter heard in arbitration prior to a decision in District Court is made, Management will contend that this matter is not properly before the Arbitrator and therefore, make a procedural argument. An arbitrator cannot decide the meaning or intent of a document procured in Civil Court, nor does his authority reach those limits. Once the matter is decided in Civil Court, the matter can proceed to arbitration if appropriate, and the merits of the case can be argued at that time.

REASON FOR DENIAL: It is Management's position that the Union's requested remedy is inappropriate. There is no violation of the National Agreement in this instant grievance. Grievance denied.

The Union responded with the following "Step 2 Rebuttal":

This letter of removal is not for just cause, but for retaliation against the grievant for exercising her rights under EEO and the CBA. This is obvious because management objects to this grievance being arbitrated prior to the Court Case being heard. So why not wait until the court case is heard to do the removal since the grievant is in a non-pay status.

The Union cited violations of Article 2, 3, and 4 during the Step 2 discussion. Article 2 was violated when management breeched the settlement agreement and then retaliated against the grievant by this removal action. (sic)

Article 3 was violated when management refused to recognize the EEO settlement as an applicable law mentioned in Article 3. And there is no reason in Article 3 to remove the grievant.

Article 5 prohibits the Employer from taking any actions inconsistent with its obligations under law. These are not new arguments because they were raised in the discussion at Step 2.

Nowhere in the cited portions of the ELM is there a requirement for submission of a 3971 every 14 days. That is more retaliation against the grievant.

This is all a threat against the employee's livelihood and a violation of Nicholas Rinaldi's Zero Tolerance Policy dated August 19, 2003 and is therefore in compliance with the policy in the Joint Statement on Violence and Behavior in the Workplace dated February 14, 1992. It states that those who do not treat others with dignity and respect will be removed from their positions. So the removal remedy is strictly in accordance with Postal policy.

This grievance should not be held in abeyance. The language in the settlement agreement is clear.

When management attempts to remove an employee convicted of a crime they use court documents to substantiate their claim and expect an arbitrator to decide the meaning and intent of those documents. So why is management objecting to an arbitrator deciding on the language in this court document.

Having been unable to resolve the grievance, the Union appealed the case to arbitration and the undersigned was appointed to hear and decide the issue. A hearing was conducted in Roanoke, Virginia on November 14, 2006. At that time, the parties were afforded full opportunity to present testimony and evidence, to cross-examine the witnesses, all of whom were sworn, and to make arguments in support of their respective positions. At the conclusion of the hearing, the parties summarized their arguments in oral closing statements and the record in this case was closed.

## II.    SUMMARY OF THE TESTIMONY AND EVIDENCE

Mr. Robert A. Young testified that he has been a member of the Eastern Area Labor Relations staff since March 2006 and is domiciled in Roanoke, Virginia. Prior to that, he was a District Labor Relations Specialist. In this capacity, he heard Step 2 grievances and advised the Roanoke Managers. Mr. Young prepared the letter dated May 17, 2004 to Ms. Freeman and he signed for Mr. James E. Cox. But, he never heard from Ms. Freeman or received any documentation to explain why she was not coming to work.

Mr. Young has been involved in numerous grievances involving Ms. Freeman. He indicated that approximately 500 grievances were filed by the Union at the Hollins Branch

concerning Ms. Freeman's placement there whereby the Union claimed that the settlement agreement placing Ms. Freeman at the Hollins Branch was in violation of the National Agreement. Mr. Young explained that a Function Four was conducted in all of the Roanoke Post Office, including the Hollins Branch, and it resulted in excessing Ms. Freeman. He went on to say that Ms. Freeman was assigned to the Cave Spring Branch and at least four grievances were filed on her behalf in March and April 2004 regarding her assignment to Cave Spring. Mr. Young represented the Postal Service at the Grievant's unemployment compensation hearing.

On cross-examination, Mr. Young revealed that he began working in Labor Relations in January 2001. When he was Manager of Labor Relations, Mr. Cox would come to him concerning various issues and he would give Mr. Cox the Management perspective on the issues. Mr. Young asserted that he did not have any involvement with the implementation of the settlement agreement. He indicated that when he wrote the letter dated May 17, 2004, the issue was not the settlement agreement but that Ms. Freeman had stopped coming to work and he was trying to get her to come back to work. Mr. Young maintained that the majority of the 500 grievances filed concerning Ms. Freeman's placement at Hollins Branch were held in abeyance and one representative case was forwarded to Step 3.

Mr. Young acknowledged that Ms. Freeman submitted a couple of Form 3971's requesting administrative leave. In his opinion, the Postal Service was not obligated to pay administrative leave because it was a condition of the settlement agreement at the beginning and not at the end. He also pointed out that the Grievant was given a position at Hollins Branch and he thought it was as a Window Clerk, even though she did not work the window.

Ms. Anne Murray testified that she has been the Postmaster at the Fort Myers Post Office since July 2006, prior to which she was the Postmaster at the Roanoke Post Office from June 2002 till May 1, 2006. A Function Four had taken place the year prior to when she started at the Roanoke office but had never been implemented. In this regard, the Function Four was updated and Ms. Freeman was excessed to the Home Shopping Network. Ms. Freeman was subsequently moved to Cave Spring Branch from the Carrier Annex. Ms. Murray submitted that there were no Clerks with retreat rights at the Cave Spring Station and the Union did not have a problem with placing Ms. Freeman at Cave Spring at that time. Ms. Murray stated that Richard Kassebaum was the Station Manager at Cave Spring and Janice Minnix was detailed to an MDO position in Charlotte from November 15, 2003 until April 2004 when she was given a permanent position at the Charlotte P&DC. She stated that Valerie Crouse was stationed at Martinsville which was 40 miles from the Cave Spring Station during the period of February thru March 2004. Ms. Murray did not know who Mr. Russell is, but noted that Mr. Payne, Mr. Collins,

Mr. Edwards and the other employees listed in the settlement agreement[2] were not working at Cave Spring. Ms. Murray concurred with the Notice of Removal issued by Supervisor Richard Kassebaum to Ms. Freeman. She denied Ms. Freeman's requests for administrative leave submitted March 8, 2004 and April 14, 2004 because work was available for Ms. Freeman at the Cave Spring Branch and neither the Grievant nor Ms. Freeman ever complained to her about being placed at the Cave Spring Branch. Ms. Murray asserted that the Grievant did not respond to her or provide documentation in response to the letter dated May 17, 2004.

On cross-examination, Ms. Murray revealed that she has almost 27 years of employment with the Postal Service, 16 of which have been in Management, and she has testified several times during arbitration. She stated that Valerie Crouse was the Manager at Cave Spring Branch prior to being detailed to the Martinville Post Office and Mr. Kassebaum was assigned to the Station Manager position at Cave Spring. Ms. Murray asserted that Ms. Freeman was placed in a full time Window Distribution Clerk position at the Hollins Branch prior to when she became the Postmaster at Roanoke and, although it is a bid position, Ms. Freeman was placed in the Window Distribution Clerk position as a result of the EEO settlement.

On redirect examination, Ms. Murray recalled that Mr. Wood signed the Notice of Removal for Mr. Kassebaum who was on annual leave at the time. She was aware there were grievances filed concerning the placement of Ms. Freeman at the Hollins Branch prior to her arrival at Roanoke, but she did not know about other grievances filed on behalf of Ms. Freeman concerning the various moves made. She spoke with Faye Cox from the Union regarding the moves of Ms. Freeman because there were many employees who had retreat rights. She never saw any of the four grievances filed by the Union on behalf of Ms. Freeman.

Mr. Richard Kassebaum testified that he has been employed by the Postal Service for 18½ years. He has been a Manager for six years and a Supervisor for eight years before that. He has been the Station Manager at Cave Spring since February 2005, prior to which he was detailed to the position for one year. In 2000, he was the Station Manager at the Hollins Branch and Ms. Freeman was assigned to the Hollins Branch at about the same time he started there. Mr. Kassebaum filled out the request for discipline dated June 25, 2004, requesting removal of Ms. Freeman. He explained that he did not sign the Notice of Removal because he was on vacation at the time; however, he confirmed that the charges contained in the Notice of Removal are true and accurate. According to Mr. Kassebaum, Ms. Freeman stopped coming to

---

[2] The Memorandum of Settlement in Civil Action No. 7:00-CV-00071 provides that: 3. The defendant agrees that plaintiff will not be placed under the direct line supervision of the following individuals: Russell Rhoades; Henry Payne; Harry Collins; John B. Edmonds; David Jennings; Keith Forbes and Janice Minnix. The defendant agrees that plaintiff will not be placed under the supervision of Valerie Crouse except for two levels of supervision removed; 4. Defendant agrees that plaintiff will not be required to work in the same work environment with the following individuals: Rick Bassett; Mike Carroll; Charles Perdue, Jr.; Mark Kegeler; and Tom Duffy.

work at Cave Spring shortly after she was moved there in March 2004 and she never came back to work. She did not respond to the letter dated May 17, 2004 and did not provide to him any documentation as to why she was not coming to work. Ms. Kassebaum did not sign the Form 3971 requesting administrative leave because he does not have the authority to approve administrative leave. However, he signed the Form 3971's approving the Grievant's request for annual leave from March 22 through April 2, 2004. Mr. Kassebaum made reference to the questions he asked and Ms. Freeman's responses during the pre-disciplinary interview he conducted. He stated that the Grievant never reported to him that she was having any problems, or that things were not working out, or that anyone was bothering her during the time she worked at Cave Spring. Mr. Kassebaum asserted that Ms. Minnix has never worked at Cave Spring since he has been there and none of the other employees or management officials listed in the EEO Settlement Agreement worked there.

Mr. Kassebaum indicated that Ms. Freeman was charged with AWOL for all the time after the approved annual leave in April 2004 through June 25, 2004. He was the Station Manager at Hollins Branch when Ms. Freeman was given the Window Distribution Clerk assignment there and he recalled that the Union filed grievances over her placement in the bid position. He stated that Ms. Freeman worked at the Hollins Branch until she was excessed as a result of a Function Four. The Grievant never complained during the time she was at Hollins Branch about not working the window and the Union never made that argument on her behalf.

On cross-examination, Mr. Kassebaum said he was not familiar with the EEO case and settlement agreement until Ms. Freeman was transferred to the Hollins Branch and she came to work for two and one-half years at Hollins without any problem. He stated that the eight junior employees at Hollins Branch were excessed to the plant. Mr. Kassebaum stated that there are three window stations at the Hollins Branch and at the time Ms. Freeman was working at the Hollins Branch there were two full time Window Clerks and six Window Distribution Clerks.

Mr. Edward Lee Wood, Jr., testified that he has been employed by the Postal Service for 25 years and he has held a supervisory or management position at the Roanoke Post Office since 1993. Mr. Wood signed the Notice of Removal for Mr. Kassebaum. In this regard, he explained that he was at the Cave Spring office on other business and he was asked to sign the Notice of Removal for Mr. Kassebaum who was on vacation. He asserted that it is not unusual for another official to sign for a Manager or Supervisor in their absence. Mr. Wood stated that he had some familiarity with the Grievant's absence and he read the removal notice before signing it. Mr. Wood described Ms. Freeman as a good employee and she had no discipline.

Mr. John Feazelle testified that he has held the position of Distribution Window Clerk at the Cave Spring Post Office since 1991 and he has been a Union Steward for 15 years. Mr.

Faezelle reported that he filed the grievance on behalf of Ms. Freeman protesting the Notice of Removal because the Grievant was exercising her rights under the settlement agreement. Mr. Faezelle said he gave the grievance to Skip Carter, the Grievant's immediate supervisor, who sent him to Mr. Kassebaum, however, Mr. Kassebaum said he would not discuss the grievance, that he was verbally denying the grievance, and he would not put anything in writing.

According to the Union Steward, the EEO Settlement Agreement is specific in providing that Ms. Freeman was to be placed in a full time Window Clerk position at the Hollins Branch and she was to be placed on administrative leave until she was placed in that position. However, the Union argued that she must bid on the job. He went on to say that there is no limit on administrative leave and the Union would not file any grievance if Ms. Freeman was placed on administrative leave. According to Mr. Faezelle, an employee who does not hold a bid position would not have any retreat rights.

On cross-examination, Mr. Faezelle stated that he works on the window most of the time and does distribution work some of the time. He has been to the Hollins Branch but has never worked there. He stated that the Union is asking that Ms. Freeman be put on administrative leave until she can be placed in a full time Window Clerk position at the Hollins Branch. He emphasized that there is a difference between a Full Time Window Clerk and a Distribution Window Clerk. He pointed out that the Full Time General Window Clerk position has been changed to Sales and Service Associate position. Mr. Faezelle was not aware that any shadowing opportunities were made available to the Grievant. He also asserted that the only proper way for Ms. Freeman to get the Window Clerk position is to bid on it. According to Mr. Faezelle, both Ms. Minnix and Ms. Crouse held managerial positions at Cave Spring at the time Ms. Freeman was assigned to work there, even though they were both detailed to other locations. Mr. Faezelle revealed that there was a lot of hostility in the Cave Spring Post Office in 2000. A workplace assessment survey was conducted because of numerous complaints to the hotline about the way Ms. Crouse was treating people. Ms. Crouse retired in July 2004 as the result of an interview by the Postal Inspector.

Ms. Deborah Freeman, the Grievant herein, testified that she has been employed by the Postal Service since March 1988. She said she was never previously disciplined. Ms. Freeman explained that there was a discussion between Mr. Cox, her attorney, the Postal Service attorney, and the judge during the settlement negotiations that there was not a Window Clerk job available at that time. She did not file a grievance when she was placed in the Distribution Window Clerk position at the Hollins Branch because it was her understanding that as soon as a Window Clerk job became available she would be put into it. According to Ms. Freeman, she stayed at the Hollins Branch in good faith and when she was excessed she realized that they

were not going to put her in a Window Clerk position. Ms. Freeman described the events and behavior of some of her co-workers when she worked at the P&DC which led her to file the EEO complaint for sexual and racial discrimination and harassment. She concluded her testimony by stating that she never received administrative leave.

## III.    RELEVANT PROVISIONS OF THE AGREEMENT

### ARTICLE 16
### DISCIPLINE

**Section 1. Principles**

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations. Any such discipline or discharge shall be subject to the grievance-arbitration procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay.

## IV.    CONTENTIONS OF THE PARTIES

### A.    Postal Service

The Postal Service contends that the Court case is not dispositive of the matter at hand. The Postal Service maintains that issue to be decided in this case is whether there was just cause for the removal of Ms. Deborah Freeman. The Postal Service recognizes that there were problems at the Roanoke Post Office which lead to the civil court case and the settlement agreement. The Postal Service acknowledges that the settlement agreement was in violation of the Agreement as far as putting Ms. Freeman in a full time Window Clerk position at the Hollins Branch. According to the Postal Service, the only way the settlement agreement would not be in violation of the Agreement is if the Grievant were placed on administrative leave for up to 25 years until such time as she had enough seniority to bid into the Window Clerk position. However, it submits that it is unlikely that would occur since there are only three windows at the Hollins Branch and the Window Clerk position is a highly sought after job.

The Grievant was placed in the Distribution Window Clerk position at the Hollins Branch and the Union filed over 400 grievances challenging the placement of Ms. Freeman in the bid position at the Hollins Branch. Nevertheless, the Grievant worked there for two and one-half years and she was happy. After a Function Four update, she was moved out of Hollins because of her seniority and put in the Home Shopping Network. She was then moved to the

Carrier Annex and finally to the Cave Spring Station. According to the Postal Service, the Grievant continued to work throughout all the moves and never claimed that the settlement agreement was not being complied with until she was placed in Cave Spring. However, none of the people listed in the settlement agreement were working at Cave Spring and the Grievant never complained about a hostile working environment at Cave Spring. For four years Ms. Freeman worked outside of the settlement agreement in three different locations until she was moved to Cave Spring. She filed grievances, she filed a lawsuit and she filed an EEO complaint but she never stopped working until March 8, 2004 when she decided, for whatever reason, that she was not coming to work anymore and she asked for administrative leave back to 2000.

The Postal Service points out that Ms. Freeman was sent a letter asking her to reconsider her position, but she did not. She was sent a letter instructing her to return to work or to provide documentation to substantiate that she could not come to work, but she did not follow those instructions. The Postal Service asserts that the Grievant should have obeyed the instructions and grieved later. Because of this the Postal Service charged the Grievant with Improper Conduct – Failure to Follow Instructions which is a serious offense warranting removal. In support of its argument, the Postal Service submitted several prior Arbitration Awards in which removals were upheld when the employee failed to follow instructions. In addition, the Postal Service contends that the removal was warranted since the Grievant was AWOL from March 8, 2004 until the removal was issued on July 2, 2004.

The Postal Service believes it has proven that the Grievant was guilty of failure to follow instructions and AWOL. It therefore requests that the grievance be denied.

### B.    Union

The Union contends that the EEO Settlement Agreement is clear in providing that the Postal Service agreed to transfer the Grievant "as soon as practicable" to a full time Window Clerk position in the Hollins Branch of the Roanoke Post Office or she "shall be placed on administrative leave until such time as she is placed in such position." The settlement agreement does not say that Ms. Freeman will be placed in the Window Clerk position for 50 years, but only that she will be placed on administrative leave until such time as she is placed in the position. The settlement agreement was approved by two full time attorneys for the Postal Service. According to the Union, the Postal Service does not want to put the Grievant on administrative leave. Mr. Cox signed the settlement agreement and the Postal Service now renders it useless.

As long as the Grievant is placed on administrative leave, there is no violation of the National Agreement. According to the Union, the parties could have met with the Union and

worked out a settlement that is not in violation of the Agreement. The Grievant entered into the settlement agreement in good faith that she was going to be placed in a Window Clerk job as soon as it was available. It was not until she was excessed that she realized that there was no intention by the Postal Service to live by the terms of the settlement agreement. Absent the settlement agreement, the Grievant could have pursued her EEO case throughout the courts. If there is a breach of the settlement agreement, it is to be dealt with by the parties to the agreement; i.e., the Grievant and her attorney, and the representatives and attorneys for the Postal Service.

Ms. Freeman did everything she could in good faith to live up to the settlement agreement. She was told that she would be put into a Window Clerk position and she took them at their word. It was only when she was excessed that she realized the Postal Service had no intention of placing her in the Window Clerk position. The Grievant is a 16-year employee who has never been disciplined and Supervisor Wood said she was a good employee. Yet, no matter where Ms. Freeman is placed, there is no way to prevent the other employees from bidding to where she is working. The Court determined that she was entitled to be on administrative leave and the Postal Service has paid her administrative leave for the time she was off. In this regard, the Union submits that she cannot be removed from her employment on the charge of AWOL.

With regard to the charge that she failed to follow instructions, the Union emphasizes that the Grievant justified her absence by referring to the EEO Settlement Agreement. In this regard, the Union calls attention to the Court decision in the breach of settlement agreement case in which the judge found that Ms. Freeman was entitled to administrative leave and that she had the right to stay at home, do nothing until given a true window clerk position and continue to receive her salary. The judge determined that Ms. Freeman was not estopped from asserting breach by waiting four years to bring the case to court and three weeks after the Court decision was rendered on June 7, 2006, the Postal Service gave Ms. Freeman her retreat rights back to the job at Hollins Branch.

The Union submits that the Postal Service did not have just cause to issue the Notice of Removal to Ms. Freeman. The actions of the Grievant did not rise to the level of removal and the issue has already been decided by the Court. The Union requests that the grievance be sustained and that Ms. Freeman receive administrative leave until the date she is returned to work.

## V.    DISCUSSION AND FINDINGS

The issue to be resolved in this case is whether the Postal Service had just cause to issue the Notice of Removal, dated July 2, 2004, to Ms. Deborah Freeman for "Improper Conduct – Failure to Following Instructions" and "AWOL."

The record reveals that Ms. Freeman worked for the Postal Service since March 1988 and that for a period of time prior to February 1, 2000 the Grievant suffered embarrassing racial discrimination from fellow white employees, which acts substantiated a Title 7 action that was filed on February 1, 2000. The legal action resulted in a settlement agreement dated July 19, 2000 between the Grievant and the Postal Service. Pertinent to this case, in section 5 of the settlement agreement it was stipulated that the Postal Service would "transfer plaintiff as soon as practicable to a full time window clerk position in the Hollins Branch of the Roanoke Post Office. Plaintiff shall be placed on administrative leave until such time as she is placed in such position." By all indication and having not been presented with anything to the contrary it can only be concluded that this settlement agreement was negotiated and entered into at arms length by Ms. Freeman and the Postal Service.

Generally, Arbitrators will follow Court decisions that are on point.[3] In this case, however, there is even more than the Federal District Court decision submitted as a joint exhibit. There is a specific settlement agreement relative to this employee and applicable to her employment with the Postal Service. This distinguishes the case at hand from those Arbitration decisions relied upon by the Postal Service in support of its arguments.

The Settlement Agreement is somewhat ambiguous as to the time frame for the placement of Ms. Freeman into a window clerk position "as soon as practicable", however, it is clear that if the Grievant is not working as a window clerk, she is to receive administrative leave. The District Judge did not consider nor rule upon the charges which precipitated the removal action considered here. His function was not to interpret or apply the terms of the parties' National Agreement. It was to determine if the Settlement Agreement between Ms. Freeman and the Postal Service had been breached in accordance with the applicable law. Nevertheless, in my opinion, the action taken to remove the Grievant in this case cannot be divorced from the Settlement Agreement since it pertains specifically to Ms. Freeman, and therefore the findings of the District Judge, in his Decision, dated June 7, 2006, are found to be relevant with regard to the determination which must be made herein. The Judge stated that "under the settlement agreement, plaintiff was to receive, among other things, 1) window clerk training, 2) a 'window clerk' position 'as soon as practicable,' and 3) administrative leave until

---

[3] See "How Arbitration Works," Elkouri and Elkouri, Sixth Edition (2003) at page 538.

she received the window clerk position." It was pointed out by the Judge that his decision with regard to damages due to Ms. Freeman was only for the time up to the removal action. In that regard, it was found that since the Grievant never worked the window clerk position as promised in the settlement agreement, she was entitled to administrative leave, "which means plaintiff had the right to stay at home, do nothing until given a true window clerk position, and continue to receive her salary." The Judge ruled that the Postal Service violated the settlement agreement and that Ms. Freeman was entitled to damages.

With regard to the practicablilty of placing the Grievant in a window clerk position, it was stated that:

> "Impacticability" does not apply because the contract states that defendant will place plaintiff in a window clerk position as soon as practicable. Until then, plaintiff was on administrative leave. If placing defendant in a window clerk position was not practicable, then defendant must put her on administrative leave.

In this particular case, and in accordance with the National Agreement, perhaps it would not be practicable to place Ms. Freeman in a window clerk position until she could bid on and be awarded a full time window clerk position.[4] The Judge went on to state that, with regard to the breach of the Settlement Agreement, the Postal Service did not present any evidence to show that it was not practicable to put plaintiff on administrative leave.

With regard to an estoppel claim raised by the Postal Service, the Judge specifically found that Ms. Freeman was not estopped from asserting a breach of the Settlement Agreement by waiting four years. He stated that, "She, as the reasonable person would be, was unsure when she was actually working as a window clerk because Defendant gave Plaintiff some duties that persons with 'window clerk' in their titles performed. Plaintiff, furthermore, did attempt to get her administrative leave throughout that period, which Defendant consistently and wrongfully denied." He went on to state that "Defendant is not relieved from performance because Plaintiff breached first. Defendant breached first by wrongfully withholding administrative leave when Plaintiff was not working as a window clerk." In my opinion, the Grievant attempted to mitigate her damages by working in a Distribution/Window Clerk position first at the Hollins Branch, then at the Carrier Annex, and finally at Cave Spring. However, when she realized or at least believed that the Postal Service would not comply with the Settlement Agreement, she sought specific performance and, as the Judge determined, she was entitled to it. According to the

---

[4] The parties' Joint Contract Interpretation Manual, June 2004, states that, "EEO settlements to which the union is not a party will not take precedent over the language contained in the collective bargaining agreement (CBA). Nor can an EEO settlement modify the terms or requirements of the CBA."

Judge, Ms. Freeman was entitled to "(1) not work while on administrative leave, (2) wait for a true window clerk position, and (3) receive salary while waiting."

The charges set forth in the removal action are 1) Improper Conduct for Failure to Follow Instructions and 2) AWOL. In Charge 1, it was alleged that Ms. Freeman was directed to either report to work or provide documentation that was acceptable to substantiate her continued absence from duty. Relative to this claim, the Postal Service contends that the Grievant violated the principle of "obey now, grieve later." Arbitrator Carlton J. Snow[5] discussed the doctrine as follows:

> There has emerged among arbitrators a principle about which there is widespread consensus, namely, "Work now, grieve later." It is one of the immutable principles of arbitration. Employees disregard it at their peril.
>
> The "Work now, grieve later" principle teaches that employees who believe a supervisor issued an incorrect order must not "take the law into their own hands" but must obey the order and grieve it. Even incorrect orders must be obeyed.

However, as noted above, the Grievant was directed "to either report to work or provide documentation that was acceptable to substantiate your continued absence from duty." In my opinion, the Grievant provided documentation for her absence in the form of the settlement agreement entered into between her and the Postal Service, as well as her request for administrative leave. The Notice of Removal mentions that during her PDI, Ms. Freeman kept referring to "Article 5" of the Settlement Agreement. If she was not assigned to a window clerk position at the Hollins Branch of the Roanoke Post Office then, per the Settlement Agreement and according to the District Judge, she was entitled to be on administrative leave. Therefore, it is found that the Grievant complied with the directive set forth in the May 17, 2004 letter from Mr. James Cox.

As for the AWOL charge, it is found that the charge was not substantiated by the facts of this case. Ms. Freeman was entitled to receive administrative leave if not working in accordance with the settlement agreement. Therefore, she cannot be charged with AWOL because she could choose to wait until she was placed in the window clerk position and until then she is to receive administrative leave. Indeed, the record reveals that the Postal Service has paid the Grievant administrative leave for the dates cited in the removal notice and charged as AWOL.

In view of all the above, and based upon the uniquely specific circumstances surrounding this case, the grievance filed on behalf of Ms. Freeman is sustained. It is my opinion that the Postal Service has not established just cause in accordance with Article 16,

---

[5] USPS and APWU, Case No. F90C-4F-D 95024884, August 10, 1995.

Section 1 of the National Agreement to remove the Grievant from her employment based upon the charges considered herein. Therefore, she is reinstated to her position with the Postal Service and she shall be made whole for all lost wages as a result of the Notice of Removal dated July 2, 2004.

## AWARD

The grievance filed on behalf of Ms. Deborah Freeman is sustained. Based upon the uniquely specific circumstances surrounding this case, it is found that the Grievant provided documentation for her absence in the form of the settlement agreement entered into between her and the Postal Service, as well as her request for administrative leave. According to the Settlement Agreement she was to be placed on administrative leave until such time that she was placed in a full time window clerk position at the Hollins Branch of the Roanoke Post Office. In addition, it is found that she cannot be charged AWOL for the dates cited in the removal notice because she was entitled to receive administrative leave if not working in accordance with the settlement agreement. Furthermore, the Postal Service has paid the Grievant for administrative for the dates cited in the Notice of Removal and charged as AWOL. Consequently, it is found that the Postal Service did not prove that it had just cause in accordance with Article 16, Section 1 of the Agreement to remove Ms. Freeman from her employment. The Grievant is therefore reinstated to her position with the Postal Service and she shall be made whole for all lost wages as a result of the Notice of Removal dated July 2, 2004.

Christopher E. Miles, Esquire
Labor Arbitrator

January 10, 2007

REGULAR ARBITRATION                    SEP    2

```
-----------------------------------------------
In the Matter of the Arbitration       )
                                       )     Grievant:  T. Khong
            between                    )
                                       )     Post Office:  Fort Worth, TX
UNITED STATES POSTAL SERVICE           )
                                       )     USPS Case No.  G01N-4G-D 05062830
            and                        )
                                       )
    NATIONAL ASSOCIATION OF            )
    LETTER CARRIERS, AFL-CIO           )
-----------------------------------------------
```

BEFORE:    I. B. Helburn    ARBITRATOR

APPEARANCES:

      For the U. S. Postal Service:  J. B. Reeves

      For the Union:  Dana R. Culpepper

      Place of Hearing: Fort Worth, TX

      Date of Hearing: August 9, 2005

AWARD:    The grievance is sustained in part and denied in part.  Just cause did not
exist for the removal.  The grievant is to be reinstated with a three-day, on-
paper disciplinary suspension for attending the seminar while on sick
leave on December 18, 2004.  Other than the three-day suspension, the
grievant is to be made whole for wages lost through June 9, 2005, and all
benefits and seniority lost as a consequence of the removal.  The back pay
liability of the Postal Service shall be reduced by any money earned by the
grievant while in a non-pay status.

Date of Award: August 29, 2005

PANEL:  Regular Contract and Discipline



GOVERNMENT
EXHIBIT
5

REGULAR ARBITRATION

```
--------------------------------------------------------
In the Matter of the Arbitration          )
                                          )
        between                           )
                                          )
UNITED STATES POSTAL SERVICE              )
Fort Worth, Texas                         )
                                          )
        -and-                             )
                                          )
NATIONAL ASSOCIATION OF LETTER            )
CARRIERS, Branch No. 226                  )
--------------------------------------------------------
```

OPINION AND AWARD

OF THE

ARBITRATOR

USPS No. G01N-4G-D 05062830
NALC DRT No. 10-051431
T. Khong

## APPEARANCES

### For the Postal Service:

| | |
|---|---|
| J. B. Reeves | Labor Relations Specialist |
| R. W. Thompson | Postal Inspector |
| Milton J. Russell | Supervisor, Customer Services |
| Jennifer Morgan | City Carrier |

### For the Union:

| | |
|---|---|
| Dana R. Culpepper | Local Business Agent |
| Ha Khong | Grievant's Wife |
| Gina Mendoza-Telck | Steward |
| Lucinda J. Sapp | Branch President |
| Tommy V. Khong | Grievant |

## PERTINENT NATIONAL AGREEMENT PROVISIONS  (JX-1)[1]

ARTICLE 3 – MANAGEMENT RIGHTS

ARTICLE 15 – GRIEVANCE-ARBITRATION PROCEDURE

Section 2.  Grievance Procedure—Steps

ARTICLE 16 – DISCIPLINE PROCEDURE

Section 1.  Principles

Section 5.  Suspensions of More Than 14 Days or Discharge

ARTICLE 17 – REPRESENTATION

ARTICLE 19 – HANDBOOKS AND MANUALS

---

[1] JX refers to Joint Exhibit.

## BACKGROUND

Tommy V. Khong, the grievant and a City Carrier, was born in Vietnam in 1961. He testified that he grew up in a culture in which the boss' word was obeyed. Khong graduated from high school in 1979 and spent from December 1988 – May 1990 in a refugee camp in Malaysia before coming to the United States. While in the camp, Khong had English as A Second Language (ESL) class. He has had no formal English training in this country.

Prior to his employment with the Postal Service, the grievant held jobs as a cashier in two restaurants and as an Assistant Manager of a dry cleaning store. Khong stated that he received help from friends at his church when he filled out the Postal Service job application form and that he prepared for the exam taken as part of the application process for about a month. He scored 100 on the exam.

Khong testified that on September 20, 2004[2] he tripped coming down the steps of a house on his route. The next day he saw a Postal Service contract doctor, Dr. Morris, D.O., who diagnosed a right ankle sprain and told the grievant to wear a splint, to use crutches and not to put weight on his right ankle. Khong was released to limited duty and on September 22, signed a limited duty offer that involved no driving or lifting, no more than 2 hours standing, no walking or pulling/pushing. It was also noted that Khong was limited to non-ambulatory chores and that he was to elevate his right leg. According to the grievant, on September 22 his right foot became swollen and painful, so he went to the Arlington Emergency Clinic. Additional X-rays disclosed a fracture rather than a sprain. Khong's foot was put in a cast.

On September 29 the grievant accepted a limited duty offer that involved answering the phone and miscellaneous office work. He was allowed to sit and to use his hands and to stand and/or walk for an hour if he could tolerate that activity. Jason Russell, Khong's supervisor noted that the grievant was driving his own vehicle to work and that Khong offered to deliver express mail once or twice and to take mail to carriers on the street. Russell recalled that when the grievant said that driving fell outside his medical limitations, he was no longer asked to drive.

---

[2] All dates are in 2004 unless otherwise noted.

Russell and Khong agreed that the grievant was not put on street time when he drove. Russell recalled that Khong did not pick up UBBM at each case and did not push UBBM in a gondola, but rather he spent most of the time answering the phone and working UBBM. The grievant stated that he delivered express mail about six times because his supervisor said that he needed help, that he picked up UBBM at the cases and put it on a cart.

On October 20, 2004, Khong was sent notice that OWCP had accepted his claim stemming from the September 20 accident and the diagnosis of a fracture, even though the Fort Worth District had attempted to controvert the claim. On October 22, a Texas Workers' Compensation Work Status Report indicated that the grievant was to wear a splint/cast at work, to use crutches at all times and was not to drive or operate heavy equipment. A November 4 Work Status Report indicated that Khong was to return to work without restrictions on December 4, but in early November he was not to stand and was to use the assistive devices noted above. Also at this time the grievant saw Dr. Chris Wong, who gave him exercises designed to wean Khong from the assistive devices. While Khong was not to lift, stand or push, he could walk for up to 2 hours. This was reflected in a limited duty offer accepted by the grievant on November 9. The offer listed answering the phone, working UBBM, doing office work and working in the accountable cage. Among the restrictions was a 2 hour limit on walking.

According to a "13" in evidence, on November 6, Station Manager Luis Tenorio saw the grievant walking from UBBM to the hamper area without crutches. The next day Tenorio saw Khong standing by the swing room without crutches. These observations, or perhaps others, resulted in Tenorio's call to the Postal Inspection Service because he felt that the grievant was exceeding his medical limitations.

Postal Inspector R. W. Thompson, who conducted the investigation and who followed Khong for several days, testified that the grievant would leave work and go to work on rental property that he owned. Later, when the grievant's schedule changed, Khong worked on the rental houses in the morning before his tour began. A contract fraud analyst was hired to conduct surveillance. Khong was videotaped on November 30 and December 1 while working at his rental property. The tape showed that the grievant was "walking, bending, twisting, lifting a door and kicking a trash pile with both feet, all

4

without the use of either a split/cast or crutches" (JX-2, p. 96). According to Thompson, when he interviewed Khong, the grievant initially said that he always wore a leg brace and used crutches, but when Thompson cautioned him to tell the truth, Khong said that he used the brace and crutches only at work. When the videotape was shown to Dr. Wong on December 17, the doctor said that he believed that Khong could work without restrictions.

On cross examination, Thomson noted that he had followed the grievant for several days and had not seen him work—that he had only watched the videotape. Thompson had not weighed the door or a bucket that the grievant also had lifted on the videotape.

Khong testified that on November 4, Dr. Wong had told him to go home and exercise and to try to walk without crutches and the boot when not at work, but to use these devices away from work if the grievant was in pain. Khong said that the door was small and hollow-core and that the paint bucket was empty, but that he wanted to keep the color. He explained that the door had almost fallen into the street, so he moved it slightly while putting his weight on his left foot. He had simply pushed carpeting and other trash with his feet. The grievant said that he had not violated his doctor's orders—that he had lifted more weight at the Post Office than at his home. A "13" written by Tom Sanders and dated November 29-December 13 noted that Sanders had observed the grievant walking from the UBBM to the hamper area, pushing the hamper and walking outside and to the restroom without using crutches.

A few days before December 18, Khong's request for annual leave for that day was denied. At about 7 A.M. on the morning of December 18, the grievant called for a day of sick leave because his son was ill. The parties agree that Khong spent the day at a seminar on mortgages at a Dallas hotel. He wore the boot and used crutches on Saturday but did not use them when he returned the next day. Khong and his wife testified that after the grievant called for sick leave, his son responded to medication and that Ms. Khong said that she would look after the boy. Khong testified that he did not go to work, which began at 10:30 A.M., because he had already called, although he knows now that what he did was wrong. On the following Monday, Russell asked Khong about his use of sick leave on Saturday and the grievant insisted that his son had been ill. Russell said

that he offered annual leave and that there would have been no problem if Khong had taken it. The grievant denied that he had been given an opportunity to take annual leave for the Saturday absence.

On December 17, Thompson issued an investigative memorandum (IM) that was concerned only with the supposed violation of medical restrictions. On December 23, Russell conducted an investigative interview with Khong, who was accompanied by steward Gina Mendoza-Telck. The interview lasted about two hours and according to Russell, was based on the IM and the 3971 covering the December 18 absence. The videotape was viewed. Mendoza-Telck testified that Russell's questions were lengthy and that Khong had a hard time understanding them, but Russell said that he saw no need for an interpreter. She also said that Khong tried to explain what had happened but was not given a chance, although she acknowledged that she was free to ask questions. The Union requested a copy of the videotape, but the tape was not provided.[3]

Because Russell concluded that the grievant was not honest or reliable and that his behavior was not correctable, the supervisor submitted a request for Khong's removal on December 27. Tenorio's written review and concurrence is dated December 29. The grievant was issued a Notice of Removal on January 19, 2005, with the removal to be effective on February 25, 2005. The Notice contained two charges. Khong was charged with violating the Code of Ethical Conduct/Standard of Conduct because he had engaged "in activities inconsistent with medical restrictions for an on the job injury claim" (JX-2, p. 123). This charge related to grievant's walking on the workroom floor without crutches and to the activities videotaped on November 30 and December 1. The second charge, AWOL, came from Khong's "providing false information on PS Form 3971 request for unscheduled leave/AWOL" (JX-2, p. 126).

The removal was grieved on February 9, 2005. Russell and Mendoza-Telck met at the Informal Step A but did not resolve the matter. Russell testified that he had the authority to settle the grievance, but could not and that he did not remember telling the steward that it was out of his hands. Mendoza-Telck disputed Russell's testimony. In the steward's notes on the meeting is the following: "Mr. Russell and I discussed the

---

[3] Because the tape was never provided to the Union prior to the arbitration hearing, the Union's motion that the videotape not be accepted as evidence was granted.

complexity of the case and <u>with Mr. Russell believing the documents</u> provided and the Postal Inspector's involvement <u>determining Mr. Khong's fate, we did not feel</u> as though we could resolve at our level and <u>therefore agreed to grieve to</u> formal Step A" (JX-2, p. 71).

Lucinda Sapp, Branch President and the designee at Formal Step A, testified that Russell and Tenorio both said that the matter was out of their hands. However, it is undisputed that a Formal Step A meeting was never held and thus the Union moved the grievance to Step B. The Dispute Resolution Team reached impasse, as noted in a March 4, 2005 decision.

Thereafter the matter was advanced to arbitration and assigned to the undersigned regular panel arbitrator. The grievance was heard on August 9, 2005 in Fort Worth, TX. The parties stipulated that the grievance was properly before the arbitrator. Witnesses were sequestered, affirmed before testifying and made available for cross examination. Documentary and testimonial evidence was received. The grievant, accompanied by an interpreter, was present throughout and testified in his own behalf. The grievance was argued orally, thus the record was closed at the conclusion of the proceedings.

## ISSUE

The stipulated issue is:

Did Management violate Articles 3, 15, 16, 17 and 19 with reference to the M-39, Section 115 and was there just cause for the Notice of Removal dated January 19, 2005 and received by the grievant on January 22, 2005. If there was no just cause, what is the appropriate remedy?

## POSTAL SERVICE POSITION

For reasons noted below, the Postal Service asserts that the removal was for just cause and thus the grievance should be denied.

1. It is critical that Postal Service employees be honest. Khong was not honest with the Postal Service until he was presented with proof of his behavior.

2. Khong did not have a problem understanding English or communicating in English. Russell and Morgan both testified that the grievant understood them and

participated in conversations.  There was no undue pressure put on the grievant by the Postal Inspector, who was able to communicate with Khong without trouble.

3.  The Postal Service conducted a proper investigation. Russell was not obligated to repeat the Postal Inspector's work.  Russell gave the grievant an investigative interview in which he showed Khong the video and talked about the sick leave taken on Saturday.  Khong had a chance to clear the matter up, but refused to do so.

4.  The Postal Service acknowledges that Khong was injured on the job and is not terribly concerned with his intermittent use of crutches. The Service is concerned that the grievant violated his medical restrictions and that he attended the real estate seminar after being granted sick leave to care for his child.  Khong's conversation with Morgan shows that he knew better.

5.  The Postal Service's failure to hold a Formal Step A meeting did not constitute harmful error.  The Union moved the grievance to Step B as it had the right to do.  The Dispute Resolution Team could have remanded the grievance to Formal Step A, but elected not to do so.

6.  The grievant told his supervisor when asked to work out of his medical restrictions, but then did not do his limited duty job, as Morgan testified.

7.  While the Union claims that Russell said that the matter was out of his hands at the Informal Step A meeting, the supervisor testified that he had the authority to settle the grievance.  Both designees agreed to send the grievance on.

8.  Khong knew the rules, which were reasonably applied.  There is credible evidence that he violated the rules, including the Code of Conduct, and that he was AWOL.  Khong's supposed difficulties with English, his upbringing in a very different Vietnamese culture and the lack of an interpreter do not serve to mitigate, as the grievant committed infractions for which summary discharge is appropriate.

9.  The Postal Service submitted five regular panel awards in support of various contentions made.

**UNION POSITION**

For reasons summarized below, the Union insists that the removal was not for just cause and thus the grievance should be sustained and the grievant should be reinstated and made whole.

1.    The parties are required to make full disclosure at Formal Step A. Management must hold a meeting and disclose arguments and evidence. Simply because the grievance was moved to Step B does not mean that due process violations did not occur.

2.  Both the supervisor and the Station Manager told Union officials that they did not have the authority to settle the grievance. This is a serious due process violation, as was the failure of the Postal Service to provide the video tape taken during the investigation.

3.  The long investigative interview and the confusion involved show that Khong had trouble understanding English. Morgan said that the grievant was hard to understand at times. Also, Khong needed help to fill out his application form.

4.  The grievant was not dishonest. He had been trusted to handle money by previous employers and he was forthcoming during the investigative interview, admitting that he was wrong to have gone to the real estate seminar after calling for and receiving sick leave. Khong stated that he had learned from his mistake and would not repeat it in the future.

5.    The Postal Service has not shown that the grievant violated medical restrictions. He used crutches and the boot at first. After receiving new instructions from his doctor, Khong did not always use crutches and the boot. The Postal Service assigned the grievant duties inconsistent with his limitations.

6.  Charge 2 is poorly worded and does not provide justification for removal. The grievant was properly charged with AWOL, but one AWOL does not support the removal decision, which is punitive and not corrective.

7.  Morgan's statement and testimony were not credible, as she showed herself to be paranoid. It is noteworthy that she spoke about "Asian people."

8. Not only can the Postal Service not show that Khong violated regulations, but also his due process rights were violated. The grievant was not provided an interpreter. There was no full investigation. The Union's request for information was not fully met.

9. Five regular panel awards were submitted in support of various Union contentions.

## DISCUSSION

For reasons discussed below, the grievance is sustained in part and denied in part, so that the removal is reduced to a three-day disciplinary suspension.

### Due Process Issues

The failure of the Postal Service to schedule a Formal Step A meeting, while contrary to the letter and the spirit of the National Agreement, is not a due process violation. The parties themselves have determined how such an eventuality is to be handled: Management's failure to hold a Formal Step A meeting moves the grievance to Step B. Had the Union violated time limits or refused to meet at Step B, the grievance would have been waived. The contrast between these approaches provides strong evidence that the parties did not intend for Management's failure to hold a Formal Step A meeting, in and of itself, to constitute fatal error. It would be presumptuous of the arbitrator to overrule the parties' own agreement. Furthermore, as the Postal Service advocate noted, had the DRT felt that the file was not fully developed, the grievance could have been remanded to Formal Step A for additional consideration. This did not happen. Finally, the joint file in this case is extensive, leaving no room for a conclusion that the Union's ability to defend Khong either at Step B or at arbitration was compromised by the lack of a Formal Step A meeting.

I cannot conclude that either Russell or Tenorio lacked the authority to settle the grievance. Russell testified that he did not so indicate to Mendoza-Telck. While the steward's testimony contradicts Russell's, the steward's written statement set forth in the Background section above, includes the information that "we did not feel as though we could resolve at our level and therefore agreed to grieve to Formal Step A" (JX-2). The written statement does not support a conclusion that Russell did not have the authority to settle the matter—only that he would not, at least on the Union's terms. Sapp testified

that Tenorio said that the matter was out of his hands. However, no context for the alleged remark was provided. Particularly when there was no Formal Step A meeting, and because Sapp did not indicate that she and Tenorio actually ever discussed the case, I cannot find evidence sufficient to justify a finding in the Union's favor on this point.

No error can be found in the absence of an interpreter at the investigative interview or the interview with the Postal Inspector. Khong had the right to Union representation when interviewed by Thompson, who testified without contradiction that the grievant did not ask for a steward. Nor is there any indication that the grievant did not understand Thompson. Mendoza-Telck represented Khong at the investigative interview. Russell's notes and the steward's notes indicate that she asked questions. Mendoza-Telck was not prohibited from trying to be certain that Khong understood the proceedings. She said that he did not, but she did not ask for a postponement until an interpreter could be found. Russell seemingly had no indication that the grievant was having difficulty comprehending, thus he was not obligated to find an interpreter or delay the meeting until the grievant found one.

The investigation was sufficient. Russell was not obligated to retrace the Postal Inspector's steps and to redo the investigation. The supervisor was obligated, as his part of the investigation, to give Khong his "day in court" and allow him to respond to the charges. The grievant was given an extensive opportunity in an investigative interview that all agreed was unusually long to respond to the allegations that he exceeded his medical limitations and that he wrongfully claimed sick leave on December 18. Thus the Postal Service met its obligation to conduct a reasonable investigation.

**Evidentiary Issues**

The videotape needs little discussion. While it was shown at the investigative interview, the Union was not given a copy then and later requests for a copy went unfulfilled. The National Agreement clearly requires both parties to make existing available evidence and argument during the grievance procedure and to jointly assemble the grievance file. When legitimate Union requests for information were not met and when the requested information was not in the joint file, the Postal Service should have no realistic hope of having the evidence admitted at arbitration. It does not matter whether the evidence was not forthcoming because of bad faith or simply administrative

oversight. Either way, the National Agreement tells the arbitrator not to admit the disputed evidence if an objection is raised.

The two statements from Khong's co-worker, Jennifer Morgan, are not viewed as relevant. Neither has been considered. I am satisfied, based on the testimony of Mendoza-Telck and Sapp, that the Union had never seen Morgan's lengthy statement introduced by Management. It was written in December 2004 and was in Management's hands before the grievance was filed. The statement was not given to the Union during the grievance procedure, was not in the joint file and thus is not ripe for consideration in arbitration. The shorter statement, written by Morgan and dated January 25, 2005, was not a part of the joint file and thus is not ripe for consideration. Furthermore, Morgan's testimony that Khong attended the seminar on December 18 has been confirmed by the grievant himself. Whether or not Khong used a boot and crutches is irrelevant, as he has not been charged with not using these devices on the days in question.

**Substantive Issues**

With regard to the charge that Khong violated medical restrictions, three factors prevent the Postal Service from meeting its burden of proof. Most critical may be the need to honor the language of Article 15.2 of the National Agreement and exclude the videotape, which may have been the best evidence. The second factor is related. In a previous case I have watched with amazement videotape of a Postal Service employee who allegedly had exceeded her medical limitations because the tape supported the grievant's contention that she had not been in violation, when the investigating Postal Inspector had testified that the tape showed she had. This prior experience is recounted not to suggest that Inspector Thompson has testified inaccurately in this case. Rather, the lesson drawn from that experience is that it is the arbitrator who signs the award and for that reason has the responsibility to be confident that the evidence supports the award. Finally, the documentary evidence supports the grievant's testimony that on November 4, 2004 he was told by Dr. Wong to begin to wean himself from the boot and crutches. One cannot wean himself from these devices by continuing to use them every waking hour.

The observations of Russell and Tenorio that Khong walked and stood on the workroom floor without crutches are not critical to the outcome of this case. While the observations are accepted as accurate, at best they show the grievant as lax about the use

12

of the devices, but not as deliberately attempting to avoid his restrictions. From the brief notes, it cannot be determined whether Khong walked a few steps or many yards or whether he stood for a few minutes with his weight on his left foot or a much longer time with his weight on both feet. Furthermore, these observations came at a time when Dr. Wong had told the grievant to wean himself from the boot and crutches. Moreover, there is no dispute that Khong delivered express mail and took mail to carriers already on the street, driving his own vehicle to accomplish these tasks at a time when he was medically restricted from driving. Whether the grievant volunteered to drive or agreed to a supervisor's request, Management was obligated to assign the grievant work within his limitations. There is significant irony in the fact that Management assigned the grievant work outside of his medical restrictions, but at a later date, sees nothing wrong with using the grievant's standing and walking without crutches as partial support for a removal.

As for the videotape, in his written statement, Khong wrote that on November 30, 2004, he was shown simply walking from a car to his house. This was not contradicted. Almost a month after being told to wean himself from the boot and crutches, it cannot be concluded that he was actually violating doctor's orders, even if there was a technical violation of medical limitations because they had not been changed to reflect "weaning."

The main thrust of the Postal Service's charges relates to Khong's activity on December 1, 2004, which the grievant wrote, without contradiction, took place over seven minutes. Khong testified that he moved a hollow-core door and a nearly empty bucket of paint. A solid wooden door and a nearly full bucket of paint are far heavier than a hollow-core door and a nearly empty bucket of paint. Viewing the videotape may have allowed a determination of what the grievant handled since heavy objects are generally not lifted and moved with the same ease of movement as are lighter objects. As for kicking versus moving trash, again the videotape would be the best and only persuasive evidence.

It is also critical to note that Dr. Wong anticipated that Khong would be released to return to carrier duties without restrictions on December 4, 2004. The videotape was shot on December 1, 2004, presumably after almost a month of exercises and weaning from the boot and crutches. Thus it should have been expected that at this point in time Khong's activities would have approached normal. Either the Postal Service did not

consider this at all, or this was considered and rejected. Surely Dr. Wong would not have expected Khong to adhere slavishly to all of the prior restrictions up until December 4 and then to be able immediately to take up all of his regular carrier duties.

Morgan's testimony that the grievant did not do his limited duty job is viewed as irrelevant since the grievant was not charged with not doing that work. Also, Morgan's relationship with Khong did not mark her as the kind of objective observer who could be relied on for accurate testimony about what work the grievant did or did not do.

I am mindful that Dr. Wong saw no need for medical restrictions after viewing the videotape. This would have been consistent with his projection on November 4, 2004 and does not establish a breach of the medical restrictions on December 1, 2004. In the final analysis, the evidence does not leave the arbitrator confident that the Postal Service has shown that Khong knowingly disregarded medical limitations or even that he had been malingering.

As Khong has acknowledged in so many words, the AWOL charge is fully justified. When his wife said that she would take care of their son on December 18, 2004, the grievant then had two legitimate options: 1) report for duty or 2) obtain proper leave to cover his absence. Khong did neither, but improperly used sick leave to attend the seminar. In addition, I accept as credible Russell's testimony that when given an opportunity the following Monday, Khong would not set the record straight, but persisted in his dishonesty. This justified discipline.

**The Remedy**

Certainly the ethics charge stemming from the alleged disregard of medical limitations is the more serious of the two charges. Because it has not been proven, the removal is not justified. In some instances, the AWOL itself and a possible written warning would be sufficient discipline. In this case, even with Khong's belated acknowledgement that he used bad judgment, a suspension is justified because of the deliberate wrongful use of sick leave and because of his dishonesty the following Monday. Unlike Postal Management, I do not accept the notion that Khong's dishonesty means that he cannot be trusted in the future. He had no prior discipline in the approximately five years he worked for the Postal Service and seems able to profit from the corrective discipline that the parties have established as a basic principle.

14

The suspension is to be a paper suspension, without loss of money. This is because on June 6, 2005 the advocates signed the following agreement (JX-4):

> Without prejudice to either party's position on the merits of the case, the grievant is unavailable for the hearing scheduled on June 9, 2005. The NALC has requested a postponement and the U.S. Postal Service has agreed to the postponement with the understanding that any liability for back pay for this grievant will end on June 9, 2005.

The effect of the agreement, which is clear and unambiguous and must be enforced, is to cut short the make-whole remedy that would otherwise be issued. Under the circumstances, no purpose is served by adding an additional three days to those for which the grievant will not be made whole. This will not diminish the fact that the suspension will be a part of the grievant's record and available as a past element should circumstances require its use.

## AWARD

The grievance is sustained in part and denied in part. For reasons noted above, just cause did not exist for the Notice of Removal. The grievant is to be reinstated with a three-day disciplinary suspension on paper (no loss of pay) for attending the seminar while on sick leave on December 18, 2004. The grievant is to be made whole for wages from the date he was removed from the active payroll through June 9, 2005, and for all benefits and seniority lost as a consequence of the removal. The back pay liability of the Postal Service shall be reduced by any money earned by the grievant while in a non-pay status through June 9, 2005. Money earned by the grievant thereafter is not to be used to offset back pay. The grievant is to be returned to work at the very earliest opportunity. Any prolonged delay in returning the grievant to the active payroll will restart the back pay liability of the Postal Service, unless the delay is attributed to the grievant. The arbitrator will retain jurisdiction to resolve problems that may arise from the implementation of the award.

I. B. Helburn, Arbitrator

Austin, Texas
August 29, 2005

15

Regular Arbitration Panel

FEB − 1 2005

| | |
|---|---|
| In the Matter of the Arbitration | ) |
| | ) |
| between | ) |
| | ) |
| United States Postal Service | ) |
| | ) |
| and | ) |
| | ) |
| National Association of Letter Carriers, AFL-CIO | ) |

Grievant: M. Austin

Post Office: Birmingham, AL

USPS Case No: H01N-4H-C 04185794

NALC Case No. 530041503

Before: Roberta J. Bahakel, Arbitrator

Appearances:

|  |  |
|---|---|
| For the U.S. Postal Service: | Ms. Miranda Jackson |
| For the Union: | Mr. Steve Vadorsky |
| Place of Hearing: | Birmingham, AL |
| Date of Hearing: | January 13, 2005 |
| Date of Award: | January 28, 2005 |
| Relevant Contract Provision: | Article 15 |
| Contract Year: | 2001 - 2006 |
| Type of Grievance: | Contract |

**Award Summary:**

The Grievant was returned to work with full back pay in a prior arbitration decision. He disputed the offset for outside work performed and claimed that he was not subject to the provisions of ELM Section 436.1. Management argued timeliness as a procedural issue. After reviewing the testimony and evidence I find that the grievance was timely filed but that it is denied on the merits.

Roberta J. Bahakel

## BACKGROUND

The Grievant, a letter carrier at the Centerpoint, Alabama station, was awarded back pay pursuant to an arbitration award in case # H01N-4H-C 02217787 where Management was found to have violated the National Agreement by failing to provide the Grievant with light duty. When the back pay was issued Management withheld $8,810.00 as an offset for the amount the Grievant earned while he was off work pursuant to ELM 436.1. The Union contends that the back pay the Grievant was awarded was not the result of an unjustified personnel action such as a suspension or removal, but was because the Grievant was not given light duty which placed him a Leave without Pay status. The Union argues that because of the Grievant's situation that he should not be subject to ELM 436.1 and should not have the $8,810.00 withheld.

Management, as a preliminary issue, raises the contention that the grievance was untimely filed. It contends that the Grievant and the Union knew when they met with Management on May 25, 2004 to sign the paperwork for the back pay to be issued that the $8,810.00 was going to be offset and that the current grievance was not filed until July 27, 2004.

The Union contends that at the meeting the Management officials did not have the authority to waive the offset and that the matter was to be referred to the accounting office in Eagan, Minnesota to see if the offset could be waived. The Union contends that the Grievant did not know until he received the check if the money had been offset and that the grievance is not untimely because he filed his grievance on this matter the next day after the check was received.

## ISSUE

1. Was the grievance timely filed?

2. If so, did Management violate Article 15 of the National Agreement and Arbitration Award # H01N-4H-C 02217787 when they withheld $8,810.00 from the back pay ordered in Arbitration Award # H01N-4H-C 02217787 ? If so, what shall the remedy be?

2

CONTRACT PROVISIONS

ARTICLE 15

GRIEVANCE AND ARBITRATION PROCEDURE

Section 2. Grievance Procedure - Steps

(a) Any employee who feels aggrieved must discuss the grievance with the grievant's immediate supervisor within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause. ...

Section 3. Grievance Procedure - General

B. The failure of the employee or the Union in Informal Step A, or the Union thereafter to meet the prescribed time limits of the Steps of this procedure, including arbitration, shall be considered as a waiver of the grievance. However, if the Employer fails to raise the issue of timeliness at Formal Step A, or at the step at which the employee or Union failed to meet the prescribed time limits, whichever is later, such objection to the processing of the grievance is waived.

EMPLOYEE AND LABOR RELATIONS MANUAL

436.1 Corrective Entitlement

An employee or former employee is entitled to receive back pay for the period during which an unjustified personnel action was in effect that terminated or reduced the basic compensation, allowances, differentials, and employee benefits that the employee normally would have earned during the period.

3

MANAGEMENT INSTRUCTION

EL - 430 -90-B

III. Overview

 A. Scope

  1. Definition of Back Pay. Back pay represents the restoration, authorized by an appropriate authority, of all or any part of pay and /or employment benefits for a period during which an unjustified or unwarranted personnel action terminated or reduced the basic compensation, allowances, differentials, and/or employment benefits which an employee normally would have earned.

DISCUSSION

  I have reviewed the testimony and evidence presented at the hearing and considered the closing arguments presented by the parties. The first issue to be addressed is that of whether the grievance was timely filed. Management contends that at the meeting on May 25, 2004 the Union was informed that the offset of the $8,810.00 would be made and that the Grievant signed the form 8039 which clearly set out that the offset would be deducted from the Grievant's back pay award. The testimony from the Union was that it had requested a waiver of the offset from the local office and was told that the officials at the local level did not have the authority to waive the offset. The Union contends through its testimony that this issue was again argued at the May 25th meeting and the Grievant was told he had to sign the Form 8039 or that a check could not be cut for his back pay but that no one at the meeting could make a decision about whether the offset could be waived. The Union contends that the Form 8039 was to be sent up to Eagan (the main accounting office) to see if the offset could be waived. It further contends that it did not know what the final outcome would be until the Grievant received his check and saw that the $8,810.00 had been cut out. It immediately filed this grievance once there was direct evidence that the money had been offset.

4

It is clear from the testimony presented at the hearing that Management told the Union that there was nothing that they could do about waiving the offset. Management believed that it was clear that there was nothing further that could be done and that the Form 8039 would be processed as submitted. The Grievant testified that he told Management that he did not want to sign the Form 8039 because he didn't believe the money should be offset, but that he was told that unless he signed the form that the request for back pay could not be processed and no check would be issued, for either the full amount of back pay or the back pay minus the offset. The testimony is clear that the Union was told that if it was not satisfied that it should file a grievance. The Union steward, Mr. Thomas, testified that he understood that the Form 8039 would be sent up and that there was a chance that a higher official would approve the waiver of the offset. He further testified that he waited to file the grievance until the Grievant received his check because until the check was received he wouldn't know whether the offset had been waived or not.

Based on the testimony and evidence presented it is my determination that the grievance was timely filed in that the discussion held when the Form 8039 was signed showed that there was an ongoing dispute about the offset and that the Union, while it was aware of the fact that the offset was on the Form 8039, had not received from the local Management officials anything that definitely showed that the offset would not be waived. The testimony showed that phone calls had been made to higher level officials by local management as late as during the meeting on May 25, 2004, but that no definitive answer was received even during that meeting. Based on the foregoing I will now address the merits of the case.

The Union alleges that there was no unwarranted or unjustified personnel action taken against the Grievant, therefore he should not be subject to the provisions of ELM Section 436.1. Management Instruction EL-430-90-8 Section III D. Definitions, found on page 69 of Joint Exhibit 2 states: " Unwarranted or Unjustified Personnel Action. Includes both personnel and pay actions (alone or in combination) as well as omission or failure to take an action or to confer a benefit." The testimony showed that the action against the Grievant was one of omission or failure to take an action. Based on the language of this section the Grievant would be considered to have been subject to an unwarranted or unjustified personnel action and would be subject to the provisions of ELM Section 436.1. As such he is due to be compensated for his

5

back pay less any outside earnings. This is what was done in this case. The Grievant is entitled to be made whole for the Postal Service's improper action. To allow him to keep the additional funds from a job that he did not hold prior to being placed on LWOP would be enriching him beyond what he would have made if the Postal Service had granted his light duty. This would more than make him whole which is the standard the parties have agreed to in their contract. Therefore the grievance is due to be denied.

## DECISION

The grievance is denied.

Done this 28th day of January, 2005.

Respectfully submitted,

Roberta J. Bahakel
Arbitrator

6

REGULAR REGIONAL ARBITRATION PANEL          DEC 1 9 2005

| | |
|---|---|
| In the Matter of the Arbitration ) | **Grievant:**   Bonita L. Toles |
| between ) | |
| ) | **Post Office:** Carol Stream, Illinois |
| United States Postal Service ) | |
| ) | **Case No:** |
| and ) | **USPS:** J98C-4J-C 99253614 |
| ) | **APWU:** CS-299-3125 |
| American Postal Workers Union ) | |

**Before:**                     **John C. FLETCHER, Arbitrator**

**Appearances:**

**For the Postal Service:**       John H. Behnke, Labor Relations Specialist
                                  Great Lakes Area
                                  Bloomingdale, Illinois 60117-3005

**For the Union:**                John R. Clark, National Business Agent
                                  Clerk Division
                                  Chicago, Illinois  60606

**Place of Hearing:**             Carol Stream, Illinois

**Date of Hearing:**              November 9, 2005

**Date of Award:**                December 7, 2005

**Relevant Contract Provisions:** Articles 5, 9, 10, 15, 19, National Agreement

**Contract Year:**                1998 - 2000

**Type of Grievance:**            Contract

## Award Summary

The grievance is arbitrable.  The grievance sustained in part and denied in part, Management misapplied ELM procedures when it disallowed back pay subsequent to February 22, 1999, a period in which Grievant had outside employment.  Management ordered to recompute Ms. Toles back pay entitlements to include that period.

*Fletcher*

**John C. FLETCHER, Arbitrator**

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

## OPINION AND AWARD
### J98C-4J-C 99253614 - CS-299-3125
### Bonita L. Toles
### Carol Stream, Illinois

### Background:

On May 26, 1998, the herein Grievant, Ms. Bonita Toles, at the time a Level 6 Accounting Technician with 20 years Postal Service employment and a discipline free record, was issued a notice of removal on a charge of being AWOL from the Northern Illinois District Accounting Department, since February 1, 1998. The grievance challenging Ms. Toles removal was heard by Arbitrator Linda DiLeone Klein on April 6, 1999. In an award dated April 19, 1999, Arbitrator Klein ordered that Ms. Toles be reinstated to Postal Service employment without loss of seniority or benefits, and that she be compensated at the straight-time rate for wage losses during the window of her removal period, less any interim earnings or benefits received.

In due course Ms. Toles was returned to service and procedures were started to compute her back pay entitlements. On June 17, 1999, Ms. Toles submitted PS Form 8038 *Employee Statement to Recover Back Pay,* to the Back Pay Coordinator handling her case. She also submitted a copy of her *Work Search Record* provided by the State of Illinois to

**USPS & APWU**
**J98C-4J-C 99253614 - CS-299-3125**
**Bonita L. Toles**
**Carol Stream, Illinois**

contemporaneously record her job search activity while receiving unemployment benefits, a handwritten list of places she sought work after her unemployment benefits had expired, as well as check stubs and statements on wages obtained from other employment during the period she was out of work from the Postal Service.

From this data, the Back Pay Coordinator compiled PS Form 8039, and disallowed entitlement for substantial periods of time in the previously agreed upon back pay period. On August 6, 1999, the Coordinator sent the 8039 to Ms. Toles with a letter, wherein it was noted, *inter alia,* that by agreement with her Supervisor it had been determined that the back pay period would be between June 27, 1998 to May 25, 1999.[1]   The Coordinator's letter also indicated that back pay was being disallowed between August 11, 1998 and January 5, 1999 on the grounds that Ms. Toles had not made a reasonable effort to find other employment during that period – contending that one contact per week, some unverifiable, was not considered to be a reasonable effort. As to the period between January 6, 1999 and February 21, 1999, that too was disallowed on the basis that two contacts during a six-week period did not constitute a reasonable effort.

---

[1]      Joint Exhibit 7.

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

Ms. Toles worked one day during the week of February 22 – 28, 1999 and was allowed back pay for that week. She also worked between April 19, 1999 and May 30, 1999 and was allowed back pay for that period as well. Back pay for the remainder of the time between February 21st and May 25th was disallowed, according to the Coordinator's letter.

Ms. Toles refused to sign the 8039,[2] and on August 13, 1999, the instant grievance was filed contending, *inter alia,* that Management had violated the Agreement by failing to process Ms. Toles back pay claim timely. The grievance was appealed to Step 3 without a decision or meeting at Step 2. At Step 3 the grievance was denied on the basis that Ms. Toles had not made a reasonable effort to find work, as identified in ELM regulations, during the periods that back pay had been disallowed by the Back Pay Coordinator.

Appeal was taken to this arbitration.

## THE ISSUE

The Union sees two issues in this matter. The first:

Is this grievance non-arbitrable on the basis that the issue of remedy was previously decided by the final, binding

---

[2]    Nonetheless, it was eventually forwarded to the Data Center for processing.

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

and otherwise unalterable decision of Arbitrator Linda DiLeone Klein in case No. J94C-4J-D 98105435

The second:

If arbitrable, did the Postal Service fail to comply with the arbitration award of Arbitrator Linda DiLeone Klein in case No. J94C-4J-D 98105435 when it refused and failed to compensate Bonita L. Toles "at the straight time rate for the time frame between the effective date of her removal and the date of her reinstatement, less an interim earnings or benefits?"

If yes, what shall the remedy be?

The Postal Service contends that the only issue here is whether it violated the terms of the National Agreement by delaying the processing of Ms. Toles' back pay claim.  It notes that that was the issue stated in the Step 3 denial *as the issue involved in the grievance* and that the Union had an opportunity to "rebut" the matter, but did not do so, as they have done on numerous other occasions in the past when the issue framed by its designee at Step 3 was disputed by the Union's designee.

The Service also challenges the expansion of the Union's issue before the Arbitrator to one of non-arbitrability.

## THE POSITON OF THE PARTIES

### The Position of the Union:

The Union first argues that this grievance is non-arbitrable because the issue of the remedy was specifically provided by Arbitrator Klein, who

**USPS & APWU**
J98C-4J-C 99253614 - CS-299-3125
**Bonita L. Toles**
**Carol Stream, Illinois**

ordered back pay for the period Ms. Toles was out of work, however the Service has not provided this back pay, therefore it is in violation of Arbitrator Klein's award. Citing the *Steelworkers Trilogy*,[3] the Union asserts that it is well decided that Arbitrator Klein's award is not reviewable or alterable by the employer, the Union, the courts, and/or the Arbitrator, *for that matter*. And, Arbitrator Klein directed the Postal Service to pay Ms. Toles for all straight time hours between June 27, 1998 and May 25, 1999, less interim earnings and unemployment compensation [totaling $11,581.00] that was received during her out-of-service period. As a final and binding award, Management had only one option, the Union asserts, and that was to pay the back pay as ordered by Arbitrator Klein.

The Union next argues that Ms. Toles was never provided with clarification or guidance on what was expected with regard to "reasonable efforts to obtain outside employment", while in a dismissed status, in order that she be eligible for back pay. Accordingly, Management is not privileged to now impose unreasonable standards of job-hunting upon Ms. Toles. But, in any event, Ms. Toles did make a reasonable effort, and documentation of her attempts to secure other employment was provided

---

[3]    *Steelworkers v. American Mfg. Co.* 363 US 564 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.* 363 US 574 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.* 363 US 593 (1960)

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

the Coordinator. Nonetheless, Arbitrator Klein did not order compensation on the basis that Ms. Toles make a reasonable effort to find other employment, she fashioned a remedy that ignored this requirement, a remedy that ignored other normal entitlements, i.e., lost overtime opportunities, etc.

Finally, in this matter the Union asserts that Management is misapplying Part 436.25 of the ELM. That section of the ELM pertains to situations in which the employee obtained *no* outside employment. In this matter Ms. Toles did obtain employment. Therefore, she is privileged to be credited with back pay for the entire period, less outside earnings, the Union says.

In support of its several arguments the Union cited the following arbitration decisions:

| | | |
|---|---|---|
| C4C-4M-D 33178 | Cohen | October 22, 1987 |
| N4C-1A-C 9658 | Dennis | November 20, 1990 |
| A90T-1A-D 96036790 | Cannavo | May 5, 1999 |
| A94C-4A-C 97014816 | Cannavo | July 14, 1999 |
| A94C-4A-C 96085592 | Gudenberg | November 22, 1999 |
| H98C-1H-C01038164 | Byers | December 29, 1001 |
| A90C-1A-C 95062920 | Harris | September 15, 2002 |
| A00C=4A-02144243 | Thomas | November 21, 2003 |
| A00C-4A-C 03002522 | Harris | June 22, 2004 |
| A00C-4A-C 04024435 | Thomas | July 16, 2004 |
| B00T-1B-C 04031672 | Gudenberg | August 26, 2005 |

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

### The Position of the Postal Service:

Management notes that on receipt of Arbitrator Klein's award it immediately began processing Ms. Toles back pay entitlements. If there was any delay in processing her back pay entitlement, Ms. Toles was the one responsible, as for example, first she provided the Agency with the wrong information and then she refused to sign PS Form 8039.

With regard to the periods in which back pay was disallowed, the data that she supplied disclosed that during the first six months of the back pay period Ms. Toles only attempted on contact per week. And, during the remainder of the back pay period Ms. Toles only made two contacts in a six-week period. These efforts fall well short of any standard of "reasonable effort" the Service asserts. On the allegation that Ms. Toles was not informed of the requirements to make a reasonable effort to acquire employment, the Service points out that mention was made in her notice of removal as well as the letter advising her of the effective date of her removal. Moreover, Ms. Toles was given a copy of Part 436 of the ELM on June 22, 1998, where these requirements are contained.

In response to the Union's argument that Ms. Toles was only expected to look for accounting jobs, the Service notes that she is not an accountant, and her duties, before her removal, involved mainly general

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

clerical record keeping and data entry work. Thus, any alibi that there was not work within her field cannot be credited.

The Service contends that the Union's arguments on non-arbitrability cannot be entertained as they were never advanced at the steps of the grievance procedure. But, in any event, the remedy provided by Arbitrator Klein in the initial personnel action must be compatible with the requirements of the Agreement and the ELM. These clearly establish the right of the Postal Service to require that employees awaiting final action on removals make a reasonable effort to secure other employment, and if they do not the Service is privileged to adjust *downward* back pay entitlements accordingly.

In support of its several arguments the Service cited the following arbitration decisions:

| | | |
|---|---|---|
| N4C -1V-C 41723 | Bello | July 9, 1990 |
| N7C-1A-C 20514 | Talmadge | May 8, 1992 |
| A90M-1A-C 92021244 | Carey | September 8, 1993 |
| J90C-4J-C 94022208 | Dworkin | August 16, 1996 |
| B94M01B-C 98008085 | Nolden | January 7, 1999 |
| A94N-4A-C 98098659 | Gudenberg | April 7, 1999 |
| A96N-4A-C 9810543 | Devine | September 20, 1999 |
| B90M-4B-C 96043639 | Liebowitz | November 23, 1999 |
| A98M-1A-C 01117202 | Cannavo | June 22, 2002 |
| D98C-4D-C 00156213 | Plant | February 16, 2003 |
| A00T-1A-C 02225914 | Thomas | September 15, 2003 |
| I94N-4I-D 9915580 | Suardi | February 4, 2000 |

**USPS & APWU**
**J98C-4J-C 99253614 - CS-299-3125**
**Bonita L. Toles**
**Carol Stream, Illinois**

## DISCUSSION

Even though it appears that it was not discussed at the steps of the grievance procedure preceding invocation of arbitration on this matter, we will first address the Union's argument that Arbitrator Klein's award restoring Ms. Toles to Postal Service employment with back pay and benefits is not subject to review in any forum – including this arbitration, therefore the Postal Service *must* now pay Ms. Toles for all straight time hours she would have worked between June 27, 1998 and May 25, 1999, (less earnings from other employment and State unemployment benefits received).

Valid or not, the Union's Argument is "boot-strapped" on the issue of substantive arbitrability – Arbitrator Klein's award is final and binding, the Union insists, she fashioned a remedy, and that remedy is not reviewable so long as it comports to the teachings of the United States Supreme Court in the *Steelworkers Trilogy*. It is well accepted, in all areas of labor arbitration, that substantive arbitrability, unlike procedural arbitrability,[4] may be raised at any time *by either party*. In the Postal Service, procedural arbitrability might concern a matter of a belated filing of a grievance. The

---

[4]     Procedural arbitrability issues usually concern settled matters, moot issues, or failures to comply with the grievance processing requirements of the parties' collective bargaining agreement.

APWU – USPS National Agreement, for example, requires that timeliness issues must be raised and preserved at one of the grievance steps contained in Article 15.   This is not true with regard to substantive arbitrability as that matter goes to the core of arbitrability itself.  It concerns jurisdiction, and if the Arbitrator does not have jurisdiction to hear the matter that issue can be raised at any time.

But, even so, the Union will not prevail on its arbitrability challenge. To draw its essence from the agreement, Arbitrator Klein's remedy must be founded in the Agreement *and the parties' practices there under.*   The parties' practice under the National Agreement, with regard to back pay awards, incorporates Part 436 of the ELM, which in substance requires, *inter alia,* that employees must make a reasonable effort to secure other employment while awaiting a *final* determination on their removal and if they do not, the employer is privileged to withhold back pay for any periods where such reasonable effort was not demonstrably exerted.  Accordingly, it must be assumed that Arbitrator Klein's award was in harmony with the Agreement and practice of the parties.[5]  She had as an exhibit the removal notice that was provided Ms. Toles.  That removal notice, also in evidence before this Arbitrator, contained the following paragraph:

---

[5]      If an award does not draw its essence from the Agreement and practices of the parties, it may well be successfully challenged on that basis.

**USPS & APWU**
J98C-4J-C 99253614 - CS-299-3125
**Bonita L. Toles**
**Carol Stream, Illinois**

If this action is reversed or modified on appeal, back pay may be allowed unless the appropriate award or decision specifies otherwise, <u>only if you have made reasonable efforts to obtain alternate employment during the potential back period</u>. The documentation which you must maintain and present to support a back pay claim is described in Part 436 of the *Employee and Labor Relations Manual*. (Underlining in the original.)

Arbitrator Klein's award provided:

The grievant shall be reinstated without loss of seniority or benefits. The grievant shall be compensated at the straight time rate for the time frame between the effective date of her removal and the date of her reinstatement, less any interim earnings and benefits.

"Less any interim earnings", fairly read, can only reference actual interim earnings received *as well as potential earnings that would have resulted from reasonable efforts to obtain employment during potential back pay periods*, otherwise it would fail to be in harmony with the Agreement and the parties practices thereunder. Accordingly, the Union's arbitrability challenge is rejected.

The next matter to be resolved is what is the *actual* issue now before the instant Arbitrator? From the arguments of the Advocates, documents in evidence and testimony of witnesses, the Arbitrator concludes that the *actual* issue in this matter is:

Was Management privileged to withhold back pay from Ms. Toles for the periods that it did, as reflected on the Form 8039 and the Coordinator's letter dated August 6, 1999?

If not what shall the remedy be?

But, before dealing with this issue, it is necessary to address the argument of the Union that Ms. Toles was not adequately informed of her obligation to exert a reasonable effort to seek employment while she was out of work and what documentation was necessary to establish her efforts in this area. Ms. Toles was notified in her removal notice of the ELM requirements in this regard. She was. according to the evidence in this record, also given this information at her "exit" interview.    Accordingly, the Arbitrator is not persuaded that she was so uninformed of the Postal Service's expectations in this area that she should be excused from compliance with the obligation to make a reasonable effort to secure other employment.

With regard to the merits of the matter, because of Step 4 settlemetns, certain ELM provisions, Ms. Toles State unemployment benefit period, as well as her job search activity, Grievant's back pay period – June 17, 1998 through May 25, 1999 – needs to be looked at in four separate segments; (1) the first 45 days; (2) the period when Ms. Toles drew State unemployment benefits, June 30, 1998 and January 5, 1999 (less the first 45 days of her removal period); (3) the period between January 6 and February 22, 1999; and (4) the period between February 22 to May 30, 1999 when Ms. Toles in the employee of Paige Companies, a temporary employment agency.

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

By agreement of the parties at the National Level employees are provided *per se* back pay for the first 45 days after they have been removed.[6]  Thus, Ms. Toles is entitled to back pay at the straight time rate for hours she would have worked during this period – (Segment 1) – less any unemployment benefits applicable to that period.

With regard to Segment 2, Ms. Toles submitted an Illinois *Work Search Record* form, indicating job search attempts she made while drawing unemployment benefits that indicated that each Monday during this period she made a single effort (mostly by telephone or fax) to seek work.  In disallowing back pay for this period, the Service's Back Pay Coordinator indicated that one contact per week was not considered to be a reasonable effort and that at least one of the firms *allegedly* contacted during this time had no record of Ms. Toles contacting them.  The Arbitrator agrees, one contact per week, undertaken in what manifestly appears to be a *pro forma* manner, is not fairly considered a reasonable effort to obtain other employment.  It appears to this Arbitrator that Ms. Toles completion of the *Work Search Record* form, each and every Monday, was actually done to provide a paper trail to maintain entitlement for State unemployment benefits as opposed to a *reasonable* search for work to be eligible for back pay from the Postal Service, if she prevailed in arbitration.  Accordingly, Ms. Toles is not entitled to any back pay for the period between the end of the first 45 days and January 5, 1999 – (Segment 2).  Her unemployment benefits for

---

[6]      H7C-NA-C 77 (April 19, 1990)

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

this period, however, cannot be used to offset back pay entitlements for other periods.

In the third breakdown period – January 6, 1999 through February 21, 1999, Ms. Toles indicates that she only made two "contacts" for employment. The Coordinator disallowed back pay for this period. By any measure, the Arbitrator concludes that a mere two attempts to get work in this six-week window was not exerting a reasonable effort. Accordingly, Ms. Toles is not entitled to any back pay for this period, as well.

In the fourth breakdown segment, Ms. Toles had employment. On February 25, 1999, Ms. Toles began employment with Paige Companies, a temporary help agency. Ms. Toles worked 8 hours on that day, but was not provided with work again by Paige until April 19, 1999. The Coordinator credited Ms. Toles with making a reasonable effort to find employment during the Postal Service Work Week between February 22 – 28, 1999, but disqualified her for back pay for the period between February 29, 1999 and April 19, 1999, on the basis that she did not make a reasonable effort to secure employment during that time.

This denial of back pay for this period, the Arbitrator believes, is a mistake, and not in harmony with the ELM 436. When Ms. Toles commenced working for Paige Companies, applicable "ground rules" changed concerning reasonable efforts to find employment and the requirement to provide documentation

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

supporting these efforts. The nature of the employee – employer relationship in a temporary help agency is that the employee is subject to placement with a client firm whenever an order for an employee with their qualifications is received by the agency. In this period, Ms. Toles had a job, albeit a job that was not producing work for extended periods of time. She was associated with Paige Companies, and there is no showing, no allegation, that she wasn't available for any and all work they had available for her during this period.

Under ELM 436.425, entitlement to back pay in this period was denied because the Coordinator considered as insufficient documentation that Ms. Toles submitted concerning efforts to find employment. because "one contact in an almost 2 month period [was] not a reasonable effort." ELM 436.425 reads:

> Where the original action resulted in separation or indefinite suspension and *no outside employment* was obtained, employees must furnish the following: (Emphasis added.)

> c.    If the back pay period is more than 6 months, employees must provide documentation in support of their efforts to secure other employment for all parts of the back pay period which exceed the first 45 days.

The segment between February 25, 1999 through May 25, 1999 was a period in which "outside employment" was obtained by Ms. Toles. Thus, it seems that Part 436.425, with all of its sub-parts, would not be applicable to this segment at all. Accordingly, it was a violation of the Agreement to deny back pay to Ms. Toles

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

during this period. We will order that Ms. Toles now be paid for the straight time hours she would have worked in this period

The Union has submitted a copy of a back pay check that was issued to Ms. Toles on May 11, 2000.[7] It expresses mystification over the calculation methodology followed in arriving at the gross amount of the remittance. The Arbitrator, after careful study of the record and the check, *believes* that the check represents payment of back pay for the first 45 days of the out of work period, payment for the pay lost during the week of February 22 – February 28, 1999, and pay, and pay for the period commencing April 19, 1999 through the end of the agreed upon back pay period – May 25, 1999, less unemployment compensation received during the first 45 days. Nonetheless, an adequate explanation of the check is warranted, and it should be provided to Ms. Toles and the Union.

---

[7]     Joint Exhibit 14.

USPS & APWU
J98C-4J-C 99253614 - CS-299-3125
Bonita L. Toles
Carol Stream, Illinois

## A W A R D

The actual issue involved in this matter:

Was Management privileged to withhold back pay from Ms. Toles for the periods that it did, as reflected on the Form 8039 and the Coordinator's letter dated August 6, 1999?

If not what shall the remedy be?

Is sustained in part and denied in part. As noted above Management was privileged to withhold back pay from Ms. Toles for segments two and three, but was not privileged to withhold back pay for segment four. Accordingly Management is ordered to now recompute Ms. Toles back pay to include the hours she would have worked in this period.

_____
John C. Fletcher, Arbitrator

Poplar Grove, Illinois – December 7, 2005

REGULAR ARBITRATION PANEL

---

| | |
|---|---|
| In the Matter of the Arbitration | ) CASE NO: C98C-4C-C 0274532 |
| | ) |
| between | ) LOCAL UNION NO: KAL01259 |
| | ) |
| THE UNITED STATES POSTAL SERVICE | ) GRIEVANT: Marc Rigel |
| | ) |
| and | ) |
| | ) POST OFFICE: Harrisburg. PA |
| THE AMERICAN POSTAL WORKERS UNION | ) |
| AFL-CIO | ) |

---

BEFORE:  Lawrence R. Loeb, Arbitrator

APPEARANCES:

On Behalf of the Postal Service:                 Catherine Shade
                                                 Labor Relations Specialist

On Behalf of the Union:                          Jeff Kehlert
                                                 National Business Agent

Place of Hearing:                                Harrisburg, PA

Dates of Hearing:                                January 25, 2006

Record Closed                                    February 4, 2006

Contract Provision:                              Article s 15 and 19

Date of Decision:                                March 31, 2006

Decision:                                        The grievance is sustained in part
                                                 and denied in part.

## SYNOPSIS

The Employer's failure to turn over certain information the Union requested barred Management from offering those documents at the trial or eliciting any testimony regarding their contents. The Postal Service had a right to set off the amounts the grievant earned while he was off work in spite of the fact that it failed to include the language from the ELM advising him that he had an obligation to mitigate his damages by seeking outside employment.

## I. STATEMENT OF FACTS

The present dispute originated on August 12, 1998 when the Employer issued a notice of removal to the Grievant advising him that he would be terminated on October 5th of that year for reasons that have no relevance to the present dispute. After reciting the basis for the Grievant's termination the letter closed by advising him that he had a right to file a grievance within 14 days to protest his discharge. The letter however, failed to advise the Grievant that:

> Pursuant to Employee and Labor Relations Manual, Part 436, Back Pay (copy enclosed), if the pay period is more than 45 days, but less than 6 months, you must provide a statement certifying the reason why outside employment was not obtained for all parts of the back pay period exceeding the first 45 days. If the back pay period was more than 6 months you must provide documentation in support of your effort to secure other employment for all parts of the back pay period exceeding the first 45 days. Therefore, you should maintain documented evidence of the following:
>
> 1. Date of contact;
> 2. Business name, address, and telephone number;
> 3. Name and position of the person you contacted;
> 4. Whether of not you completed an application for employment;
> 5. If your were not hired, the reason (if you know).
>
> Failure to make diligent efforts to secure outside employment or failure to document your efforts could result in your being denied back pay should you be the prevailing party in this appeal.

The language grew out of a 1989 Step 4 settlement which also included the following provision:

> Notice of the employee's duty and responsibility under Section 436 of the ELM to mitigate damages will be included in letters of removal and letters of indefinite suspension beginning July 15, 1989.

The Union initiated a timely grievance challenging the removal, but was unable to convince Management to rescind the action with the result that is proceeded to trial before Arbitrator Fred Blackwell over three days in August and September of 1999. The following month

2

Arbitrator Blackwell issued his decision in which he concluded that the Service had just cause to discipline the Grievant, but also found that there were factors that mitigated against his removal and reduced the discharge to a 60 calender day suspension. There is nothing in Arbitrator Blackwell's award to suggest that the Union took issue with the form of the notice of removal or mentioned the missing language when it protested the Grievant's removal.

Five days after receiving Arbitrator Blackwell's award Management sent the Grievant a certified letter advising him that he was to return to duty on Saturday October 30, 1999 at which time he was to resume his normal work hours and layoff days. The Grievant, however, did not immediatelypick up the letter and so did not return to work until October 31st.

At some point he completed PS Form 8038, Employee Statement To Recover Back Pay, which asked the Grievant to complete a series of questions designed to provide the Management with the information it needed to calculate the amount of back pay to which he was entitled. According to the form, that covered the period from December 4, 1988 through October 29, 1999. The Grievant answered all of the questions, advising the Service that he had received $10,183.20 in gross compensation from the local union. The sum represented monies earned from employment that began after his termination and at times that he normally would not have been working for the Postal Service. In addition, he noted that he had collected $5,742.00 in unemployment compensation covering the period from December 12, 1998 through April 10, 1999. The Employer deducted those sums from what Management calculated the Grievant's would have earned, including overtime, over the period that he was off work. It then subtracted the amounts that would have been deducted from the Grievant's pay for taxes, FICA, Medicare and Union dues; forwarding a check to the Grievant on August 22, 2000 in the amount of $10,348.72. The Grievant endorsed the check and deposited it into his account. For the Employer, that was the end if the matter.  Instead, it proved to merely be the first step in a series of events which ultimately brought this matter to arbitration.

The reason the issue refused to die was that the Grievant was upset about the amount that he was paid, believing that the Service owed him significantly more moneys than it had tendered to him. The parties, however, were unable to immediately deal with the issue and it was not until almost June 6, 2001 that the Union finally met with Management to initiate a

3

grievance in which, according to the Postal Service's Step 1 Grievance Summary, the steward argued that the Grievant had not been paid for hearing dates, holidays, or moneys lost while working for the Union. The Union's representative had a different view of the meeting as evidenced by the Step 1 Grievance Summary the stewart completed. That from indicates that the stewart complained that the Grievant had not been paid for October 29th and 30th or November 1st, 1999 and that he had not received his $125.00 clothing allowance in 1998 nor was he paid for the time that he attended the hearing before Arbitrator Blackwell; the Union maintaining that the Grievant should have either been paid out of schedule premium or penalty overtime for those days. In addition, the Union complained that the Service failed to take into account lost interest on the Grievant's TSP account. Of greater significance, it argued that when Management calculated the Grievant's earnings from the Union it charged him with $10,183.00 instead of $5,234.20. Not mentioned in Management's summary of the Step 1 meeting but which does appear on the Union's summary and what would come to play a pivotal role in this grievance was the assertion that because the letter of removal did not mention that the Grievant had to make an effort to mitigate his damages by working during the period he was off work the Service had no right to deduct and moneys from his check.

Sometime before the steward meet with Management the Grievant had supplied the Union with a letter outlining in detail every one of the claims that the Union would eventually make on his behalf. Attached to the Step 1 Grievance Summary, the letter included the Grievant's belief that he should have only been charged with half the amount that he earned while working for the Union since he worked hours other than his regularly scheduled shift at the Post Office.

Neither the Grievant's calculations nor whatever the steward actually said at the Step 1 meeting was insufficient for persuade Management to alter it's position or to pay the Grievant one cent more than he had already received. The result was that on June 22, 2001 the Union turned in a request for information seeking copies of all of the paper work submitted for the back pay award that were tendered to the Grievant as well as the methodology used to calculate the over time entitlements that went into the back pay award. Although the Service had those

documents it never turned them over to the Union. That did not stop the President of the Local

Union from appealing the grievance to Step 2 at which time she complained:

> The calculation utilized by the USPS provided inadequate back pay amounts.
> 1) Management failed to state mandatory mitigation language on the
> NOR therefore they are prohibited from mitigating any of these amounts off of
> the back pay.
> 2) Management utilized improper methodology, not in compliance with
> the ELM, to calculate overtime.
> 3) The grievant, on attached sheets has itemized additional errors in the
> back pay amount.
>
> Requested information remains pending and therefore the Union reserves the
> right to raise evidence and arguments subsequent to receipt of such information.

The Service unfortunately never scheduled a Step 2 meeting with the result that the Union

appealed the grievance to Step 3 in early July 2001 at which time it argued that because the

Service had still not provided the information to which the Union was entitled under Articles17

and 31 Management had forfeited it's right to raise any defenses to the Union's claim that the

Grievant had not been fully compensated for the losses he suffered as a result of being

wrongfully terminated.The parties ultimately met to discuss the matter at Step 3 after which, on

October 11, 2001, the Employer denied the grievance on the grounds that:

> It is Management's position that no calculation errors were established. The
> grievant was paid properly, and accepted the calculations by accepting and
> cashing the check, which indicated that it was for the back pay award. Had the
> grievant thought the payment was erroneous, he should have returned the check
> to the Postal Service and requested recalculations at that time. No violation has
> been established.
> All requested information has been provided, if available, unless protected by
> the prevision of the Privacy Act. Additional contentions raised at the Step 3
> level if not otherwise referenced are limited to those listed on the Step 3 appeal
> form.

When the matter reached arbitration the Postal Service sought to justify its actions on the basis

of Sections 436.21 of the ELM and various provisions of the EL-430-90-2, Management

Instruction, which sets out the procedures to be followed in processing back pay claims. Article

7 of those instructions provides:

## VII. Mitigating Damages
### A. General

Employees who file successful administrative or judicial appeals challenging personnel actions involving a separation, indefinite suspension, or denial of employment are required to mitigate damages during the period necessary to adjudicate their appeal. To mitigate damages, employees are expected to earn income from new employment, and/or self-employment.

### B. Eligibility for Back Pay

1.     To be eligible for back pay during the periods in which other employment was not obtained, employees must have made a reasonable effort to secure such employment during those periods.

S

Where the Management Instructions speak to an employee's duty to mitigate his or her damages by seeking outside employment, Section 436.21 of the ELM declares that any sums which an employee earns from such outside employment must be deducted from the amount of back pay the employee would otherwise be entitled to.

Management sought to solidify its position by eliciting testimony from the Manager of Customer Services who put together the calculations that ultimately resulted in the amount that the Grievant was paid by the Postal Service. The witness testified that included in that payment was a sum that he believed adequately compensated the Grievant for lost overtime. He went on to explain that he arrived at that amount by dividing in half the number of hours the other employee on the overtime desired list worked while the Grievant was off. The witness also testified that he had paid the Grievant for certain holidays, but not for others including Christmas, New Years, Memorial Day, July 4th, and Labor Day because the station was closed on those days and the Grievant would not have worked even if he had not been removed. On the more important issue of what sums should have been subtracted from the Grievant's back pay the manager stated that he initially miscalculated the amount the Grievant should have been charged for his outside employment, apparently agreeing with the Grievant that only those sums that the Grievant earned outside of his normal working hours should have been included in that calculation. The record indicates that that conclusion was based on a misreading of the ELM that was corrected by St. Louis before it issued the check to the Grievant. As to the critical

6

question of whether he maintained back pay file as he was required to do the witness admitted that he had, but also stated that he never turned it over to the Union and could not remember seeing the request for information.

## II. POSITION OF THE UNION

It should have been a simple matter for the Employer to pay the Grievant what he was owed. After all, that only required that Management read and follow the instructions in it's own handbooks and manuals. It could not even complete that simple task. Of greater significance, it didn't do anything that it was required to do in this case, most importantly failing to include the mandatory language in the notice of removal advising the Grievant that he had a duty to mitigate his damages. This is language that is part of the ELM, a handbook Management wrote. For reasons best known to the Service it didn't include the language in the notice of removal that it handed to the Grievant in 1998. The is not, as the Service would have the Arbitrator believe, some simple mistake that he can overlook.

Instead, it is analogous to the situation that arises when Management fails to include the mandatory language from the F-1 Handbook in a letter of demand. As the Service well knows, when it fails to include that language it has no right to collect whatever sums it is claiming the employee owes. That principle has been upheld by too many arbitrators over too many years for the Service to contest it. If the language is not in the letter of demand in the exact word for word format called for in the F-1 Handbook then the Service is powerless to collect the alleged debt. The situation is no different with regard to the language in Section 436 of the ELM. Management was required to put that language in the notice of removal. It didn't, and because it didn't it cannot deduct any sums from the Grievant's back pay. Certainly, if the Grievant had not worked the Service could not claim that he was at fault because it failed to advise him that he had an obligation to go out and look for work in order to mitigate his damages. In that case, it would have to pay him the entire amount that he lost as a result of the improper attempt to terminate his employment. The Grievant should not be financially punished because he did something that he was not required to do and didn't know he had to do.

This is especially so because the Employer made a number of other fatal errors when it processed this grievance. The first was that it never provided the information to which the

Union had a right to receive under the Contract. This is not a case where Management can claim that the Union was seeking something that didn't exist or that the documents were located in some out of the way site that could not be accessed by local management or that they were in some form other than what the Union was asking for.  What the Union requested was information that was in the control of local management and had been created by the Grievant's supervisor. All the Employer had to do was to go to the supervisor, obtain his file and hand it over as it was required to do by Articles 17 and 31 for the National Agreement. Had the Service provide the information as it was required to do the Union would have had an opportunity to review it and evaluate it for accuracy and come prepared to challenge it. By not turning over those documents the Employer severely limited the Union's ability to represent the Grievant. For that reason alone this grievance must be sustained.

Coupled with that mistake was the cavalier way Management behaved during the processing of this grievance; failing to meet with the Union at Step 2 and then basically ignoring the Union's arguments at Step 3. That behavior is a flagrant violation of the full disclosures of Article 15. The Employer obviously felt that it was above those rules. It isn't. It must follow them just as the Union must. Because it didn't, the Service has no right to present any evidence or arguments in contradiction to those put forward by the Union. Whatever was said, whatever evidence Management tried to submit cannot be considered by the Arbitrator, not without doing violence to the Contact. The result of all of those mistakes is that the Grievant is entitled to be made whole which means to be paid approximately $15,000.00 to cover all of the loses he sustained because of Management's failure to adhere to the Agreement.

### III. POSITION OF THE EMPLOYER

What the Grievant is asking the Arbitrator to do is order the Postal Service to pay punitive damages in an effort to unjustly enrich himself. There can be no other way to view this matter considering that he has no claim to any monies since he was paid every penny to which he was entitled. That, obviously, is not good enough for him.  As a result, he is before the Arbitrator asking to be made whole even though he has not suffered any loss. So it is that he is claiming that he should be paid overtime as well as given a uniform allowance, both are .

ridiculous contentions. The first because the Grievant was paid overtime as he himself acknowledged in a letter he sent to the local union, a letter in which he repeated exactly what he had been told by the supervisor as to how the amount of overtime was calculated. As for the uniform allowance, the Grievant did not work so he didn't need a uniform and didn't produce any receipts to prove that he purchased one. That he would make so baseless a claim is indicative of what is really going on in this case which is that the Grievant is willing to say anything, take any position no matter how absurd in an effort to obtain more money from the Employer than he is entitled to.

That much is obvious from the Union's claim that because Management failed to advise the Grievant that he had to mitigate his damages he is not only entitled to keep all of the money he has already received, but to be paid again. The claim is absurd on it's face. It is based on the notion that somehow the situation in this case is analogous to the situation where the Service fails to include certain language from the F-1 Handbook in a letter of demand. The two situations have absolutely nothing in common, though. As the Union notes, a significant number of arbitrators have determined that the failure to include the specific language mentioned in the F-1 Handbook makes the letter of demand defective. It is for that reason that Management cannot force the employee to pay the amount that he owes. The failure to include the language from section 436 of the ELM requiring the Grievant to mitigate his damages did not make the notice of removal defective. Instead, it was nothing more than a simple oversight that did not tell the Grievant something he already knew and something the local union almost certainly told him when he went to work there. The Grievant has a responsibility to do more than just sit around the house waiting hoping that an arbitrator would reinstate him. He had an obligation to mitigate his damages by seeking and accepting suitable employment. If he didn't, he has no one to blame but himself for whatever financial ruin he suffered.

In this case the Grievant did not sit around and do nothing. Instead, he found employment with the local union. The fact that he may have been working different hours for the Union than he would have worked for the Postal Service doesn't mean that he is entitled to a set-off or that the Employer could not deduct the moneys he earned from that job from what was due him from the Postal Service. The Service did what as it had a right to do under the ELM and

Management Instructions 430-90-2. To the extent that the Employer followed the applicable handbook and manuals regarding how back pay was to be calculated it did nothing wrong. It also did not err with regard to the manner by which it calculated the amount of overtime that the Grievant was entitled to. The method the Grievant's supervisor employed to calculate the amount of overtime was based on sound principals, ones that the Grievant has really never challenged. Instead, what he really wants is to be paid for things that he's not entitled to such as the days that he attended the hearing before Arbitrator Blackwell and for the three days between when he was notified that he was to return to work and the date he actually returned. In neither case does he have a legitimate claim for any monies.

That, unfortunately, has not stopped the Grievant or the Union from pursuing this matter. The essential fact which both have overlooked is that the Grievant endorsed and deposited the check that was forwarded to him in settlement of his back pay claim. By doing so he acknowledged that he was fully compensated for any moneys he may have lost as a result of being off work after he was removed. The purpose of delivering the check to the Grievant was to make him whole; to put him back into the position that he would have been in had the removal not occurred. The check he received did that. And while the notice of removal admittedly did not contain language informing the Grievant that he had to mitigate his damages; he did. He sought and found work outside of the Post Office. Since he was not harmed by the absence of the language from the notice of removal and because he received and accepted a check that fully compensated him for the time that he was off of work, neither he nor the Union have any grounds to claim that he suffered any losses and, therefore, no basis to obtain any more money from the Employer.

**IV. DISCUSSION**

At step 3 and again at arbitration Management attempted to short circuit the grievance; arguing that because the Grievant cashed the check that had been forwarded to him he acknowledged that the amount the Service tendered was correct. From that starting point Management concludes that had the Grievant really believed that the Employer miscalculated the amount that he was owed he should have returned the check and demanded that Management recalculate the payment. It is not a new argument, at least not to anyone involved

10

in debtor/ creditor relations. For decades those who owed money have attempted to escape having to fully satisfy their obligations by sending less than the amount claimed by the creditor and then arguing that when the creditor cashed the check it accepted the payment in full satisfaction of the outstanding debt. Sometimes the claims were legitimate, often they weren't. Whether the debtor actually had a legitimate dispute with the creditor or the claim was simply a scheme to avoid payment, the mechanism by which the defense was raised was a statement on the back of the check that declared something to the effect that endorsement of the check constituted full and final payment of any and all debts owed by X to Y. While the wording may not have always been the same on every check the message was; the creditor endorsed the check at his peril. Only by returning it to the debtor could the creditor insure the integrity of his claim. The Service put no such language or anything remotely close to it on the back of the check it sent to the Grievant. Instead, it simply forwarded the draft attached to which was a stub that contained the usual information found on such documents including the gross amount paid to the Grievant and a list of the sums that were deducted from the total and the reasons for the deductions (*i.e.* federal and state taxes etc.).

Whatever the pay stub lacked in terms of specificity as to how the gross amount was arrived at was made up for by the Back Pay Decision/Settlement Worksheet, PS Form 839. A multi-page document, it was completed by the Grievant's supervisor following the rules laid out in the EL-430-90-8, Management Instruction. Those required the supervisor to first calculate the amount the Grievant would have earned at straight time had he not been removed against which he was to set-off certain categories of income the Grievant received while he was off work such as unemployment compensation and/or outside income from another job. In addition, the form provides a section to be used for the calculation of overtime. When the supervisor initially completed the form he listed the Grievant's outside income as $5,199.70 based on his understanding that the amount of back pay could only be offset by the sums the Grievant would have earned during the hours and on the days that he would have been scheduled to work at the Post Office had he not been terminated. That determination was subsequently overruled by the Minneapolis Service Center or another entity located in St. Louis, Missouri. Regardless of

which entity made the adjustment, the Grievant was aware both of the contents of the first back pay decision/settlement worksheet as well as the change imposed by the other Postal authority.

More to the point, while the form has a space for the Grievant, or any other employee in his situation, to sign the Grievant never placed his signature on any of the back pay worksheets. The absence of his signature undermines the Service's claim that by endorsing the check that was ultimately sent to him and deposited into his account the Grievant waved any errors that may have been made when Management calculated the amount of money due him and more importantly, the principles underling those calculations. There is simply no evidence beyond the Grievant's signature on the check that was sent to him that he had agreed with the amount of money that Management forwarded in settlement of his back pay claim. If he was to acknowledge that the calculations were correct the palce to do it was on the form.

The Service nonetheless maintained the Grievant's signature on the check prohibits him from challenging the amount he was payed or the method by which that sum was arrived at. If the Grievant believed there was an error then, according to Management, he should have returned the check and demanded a recalculation. It is a position which the undersigned can not endorse. While the argument is logical, it has to be viewed against the reality of the Grievant's situation which is that the amount of money that he earned from his outside employment together with what he received from unemployment compensation did not come anywhere close to equaling the sum of money that he lost as a result of the attempt to terminate him. The difference was significant as indicated by the size of a check Management sent to the Grievant. The loss of that much money had to adversely impact the Grievant's financial situation. To demand that he send the check back and then go through a prolonged period of recalculation is, in essence, to ask the Grievant to continue to court financial ruin while waiting for Management to rectify what he believed was a problem. No employee should be put into the position of having to accepting less than he believes he is due in order to minimize financial disaster that almost always follows from being out of work for a significant period of time. An employee must be able to minimize his damages as quickly as possible while still maintaining the right to demand that he be paid the correct about of money that he is due. Therefore, the Grievant had a

12

right to cash the check which the Service forwarded to him and yet continue to maintain that he was improperly paid.

The fact that it took this grievance more than four years to reach arbitration underscores the hardship an employee would face if he had to forgo payment of a back pay award because he believed that Management failed to properly credit him with all the sums that he was due or miscalculated those amounts. It would be of little solace to the Grievant or to any other similarly situated employee to ultimately be proved right if the cost was bankruptcy. Absent a clear indication that the employee knew exactly how the back pay award was calculated and agreed to the calculations before the check was issued, the Employer cannot force an employee into the position of having to chose between giving up money he believes is rightfully his in order to get some funds today. For those reasons Management cannot prevail on its claim that by signing that check that was sent to him in 1999 the Grievant waved any mistake with regard to the amount that he was owed as a result of the time he was off work or that his signature constitutes an agreement that he was paid correctly.

If the Service claimed that it owed no moneys to the Grievant on the grounds that he cashed the check that had been tendered in payment of back pay that he was owed, the Union argued for the opposite proposition; that the Service owed the Grievant approximately $15,000.00 because it was prohibited from deducting any moneys from the amount of back pay to which the Grievant was entitled as a result of the attempted termination including straight time, overtime, lost holiday pay, and uniform allowances. The argument is based on the fact that the notice of removal that was sent to the Grievant failed to include language apprising him that he had an obligation to mitigate his damages by seeking outside employment. The requirement arises, in part, out of a 1989 Step 4 settlement in which the parties agreed that the notice of an employee's duty under Section 436 of the ELM to mitigate his damages will be included in letters of removal. There is no specific language in Section 436 that explicitly declares that an employee has an obligation to mitigate his damages. Instead, the provision to which the settlement agreement was aimed, Section 436.425, implies that an individual has a duty to mitigate his damages by seeking outside employment by outlining the procedures an employee

13

must follow in order to be eligible for back pay in the event that he is reinstated after being suspended or discharged.

Those rules provide that if an employee is reinstated within 45 days he is not required to certify or provide documentation to support his efforts to secure outside employment. If the period exceeds 45 days, but less than six months the individual has to submit a statement certifying the reasons why he could not obtain outside employment after the 45th day. Should the employee by reinstated after being off work for more than six months then he is obligated to supply the Service with documents to establish the efforts he made to secure employment after the first 45 days. It is impossible to read that language without concluding that an individual has an obligation to mitigate his damages if he has been suspended or discharged by seeking outside employment and, by implication, if he doesn't or if he cannot prove that he met the standards set out in Section 436.425 of the ELM then he is not entitled to back pay. From the Union's perspective those principles have no relevance to the matter under consideration. The issue is simply whether the Postal Service inserted the required language into the notice of removal. If it didn't then it has no right to claim any set-offs against any potential back pay to which the Grievant is entitled.

To reach that conclusion the Union looks to the situation which occurs when the Postal Service fails to include the mandatory language from Section 473.1 of the F-1 Handbook in a letter of demand apprising an individual of his appeal rights. With a few notable exceptions the vast majority of arbitrators who have been faced with the issue have concluded that Section 473.1 became a part of the Contract by virtue of the language in Article 19 and, as such, deserves to be as strictly adhered to as if it was found between the covers of the National Agreement. Further, because the language in Section 473.1 appears in quotation marks it must be reprinted word for word in a letter of demand. It is not sufficient for the Service to paraphrase the language even if in so doing the employee is fully apprised of his rights. Where the Employer fails to meet that standard, where the language is not printed word for word in the letter of demand the letter is defective and the Service has no right to collect any moneys from the employee even if he is unable to show that he was somehow disadvantaged or suffered any lose because of the Employer's mistake.

Since the 1989 Step 4 settlement declared that a notice of removal must notify an employee of his duty to mitigate his damages under Section 436 of the ELM will be included in letters of removal, the Union reasons that its absence from the notice that was sent to the Grievant prohibits Management from deducting any sums the Grievant earned while he was off work from the amount of back pay that Management owes him.

The Employer threw up a number of defenses to counter that attack; the weakest of which is that the Grievant was subsequently issued a second notice of removal containing the correct language. The argument is known by the Latin "post hoc propter ergo hoc", after this therefore because of this.  In simple terms, the Service is claiming that because it inserted the language from 436 ELM into the later notice of removal it is somehow excused from failing to include it in 1998. The problems with the argument are so apparent that it need not undergo an in depth analysis to resolve the issue. It is enough to declare that the Service cannot correct a mistake two, three or four years later by advising an employee at that time what it should have told him at an earlier time.

Equally unpersuasive is the Employer's claim that the Grievant was on notice of what his obligations were because he worked for the local union which was aware that he had a duty to mitigate his damages by seeking and accepting suitable employment. It is not an illogical argument, but it is not one that can be given any weight because it is not the Union's responsibility to ascertain what their members know or don't know nor is it the Union's responsibility to monitor it's members' activities to ensure that they comply with whatever requirements may have been imposed on them by the Contract or by law. And most certainly, it is not the Union's duty to do what the Postal Service is required to do. The Union seized on that point, turning the argument back on Management by maintaining that it was the Service's responsibility, as memorialized in the 1989 Step 4 settlement, to ensure that the Grievant knew exactly what his obligations were with respect to seeking outside employment after the attempted termination. The vehicle for carrying out that mandate was the notice of removal that was supposed to contain certain language from Article 436 of the ELM. Since it didn't, the Union concludes that the Grievant was entitled to the total amount of money that he would have earned had he not been wrongfully terminated which, in practical terms, means that

Management cannot setoff any sums the Grievant might have received from any outside employment.

The argument, as noted earlier in this decision, is an extension of the one the Union has successfully raised when Management has failed to include the mandatory language from article 473.1 of the F-1 Handbook apprising an employee of his appeal rights when presented with a letter of demand. Also, as noted earlier in this discussion, the vast majority of panel arbitrators who have confronted the issue have held : (1) that the language is mandatory; (2) that it must be reproduced word for word in the letter of demand and (3) even if the employee is not disadvantaged or suffered any loss by it's absence from the letter of demand the letter is invalid and Management is prohibited because of the failure to comply with the Contract from collecting the disputed sum from the employee. The Union believes that the same principles should apply when Management fails to include language from section 436 of the ELM in a notice of removal  for the same reasons.

From the Union's perspective if there is a difference between the two situations it lies in the requirement that the language apprising an employee of his obligation to mitigate his damages by seeking and accepting suitable outside employment is grounded on a 1989 Step 4 settlement while there is no such authority underlying the F-1 handbook.  That is the only difference, one which has no impact on the outcome of this dispute because the settlement is as binding on the parties as any recognized handbook or manual. From that starting point it concludes that since the Step 4 settlement uses the mandatory "will" with regard to the Service's obligation to insert the language from Section 436 of the ELM into every notice of removal or suspension the failure to include that language requires that Management pay the employee the full amount of back pay to which he would be entitled for the entire period he was off work regardless of whether or not he mitigated his damages.

The argument breaks down for a number of reasons, not the least of which is that a number of panel arbitrators who considered similar arguments regarding the inclusion of the mandatory language from the F-1 Handbook in a letter of demand  reasoned that the Service's failure to include the language in the document invalidated it.  The Union urged the undersigned

16

to adopt that position in case number C90C-4C-D 95068551/68553. The Arbitration rejected that claim on the grounds that:

> The language should have been there. Its absence, however, doesn't void the removal because the issue of mitigation is separate and distinct from the grounds which lead to the Service's decision to discharge the Grievant. The two have nothing to do with each other. If the grievance had been sustained then the missing language would have become critical. Absent that notice the Employer could not have refused to pay the grievant all of the monies he lost even if he had not made any effort to mitigate his damages by seeking other employment.

There is no reason to disavow that conclusion. If the Union was unable to convince the Arbitrator to void the entire notice of removal because the language from the Section 436 of the ELM is missing from the document then at least it seeks to take solace from the last two sentences of that paragraph, seeing in them the same principles that it now asks the undersigned to explicitly announce. The Union is misreading that language, though.

The primary distinction between the situation that exists when Management fails to insert the required language from the F-1Handbook into a letter of demand and when it fails to include wording from Section 436 of the ELM in a notice of removal is that Section 436 does nothing more and codify years of legal and arbitral authority to the effect that an employee who has been wrongfully discharged is only entitled to recoup the back pay that he lost because of Management's actions if he made an attempt to mitigate his damages by seeking and obtaining suitable employment. In that regard the undersigned wrote in Case Number C98C-1C-C 01010328 that:

> The idea that an employee cannot lie around and do nothing, but rather has a duty to mitigate his damages by seeking employment would exist regardless of whether the Postal Service had memorialized it in Section 436 of the ELM. It is such a basic principle of arbitral law that even if the Employer does not advise an employee that he must seek employment, that is, that he must make a reasonable effort to mitigate his damages, he cannot expect to be rewarded for essentially doing nothing.

That language, although it reflects the majority of arbitral opinion on the subject as reported in Elkouri and Elkouri, How Arbitration Works, is essentially dicta because in that case the

Service had sent the grievant a copy of section 436 of the ELM. Therefore, the issue which brought this matter to arbitration was not before the Arbitrator.

That doesn't change the fact that an employee who is terminated has an obligation to mitigate his damages by seeking employment. The problem is that the Service, as it so often has done, saw fit to make that principle a portion of the Contract by adding it to a recognized manual that became part of the National Agreement through Article 19. Since the Employer took that step the words can't be ignored. They have to be given some meaning. If the Service provides the employee with the required notice and the employee fails to mitigate his damages then Management has a right to reduce his back pay accordingly. On the other hand, where the Service fails to send the required language it cannot hold the employee accountable if he does nothing. It cannot, however, be made to pay double if he does what he is supposed to do which is to seek and accept employment that he can preform.

That is what the Grievant did. To allow him to keep whatever monies that he earned outside of the hours that he normally worked for the Post Office because the Employer failed to notify him that he should have worked in order to reduce the amount of back pay to which he would be entitled if he was reinstated would elevate form over substance to an absurd extent. It also would effectively convert any payment to punitive damages. Likewise, if the Employer fails to notify the employee what he has to do in order to be eligible for back pay because it did not provide the individual with either a copy of Section 436 of the ELM or insert the operable language from that provision into the notice of removal then it cannot take the individual to task and withhold money from him on the basis that he didn't maintain the records the Service demands that he provide in order to be eligible for back pay beyond a certain point in time.

In the matter under consideration the Grievant did seek employment, going to work for the local union. This was not employment which he held prior to the time of his discharge. Therefore, Management had a right to subtract whatever wages he may have earned from that job from the amount of back pay that he would have otherwise been due.

For the Employer, that ends this discussion. For the Union it is only the end of the beginning because it argued that Management failed to provide certain information it had a right to receive pursuant to Articles 17 and 31 and failed to provide a response at Step 2 of the

grievance procedure. Together, the two mistakes, in the Union's view, prohibited the Service from offering any evidence or introducing any documents to support how it calculated the amount of back pay to which the Grievant is entitled. The undersigned can only partially support that claim.

It is difficult for the Arbitrator to understand how, at this point in time, the Employer can consistently ignore the contractual admonition that the parties that are to meet at Step 2 and at the close of the meeting provide the Union with a written explanation for the reasons it is denying the grievance. Too many arbitrators too many times have taken Management to task for failing to meet that standard and yet the Service continues to ignore the Contract and the repercussions that flow from not meeting with the Union at Step 2 or submitting a Step 2 answer. The result is that it often finds itself at arbitration fighting a rear guard action, claiming that it should be allowed to introduce whatever arguments and evidence it believes it needs to prevail because the Union should have recognized from the materials which were submitted at some point during the grievance process what arguments the Service was relying on to deny the grievance and the evidence it would introduce to support those arguments. It is, at best, a tenuous position made even more so in the present case by Management's abject failure to turn over to the materials the Union sought by way of Articles 17 and 31, materials that were necessary to determine whether the Union should have initiated a grievance in the first place. What the Union sought were the documents that would have showed how Management calculated the amount of back pay to which the Grievant was entitled including the amount of overtime that he was to be paid. They were relevant and discoverable. While the Service has no obligation to create documents for the Union or to the put materials into a specific form for the Union's use, it does have a duty under Article 17 to turn over existing materials that the Union seeks and believes it needs in order to determine whether it should initiate a grievance or to prosecute one.

In this case, the Union asked a simple question; how was the Grievant's back pay calculated. Management had the documents in its possession that would have answered that question. Instead of turning them over as it was required to do, though, it ignored the Union and then at arbitration tried to justify the mistake, and it was a mistake, on the grounds that the

Grievant understood how his back pay award was calculated. It is an argument entitled no consideration because it violates the basic principle of collective bargaining which is that it is the Union, not the individual employee who negotiates and polices the contract. Therefore, it does not matter what the Grievant knew or didn't know. The question is whether, once the Union submitted the request for information the Service complied with the terms of the Agreement and turned over the documents that it had in it's possession. The answer is that it didn't. That failure cannot be excused on the grounds that the Grievant may have had some discussion with the supervisor over how his back pay, including the amount of overtime was calculated. To support Management in this argument would effectively allow the Service to bypass the Union and the Contract and permit it to deal directly with the individual employee which is exactly the antitheses of collective bargaining. For that reason it doesn't matter what the Grievant knew or didn't know in this situation because Management withheld the relevant information from the Union in violation of the Contract.

It was a mistake compounded by the Employer's failure to meet with the Union at Step 2 or issue a written denial of the grievance as required by the Contract. If it had taken those steps it would possibly been able to argue that it raised the defense at the appropriate time. That, in turn, might have enabled it to raise the argument at arbitration and support the claim with whatever evidence was already in the record. Whatever might have been is merely a matter of speculation; an intellectual exercise of no real consequence because the Service did not take any of those steps. That is the reality with which the Service must content and it is that reality that controls the outcome of this aspect of the case. The result of the Service's missteps is that Management was barred by the operation of the full disclosure language in Article 15  and the Aaron award from claiming and proving that it properly calculated the amount of overtime pay to which the Grievant was entitled.

Having failed to turn over the documents the Service is not just prohibited from introducing them, but also from eliciting testimony from the Grievant's supervisor regarding how those calculations were arrived at. It may very well be that the supervisor did everything he was supposed to do and honestly and carefully adopted a sound and valid mechanism for calculating the amount of overtime to which the Grievant was entitled. The Service, however,

cannot be allowed to introduce that information. not without doing violence to the entire grievance procedure. If it could then it could effectively circumvent both the full disclosure provisions in Article 15, but its obligation to provide the Union with the materials it needs to pursue a grievance, an obligation memorialized in Articles 17 and 31. It doesn't matter if the proffer is made by attempting to introduce the documents themselves or by way of the supervisor's testimony, the result is the same; prohibited materials are being used when they should not be.

In the legal arena the doctrine that results in the exclusion of such materials is known by the phrase, "fruit of the poisoned tree". In simple terms it means that whatever information can be traced back to evidence that was obtained from an illegal search is barred from being used against the defendant because of the initial mistake. The evidence does not become cleansed simply because the words come from someone else's mouth. Such is the case in this matter. The supervisor cannot testify to the formula he used to calculate the Grievant's overtime because the Service failed to turn the information over as required by the Wage Agreement. To allow him to testify would effectively reward the Service's intransigence while at the same time relieve Management of the obligation of complying with Articles 17 and 31. The practical result is that the Service is not in a position to challenge the Grievant's claim for overtime. The Arbitrator is not comfortable ordering the Employer to pay an employee twice for the same work, but in this case that is what must be done. And if Management is unhappy about the result, it cannot blame the undersigned because it put itself in that position by its failure to adhere to the Contract.

The Grievant wants more than just overtime, though. He also wants to br paid for certain holidays as well as receive a uniform allowance for 1998 and to be paid for the days that he attended the hearing conducted by Arbitrator Blackwell. He also wants the three days of pay that the Employer deducted because he did not return to duty when Management notified him to report. Noe of the Union's arguments in support of those claims is persuasive. The reason they are not is that the Union failed to establish a prima facia case with regard to each claim. For example, to be eligible for holiday pay the Grievant would have had to establish that he would have worked those holidays in the past or that the individual who took over his job was assigned to work on those days. He did testify in general to working on holidays, but failed to specify

21

which ones he worked or that the station was open on those days. His inability to provide that information was fatal to his claim. Similarly, he failed to prove that he met the criteria to be eligible for a uniform allowance.

## IV. DECISION

For the foregoing reasons the grievance is sustained in part and denied in part. The Service is directed to pay the Grievant an amount equal to the full amount of overtime that was paid to the other employee at the station who performed the same work as the Grievant. This means that management must pay the Grievant an amount equal to the sums it already paid him for overtime.

_____March 31, 2006_____
Date

_____
Lawrence R. Loeb

## REGULAR ARBITRATION PANEL

SEP – 7 2004

-----------------------------------------------------x

**In the Matter of the Arbitration**

    between                         **Grievant: Troy Woods**

**UNITED STATES POSTAL SERVICE**        **Post Office: Mid Island**

    and                          **Case No.: A00V1AC03023826–PE5102**

**AMERICAN POSTAL WORKERS UNION, AFL-CIO**

------------------------------------------------------x

**BEFORE:**    **Irene Donna Thomas, Arbitrator**

**APPEARANCES:**

For the United States Postal Service: Carmine Pallidino, Labor Relations Specialist
P.O. Box 7401; Islandia, NY 11760-9401

Witnesses:    n/a

For the APWU: Joseph LaCapria, National Business Agent; 350 W. 31st Street; 2d Fl. New York, New York 10001

Witnesses:    Troy Woods, Tractor Trailer Operator, MVO
                   Phillip Elefonte, TTO / Craft Director for Motor Vehicle

Place of hearing: 160 Duryea Road, Melville, NY

Date of hearing: November 5, 2003

Date of award: April 26, 2004

Relevant Contract Articles: 8, 19, and 39, ELM

Contract Year: 1994 - 1998

### AWARD SUMMARY

The grievance is denied as untimely where the union did not appeal Grievance PE0241 to Step 2 of the grievance procedure and, thus, waived the Grievant's entitlement to premium pay for the pay periods asserted in the instant case. Moreover, the instant grievance is untimely filed where the Union knew in August 2002 that Mr. Woods complained of his entitlement to premium pay and where the last period for which the Greivant was entitled to premium pay was May 2002, but where the Union did not file a grievance until October 2002.

_____
Irene Donna Thomas, Arbitrator

## INTRODUCTION

Pursuant to the arbitration procedures between the United States Postal Service and the American Postal Workers Union, the undersigned was selected to hear and decide the dispute described herein and to render a final and binding Opinion and Award. This grievance arose when the union filed a grievance claiming that the employer violated the national agreement when it did not compensate the Grievant for hours worked in excess of sixty (60) in a service week. After the employer denied the grievance at each step of the grievance procedure, the union demanded arbitration.

The arbitration hearing was opened before this arbitrator on November 5, 2003 at 160 Duryea Road, Melville, New York at which time the parties presented sworn testimony, made arguments and submitted documents in support of their respective positions.

## ISSUE

The parties stipulated that the issue to be decided is "did the Service violate the collective bargaining agreement when the Grievant was denied compensation at an additional premium of 50 percent of his base hourly rate for hours worked beyond the 12 or 60 hour limitation from pay period 16-1998 through pay period 11-2002? If so, what should the remedy be?

## BACKGROUND OF THE CASE

The underlying facts of this grievance are not in dispute. During various (24) pay

3

periods between 16-1998 and 11-2002, the Grievant, Troy Woods, worked penalty

overtime (83.80 hours) after working hours in excess of sixty (60) in a service week[1].

The latest date that Mr. Woods worked penalty overtime was May 2002 (pay period 11-

2002). In "late summer or early fall 2002", the Grievant "learned" that he was entitled to

premium overtime pay. He went to the adjustment clerk, Cathy Crimmens, in an effort to

secure his overtime pay. That same night, Ms. Crimmens informed Mr. Woods that he

was entitled to premium pay. He then went to his immediate supervisor who was required

to sign his approval for the overtime. The supervisor refused to sign the document and

told Mr. Woods to "take it to the union". He did. Mr. Philip Elefonte, Craft Director for

Motor Vehicle, APWU, prepared a grievance for Mr. Woods. Mr. Elefonte numbered

this grievance PE0241[2]. On or about August 3, 2002, Mr. Woods presented [3] grievance

PE0241 to Andy Chiefo stating that he "and the Union have become aware that

employees are entitled to be compensated for work over 60 hours. In that grievance, the

"corrective action" requested was that the employer "pay Mr. Woods for the hours

---

[1]The parties stipulated at the hearing that the Grievant worked the time and is entitled to premium pay if the grievance is timely filed.

[2]At the arbitration hearing, management presented grievance PE0241 and moved its admission as Management Exhibit 1. The union objected to its admission. After hearing argument from both parties, I reserved a ruling on admission of this document. I now decide that this document should be admitted into evidence. It is essential because it establishes that the Grievant and the Union had notice of Mr. Woods' entitlement to premium overtime pay in August 2002.

[3]According to the testimony of Mr. Elefonte, employees are entitled to do their own Step 1 grievances. Mr. Elefonte further testified that Mr. Woods told him that he (Woods) could do his own Step 1 grievance.

4

worked over 60 hours at the additional premium of 50% the [base] hourly [straight] time rate, for all hours worked in the past and up to the present time, the Union has included the weeks being claimed by the employee." Mr. Chieffo denied the grievance as untimely. About 1.5 months later, Mr. Woods told the union about Mr. Chieffo's response and asked Mr. Elefonte to "re-do the grievance for him". On or about October 31, 2002, Mr. Elefonte filed a grievance on Mr. Woods' behalf. This grievance was numbered PE5102. This second grievance complained, too, that Mr. Woods had worked "in excess of (60) hours in a service week and has requested the Union to file for premium pay for work over (60) hours. The grievance further stated that

> Management states that the employee had failed to file for his premium pay
> within 14 days of the first incident, but filing for this premium pay is basis
> on when the employee becomes aware of money that is owed, as back pay.
> By going to the ELM employees seeking back pay can go back (6) years, to
> file a claim.

On the Form 2608 summarizing the Step 1 grievance, the employer indicated that the grievance was timely filed based upon an "incident" date of October 29, 2002. But, in the Box 18, Background, management wrote "Mr. Woods would like to get paid for all hours that he worked in excess of 60 hours at the rate of penalty overtime dating back to pay period 16 1998 to pay period 11 2002. Management's position (Box 19) was that "Grievant failed to file for his pay within 14 days of the first incident". The union

5

appealed grievance PE5102 to Step 2 of the grievance procedure.  At Step 2, the employer

denied the grievance as untimely filed at Step 1 and also denied the grievance because a

Memorandum of Understanding dated October 19, 1988[4] required a timely filed grievance

in order for an employee to be entitled to premium pay.  The union demanded arbitration.

## DISCUSSION AND ANALYSIS

Article 15.2 (Step1).a of the national agreement provides that "any employee who

feels aggrieved must discuss the grievance with the employee's immediate supervisor

within fourteen (14) days of the date on which the employee or the union first learned or

may reasonably have been expected to have learned of its cause."  Article 15.2 (Step 1).d

of the national agreement provides, in pertinent part, that the union "shall be entitled to

appeal an adverse decision to Step 2 of the grievance procedure within ten (10) days after

receipt of the supervisor's decision."  Article 15.4.B of the national agreement states that

the "failure of the employee or the Union in Step 1, of the Union thereafter to meet the

prescribed time limits of the Steps of this procedure . . . shall be considered as a waiver of

the grievance."  After careful consideration of the sworn testimony and the documentary

evidence, I conclude that this grievance should be denied.

---

[4]In pertinent part, the Memorandum of Understanding provides, "The parties agree that
with the exception of December, full-time employees are prohibited from workign more than 12
hours in a single work day or 60 hours within a service week.  IN those limited instances where
this provision is or has been violated and a timely grievance filed, full-time employees will be
compensated at an additional premium of 50 percent of the base hourly straight time rate for
those hours worked beyond the 12 or 60 hour limitation.  The employment of this remedy shall
not be construed as an agreement by the parties that the Employer may exceed the 12 and 60 hour
limitation with impunity."

Mr. Woods knew of his entitlement to premium overtime pay by August 2002.[5] He insisted upon filing his own Step 1 grievance with his immediate supervisor in an effort to obtain said pay. Although there is nothing wrong with an employee deciding to file his own grievance (indeed the national agreement contemplates such action), the employee must timely inform his union representatives about management's response at Step 1 so that an appropriate, timely appeal can be had. In this case, Mr. Woods did not timely notify the union that Chieffo had denied the grievance as untimely. He shared this information with the union about 1.5 months after he presented the grievance to Chieffo. The union, probably wisely, did not file a Step 2 appeal because it clearly would have been untimely. By not timely filing a Step 2 appeal, the grievance was waived under Article 15.4.B.

In an effort to sidestep the failure to appeal to Step 2, the union filed a second grievance, PE5102, the instant grievance, on October 31, 2002. The union again made a claim for Mr. Woods' earned premium pay. This time, the union asserted that the ELM permits an employee to go back six years to file a claim, a claim which would, in essence circumvent the 14 day contractual requirement to file a grievance. I disagree.

First, the union's attempt to file a grievance covering the same period complained

---

[5]Indeed, in its opening statement, the union asserted that the Grievant informed STO Andy Chieffo about his entitlement to premium pay in August 2002. Because the result would be the same even if it is held that the Grievant knew or should have known that he was entitled to premium pay before August 2002, this decision assumes without deciding that Mr. Woods first learned of his entitlement to premium pay in August 2002.

7

of by Mr. Woods in his grievance (PE0241) cannot be supported. The facts of this case show that the union was aware by August 2002 that Mr. Woods was contending that the employer failed to pay him premium pay. The fact that Mr. Woods insisted upon filing his Step 1 grievance does not permit the union to initiate the grievance process a second time for the same contract violation.

Moreover, Mr. Woods is not entitled to the benefit of a six year claim filing period. Section 436 of the Employee and Labor Relations Manual concerns back pay issues. Section 436.1, Corrective Entitlement, provides:

> An employee or former employee is entitled to receive back pay for the period during which an <u>unjustified or unwarranted personnel action</u> was in effect that terminated or reduced the basic compensation, allowances, differentials, and employment benefits that the employee normally would have earned during the period.
>
> For purposes of entitlement to employment benefits, the employee is considered as having rendered service for the period during which the unjustified or unwarranted personnel action was in effect.

The union relies on this language to implicitly assert that Mr. Woods is entitled to the benefit of the six year claim filing period. The issue, therefore, is whether the phrase "unjustified or unwarranted personnel action" is intended to cover such actions as failure to pay premium pay, the employer's failure, for example, to assign employees to work

8

overtime in accord with the national agreement, and other "actions" which result in a

reduction of compensation than otherwise required under the circumstances. I find that it

does not.

When section 436 is viewed as a whole, the only conclusion that can be reached is

that the "unjustified or unwarranted personnel action" is intended to refer to actions such

as suspensions, terminations and/or failure to hire claims. This is so because the

limitations to said "back pay" may be offset against any "amount that the employee

earned in a new employment or in an enlarged part-time employment to replace Postal

Service employment". Also, among other reasons, back pay may be limited where an

employee failed to make "reasonable efforts" to obtain other employment and where an

employee was not ready, willing, and able to perform the duties of the postal position.

The limitations listed in Section 436.2 simply have no relevance to an employee who was

not deprived of Postal Service employment. Also supporting this finding is section

436.42, Statements by Employee. Subsection (b) states "[w]here the original action

resulted in separation or suspension," the employee must furnish specific information.

Subsection (e) states that "[w]here the original action resulted in separation or indefinite

suspension and no outside employment was obtained for all or any part of the back pay

period" the employee must furnish certain information. Subsection (g) provides that

"[w]here the original action resulted in denial of employment with the Postal Service",

the individuals must provide particularized information. Because Mr. Woods' case does

9

not involve "back pay" within the meaning of ELM Section 436, he is not entitled to a six year period to claim his premium pay. In any event, because the terms of the regulation and the terms of the collective bargaining agreement are inconsistent, the national agreement's 14 day grievance-filing period must prevail. The fact that the instant grievance is the first one filed by the union is unavailing. As indicated, the sworn testimony shows that both the Union and the grievant were aware in August 2002 that Mr. Woods was entitled to premium pay. Accordingly,

## AWARD

**The grievance is denied as untimely where the union did not appeal Grievance PE0241 to Step 2 of the grievance procedure and, thus, waived the Grievant's entitlement to premium pay for the pay periods asserted in the instant case. Moreover, the instant grievance is untimely filed where the Union knew in August 2002 that Mr. Woods complained of his entitlement to premium pay and where the last period for which the Greivant was entitled to premium pay was May 2002, but where the Union did not file a grievance until October 2002.**

**Dated:**     **Brooklyn, New York**
               **April 26, 2004**

Irene Donna Thomas, Arbitrator

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN POSTAL WORKERS UNION,    )
  AFL-CIO,       )
       )
    Plaintiff,    )
       )
    v.    )   Civil Action No.1:08-cv-614
       )   (CKK)
UNITED STATES POSTAL SERVICE,    )
       )
    Defendant.    )

**<ins>ORDER</ins>**

Upon consideration of Defendant's Motion to Dismiss or in the Alternative Motion for

Summary Judgment, and the opposition, if any, it is

ORDERED that  Defendant's Motion is GRANTED, and it is

FURTHER ORDERED that this case is dismissed with prejudice.

Dated this _____ day of _____, 2008.


_____
COLLEEN KOLLAR-KOTELLY
United States District Judge